UNITED STATES COURT OF APPEALS

FOR THE FIRST CIRCUIT

_____

No. 26-1596

EQUAL MEANS EQUAL; HEROICA FOUNDATION;
JACQUELINE FENORE,

*Plaintiffs-Appellants,*

DONALD J. TRUMP, in his official capacity as President of the United
States; CRAIG BROWN, in his official capacity as acting director of
the SELECTIVE SERVICE SYSTEM; SELECTIVE SERVICE SYSTEM

*Defendants-Appellees*.

_____

BRIEF OF PLAINTIFFS-APPELLANTS EQUAL MEANS EQUAL/HEROICA
FOUNDATION, AND JACQUELINE FENORE

WENDY J. MURPHY

Cheryl Jacques Law Office
717 Northampton Street #72
Holyoke, MA 01040
BBO#550455
617-422-7410
wmurphy@nesl.edu

# TABLE OF CONTENTS

**CORPORATE DISCLOSURE STATEMENT** ………………….…........ii

**REASONS WHY ORAL ARGUMENT SHOULD BE HEARD** ………..……….ii

**TABLE OF AUTHORITIES** ……………………………….…………iii

**JURISDICTION STATEMENT**……………………………..….…1

**STATEMENT OF ISSUES**………………………………..…....2

**STATEMENT OF THE CASE**……………………………..…...2

**APPELLANTS**………………………………………..…....3

**SUMMARY OF ARGUMENT** ……………………………………...4

**ARGUMENT**

    **I.    THE ERA IS THE TWENTY-EIGHTH AMENDMENT BECAUSE THE REQUIEMENTS OF ARTICLE V HAVE BEEN SATISFIED** …………………………………………..5

        **a.  The ERA's Ratification Deadline is Invalid** …………………...7
        **b.  The Deadline is Invalid Because it is in the Preamble**………..10
        **c.  States Cannot Rescind Ratifications**………………….....16

    **II.   BECAUSE THE ERA IS VALID, APPELLANTS ARE ENTITLED TO STRICT SCRUTINY REVIEW**…………..……..18

    **III.  EVEN IF THE ERA IS NOT VALID, APPELLANTS ARE ENTITLED TO STRICT SCRUTINY REVIEW UNDER THE FIFTH AMENDMENT'S EQUAL PROTECTION DOCTRINE**…20

    **IV.  THE MSSA IS UNCONSTITUTIONAL UNDER STRICT SCRUTINY**……………………………..…………….26

    **V.   EQUAL MEANS EQUAL HAS ASSOCIATIONAL STANDING**…28

**CONCLUSION** ………………………………………………30

**CERTIFICATE OF COMPLIANCE**…………………………..…………31

**ADDENDUM**

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, Plaintiffs-Appellants hereby disclose that they are not a publicly held corporation, have no parent companies and no companies have a 20% or greater ownership in them.

## REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

Pursuant to Rule 34.0(a) Appellants respectfully submit that oral argument is appropriate because this case raises questions of law that bear on the constitutional legal status of half the population in America. Questions presented involve the balance of constitutional authority between the national and state governments; whether the Equal Rights Amendment is now the 28th Amendment to the U.S. Constitution; whether women finally deserve the full and equal protection of all laws; and whether the Military Selective Service Act, 50 U.S.C., § 3801 et seq., unconstitutionally discriminates against women. These important issues affect the integrity of American democracy and are rarely presented to federal appellate courts. Oral argument is appropriate because it will enable the Court to engage in a robust discussion of legal controversies that deserve the fullest consideration.

## Table of Authorities

### Cases

*Ableman v. Booth*,
62 U.S. 514 (1859)……………………………………………………………21

*Ableman v. Booth*,
11 Wis. 501 (1859)……………………………………………………………21

*Block v. Board of School Lands*,
461 U.S. 273 (1983)…………………………..…………………………...12

*Briggs v. Elliott*,
91 F. Supp. 529 (E.D.S.C. 1951) …………………………………………..26

*Brown v. Board of Education*,
347 U.S. 483 (1954)…………………………………………………26, 27

*Brzonkala v. Virginia Polytechnic Institute and State University*,
132 F.3d 949 (4th Cir. 1997) …………….…………………………....23

*Coleman v. Miller*,
307 U.S. 433 (1939)…………………………………………………..4, 7, 17

*Craig v. Boren*,
429 U.S. 190 (1976)…………………………………………………….24-25

*Dillon v. Gloss,*
256 U.S. 368 (1921)……………………………………………………*passim*

*Dobbs v. Jackson Women's Health*,
597 U.S. ___ (2022)…………………………………………….6, 8, 27

*Draper v. Healey*,
827 F.3d 1 (1ˢᵗ Cir 2016)……………………………………….…..29

*Elizabeth Cady Stanton Tr. V. Neronha*,
No. 22-cv-00245-MSM (D.R.I.)……………………… ………...…...10

*ex. rel. Ashcroft v. Fulton,*
    642 S.W. 2d 617 (Mo. 1982)………………………………………………….12

*Frontiero v. Richardson,*
    411 U.S. 677 (1973)………………………………………………...*passim*

*Garcia-Catalan v. U.S.,*
    734 F.3d 100 (1st Cir. 2013)……………………………………….…..1

*Garita Hotel Ltd. P'ship v. Ponce Fed. Bank, F.S.B.,*
    958 F.2d 15 (1st Cir. 1992)……………………………………………….1

*Goldberg v. Rostker,*
    509 F. Supp. 586 (E.D. Pa. 1980)………………………………………..27

*Hawke v. Smith,*
    253 U.S. 221 (1920)………………………………………………..17

*Hollingsworth v. Virginia,*
    3 U.S. (3 Dall.) 378 (1798)……………………………..………..17

*Idaho v. Freeman,*
    529 F. Supp. 1107 (D. Idaho 1982)…………………………………………16

*Illinois v. Ferriero,*
    60 F.4th 704 (D.C. Cir. 2023)………………………………………………10

*In re Booth,*
    3 Wis. 1 (1854)………………………………………………………21

*Jacobsen v. Massachusetts,*
    197 U.S. 11 (1905)………………………………………………..11

*Jefferson City v. Acker,*
    210 F.3d 1317 (11th Cir. 2000)………………………………………28

*Kerin v. Titeflex Corp.,*
    770 F.3d 978 (1st Cir 2014)………………………………….…..1

*Kyle-Labell v. Selective Service*,
    364 F. Supp. 3d 394 (D.N.J. 2019)……………………………………..27

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)…………………………………………………………..1

*Nat'l League of Cities v. Usery*,
    426 U.S. 833 (1976)…………………………………………………………..10

*N.O.W., Inc. v. Idaho*,
    459 U.S. 809 (1982)…………………………………………..………...16

*Plessy v. Ferguson*,
    163 U.S. 537 (1895)……………………………………..……..26, 27

*Plugge v. McCuen*,
    841 S.W. 2d 139 (Ark. 1992)…………………………………………….12

*Reed v. Reed*,
    404 U.S. 71 (1971)…………………………………………..………24

*Roe v. Wade*,
    410 U.S. 113 (1973)…………………………………………………6, 8

*Rostker v. Goldberg*,
    453 U.S. 57 (1981)…………………………………………..……..27, 28

*Strahan v. Coxe*,
    127 F.3d 155 (1st Cir. 1997)………………………………..…………..10

*Students for Fair Admissions v. President and Fellows of Harvard College,*
    600 U.S. 181 (2023) …………………………………………..19, 21, 22

*Students for Fair Admissions v. President and Fellows of Harvard College,*
    980 F.3d 157 (1st Cir. 2020)………………………………………..… 28

*Summers v. Earth Institute*,
    555 U.S. 488 (2009)……………………………………..…..29

*Thurman v. City of Torrington,*
595 F. Supp. 1521 (D. Conn. 1984)……………………………………….…..18

*U.S. ex rel. Hutcheson v. Blackstone Med., Inc.,*
647 F.3d 377 (1st Cir. 2011)……………………………….…..…..……..2

*U.S. v. DeRobertis,*
538 F. Supp. 899 (N.D. Ill. 1982)………………………….…………21

*U.S. v. Virginia,*
518 U.S. 515 (1996)……………………………………………19, 20

*Valame v. Biden,*
No. 5:2023cv03018 (N.D. Cal.)……………………………….....5, 19

*Valame v. Trump,*
157 F.4th 1172 (9th Cir.)……………………………….....………...10

*Virginia et al. v. Ferriero,*
1:20-cv-00242 (D.C. Dist. 2021)……………………...…………..10

*Warth v. Seldin,*
422 U.S. 490 (1975)…………………………………………………1

*Westminster School District v. Mendez,*
161 F.2d 774 (9th Cir. 1947)…………………………………...21

*Whren v. U.S.,*
517 U.S. 806 (1996)……………………………………...18

## Constitutional Provisions

Amend. V, United States Constitution ………………………………*passim*
Amend. X, United States Constitution………………………..………….9
Amend. XIV, United States Constitution………………………...*passim*
Amend. XV, United States Constitution………………………...………17
Amend. XVIII, United States Constitution ………………………..8, 13, 15
Amend. XIX, United States Constitution………………………...……13, 14, 17
Amend. XX, United States Constitution ………………………..……...11, 13
Amend. XXI, United States Constitution ………..………………….....13

Amend. XXII, United States Constitution …………………..………..…….....13
Amend. XXIII, United States Constitution ……………………..……...…..13
Amend. XXIV, United States Constitution ………………………..……....7
Amend. XXV, United States Constitution ……………………...………...13
Amend. XXVI, United States Constitution ……………………..……….....13
Amend. XXVII, United States Constitution…………………………..8, 9, 15, 18
Amend. XXVIII, United States Constitution………………………….....*passim*
Art. I, United States Constitution …………………………….………...9
Art. V, United States Constitution ……………………………………*passim*

## Statutes, Codes, and Resolutions

50 U.S.C., § 3801 et seq, (Military Selective Service Act)………….……*passim*

15 Stat. 706 (1868) …………………………………………………….…17

92 Stat. 3795 (1978)………………………………………………………13

S. Con. Res. 120, 102nd Congress (1991–92)…………………………….....8

H. Con. Res. 120, 102nd Congress (1991–92)……………………..……...9

H.J. Res. 25, January 31, 2023……………………………………..……6, 11

S.J. Res. Const. Amend. 0004, 100th Gen. Assemb.) ……………………...6

Nevada S.J. Res. 2, 79th Leg……………………………..……………...6

## Rules

F.R.C.P. 12(b)(1)……………………………………………………1, 3

F.R.C.P. 12(b)(6)……………………………. ………………………...1, 3

## Other Authorities

10 Cong. Rec. 6628 (1955)………………………………………………13

75 Cong. Rec. 3856 (1932)………………………………………………12

92 Stat. 3795 (1978)…………………………...…………………………...13

*Archivist Letter to Congresswoman Maloney*, October 25, 2012, available at https://www.scribd.com/ document/557659874/Ferriero-Letter-of-Oct-25-2012-to-Rep-Maloney.......................................................................................................6

Bernstein, R.B., *The Sleeper Wakes: The History and Legacy of the 27th Amendment*, 61 FORDHAM L.REV. 497 (1992)…………………………………..18

Condon, S., Scalia: *Constitution Doesn't Protect Women or Gays From Discrimination*, CBSNews.com, January 4, 2011………………….…..…...24

Cong. Globe, 40th Cong., 2d Sess. 4266 (1868)……………… …………….…..16

*Debates on Woman Suffrage Referendum*, Mass. Archives, Legis. Records, Series 1915-03…………………………………………...…………...…..22

Dellinger, W., *The Legitimacy of Constitutional Change: Rethinking the Amendment Process*, 97 HARV. L. REV. 386 (1983)…………………………12, 18

*Equal Rights Amendment Extension, Hearings on H.J. Res. 134 Before the Subcomm. On Civ. and Const. Rights of the H. Comm. On the Judiciary*, 95th Cong. 57 (1978)………………………………………………….……...11

THE FEDERALIST NO. 21……………………………………………………....12

THE FEDERALIST NO. 39……………………………………………………....12

THE FEDERALIST NO. 43……………………………………………………....12

Fishell, L.A., *Note, Reversals in the Federal Constitutional Amendment Process: Efficacy of State Ratifications of the Equal Rights Amendment*, 49 IND. L.J. 147 (1973)……………………………………………………..17

Gillibrand, K, press release, *ERA is the Law of the Land,* https://www.gillibrand. senate.gov/news/press/release/gillibrand-statement-on-president-biden-declaring-the-era-as-the-law-of-the-land/…………………………………………...……7

Hatzenbuehler, M. L., et al., *State-Level Polices and Psychiatric Morbidity in Lesbian, Gay, and Bisexual Populations*. 99 AM. J. PUBLIC HEALTH (12) 2275 (2009)……………………………………………………………….......23

Ho, J., *Finding Out What it Means to Me: The Politics of Respect and Dignity in Sexual Orientation Antidiscrimination*, 2017 UTAH L. REV. 463 (2017) ..……..22

Jameson, J., A TREATISE ON CONSTITUTIONAL CONVENTIONS, 4th ed., Riverside Press (1887)……………… …………………………….......18

Joint Judiciary Committee Report on the Equal Rights Amendment, Report No. 92-359, 92d Congress, *Equal Rights For Men And Women*, July 14, 1971..19

Kalfus, M., *Why Time Limits on the Ratification of Constitutional Amendments Violate Article V*, 66 U. CHI. L. REV. 437 (1999)……………….…………9, 12

Kinnard, M., *Biden Says the Equal Rights Amendment is the Law of the Land*, Associated Press, APNews.com, January 17, 2025…………………….......6

Krieger N., *Discrimination and Health Inequities*, 44 INT'L J. OF HEALTH SERV. 643 (2014)………………… ……………………..…………………..……23

*Letter from State Attorneys General to U.S. Congress* (February 22, 2020)……11

Murphy, W., *Krakauer's Missoula, Where Subversive Meets Verisimilitude*, 42 Journal of College and University Law, no. 2, 479-516 (2016)……………..24

Murphy, W., *Unequal Protection of the Laws For Women is Constitutional Terrorism, So How Come Nobody Knows About It?*, 50 Ohio N. U. L. R. 197-261 (2024)…………………………………...15, 25

Natelson, R., *Amending the Constitution by Convention: A More Complete View of the Founders' Plan*, Independence Institute (2010)…………..……..…17

National Archives, Milestone Documents, *14th Amendment to the U.S. Constitution: Civil Rights* (1868), https://www.archives.gov/milestone-Documents/14th-amendment...................................................................16

NATIONAL ARCHIVES AND RECORDS ADMINISTRATION: EQUAL RIGHTS AMENDMENT, LIST OF STATE RATIFICATION ACTIONS, https://www.archives.gov/files/foia/pdf/era-list-of-state-ratification-actions-03-24-2020.pdf...............................................6

National Public Radio, *Pentagon Says Women Can Now Serve in Front-Line Ground Combat Positions*, NPR.org. (Dec. 3, 2015)…………………………27

Neale, T.,  CONG. RESEARCH SERV. R42979, THE PROPOSED EQUAL RIGHTS AMENDMENT: CONTEMPORARY RATIFICATION ISSUES, 14 (2018)…….…....19

*Opinions of the Office of Legal Counsel of the Dep't of Justice*, Congressional Pay Amendment, 16 Op. O.L.C. 85 (May 13, 1992)……………….……....9

Rankin, S., *With Virginia's Ratification, ERA Fight Advances*, ASSOCIATED PRESS, (Jan. 27, 2020)……………………………………………….…………6
SENATE JUDICIARY COMMITTEE, *The Response to Rape: Detours on the Road to Equal Justice* (May 1993), https://www.ojp.gov/pdffiles1/Digitization/145360NCJRS.pdf …………………………………………………...23

*Suffolk University/USA Today Issues Poll*, October 2018, https://www.suffolk.edu/-/media/suffolk/documents/academics/research-atsuffolk/suprc/polls/national/2018/%2010_25_2018_marginals_pdftxt.pdf?la=en&hash=7303DAC9B701D7E65632FEDDF60B260C8%20983B994 …………………………………………..8

Temple, S., ERA is the Law, Says ABA, *Democrats Abroad*, August 8, 2024,https://www.democratsabroad.org/sharitemple/era_is_the_law_says_aba………………………………………………………….…6

Tribe, L., Sullivan, K., *The Equal Rights Amendment, at Long Last*, The Contrarian, January 17, 2025, https://contrarian.substack.com/p/the-equal-rights-amendment-at-long..............................................................................6

U.N. General Assembly, *In-Depth Study on All Forms of Violence against Women: Report of the Secretary General,* A/61/122/Add.1, July 6, 2006……..22

U.N. Women*, Investing in Gender Equality and Women's Empowerment* Oct. 31, 2010…………………………………………………….…22

*Violence Against Women Act*, H.R. conf. rep. no. 103–711 (1994)…………......23

Wright, D., "*An Atrocious Way to Run A Constitution*": *The Destabilizing Effects of Constitutional Amendment Rescissions*, 59 DUQUESNE L. REV. 12 (2021)…18

## JURISDICTIONAL STATEMENT

This is an appeal from a final judgment of the District Court disposing of Plaintiff's claims under Fed. R. Civ. P. 12(b)(1) and 12(b)(6). Add.1-20.[1] The District Court had jurisdiction over Plaintiff's claims under 28 U.S.C. § 1331, 1343. Final judgment was entered in the lower court on April 21, 2026. Add.21. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

An appellate court reviews the granting of a motion to dismiss *de novo*, applying the same criteria as the court below. *Garita Hotel Ltd. P'ship v. Ponce Fed. Bank, F.S.B.*, 958 F.2d 15, 17 (1st Cir. 1992).

Under Rule 12(b)(1), the court must "accept as true all well-pleaded fact[s] . . . and indulge all reasonable inferences in the plaintiff[s'] favor." *Kerin v. Titeflex Corp.*, 770 F.3d 978, 981 (1st Cir. 2014). General allegations of injury suffice as it is presumed that they embrace "specific facts … necessary to support the claim." *Warth v. Seldin,* 422 U.S. 490, 508 (1975). At the motion to dismiss stage, plaintiffs need not set forth evidence that would be required at the summary judgment stage. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Under Rule 12(b)(6) allegations need only be plausible to support a reasonable inference that the defendant is liable. *Garcia-Catalan v. U.S.*, 734 F.3d 100, 103 (1st Cir. 2013). The

---

[1] The Joint Appendix is cited "J.A. #"; the Addendum to Appellants' Brief is cited "Add. #."

court must "accept as true all well-pleaded facts," analyze them in a light "most hospitable to the plaintiff and draw all reasonable inferences for the plaintiff." *U.S. ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377, 383 (1st Cir. 2011).

## STATEMENT OF ISSUES

1. Whether the Equal Rights Amendment is now the 28th Amendment to the U.S. Constitution because it has satisfied the conditions of Article V.

2. Whether the Equal Rights Amendment's ratification deadline is invalid.

3. Whether this Court must apply a strict scrutiny standard of review under the Equal Rights Amendment.

4. Whether this Court must apply a strict scrutiny standard of review under the Equal Protection doctrine.

5. Whether the Military Selective Service Act, 50 U.S.C., § 3801 et seq, is unconstitutional because it excludes women based on their sex.

6. Whether Equal Means Equal has associational standing.

## STATEMENT OF THE CASE

This is a constitutional challenge to the Military Selective Service Act (MSSA), 50 U.S.C., § 3801 et seq., which requires "male citizens" aged 18 through 26 to register for the draft, but forbids females of any age to do the same.

Appellant Jacqueline Fenore, (Ms. Fenore), a female between the ages of 18 and 26, tried to register for Selective Service on March 25, 2026, but was rejected solely because she is female. Two female members of Appellant Equal Means Equal (EME), whose ages are between 18 and 26, tried to register for Selective Service in

March 2025 but were rejected solely because they are female. Add.3-4 Appellants then sued the government for sex discrimination, asserting claims under the Equal Rights Amendment (ERA) and the Equal Protection doctrine. Add.3

Appellee (the government) filed a Motion to Dismiss all claims under Rule 12(b)(1), arguing that none of the plaintiffs had standing. Add.3. The government also filed a Motion to Dismiss all claims under Rule 12(b)(6) on the grounds that none of the plaintiffs had stated any valid claims. Add.3.

On April 21, 2026, the District Court denied the government's 12(b)(1) motion as to Ms. Fenore. Add.12-16 and granted its motion as to EME. Add.8-11. The District Court dismissed the ERA and Fifth Amendment claims under Rule 12(b)(6).

This appeal follows.

**APPELLANTS**

I.      EQUAL MEANS EQUAL

EME is a national non-profit organization whose sole purpose is to advocate for the ERA and eradicate sex inequality. EME has over twenty-thousand supporters and members. EME's members and supporters donate funds and volunteer services, enabling EME to carry out its mission. (J.A.xx). In March, 2025, two female members of EME between ages 18 and 26 attempted to register for Selective Service, but were rejected solely because they are female. (J.A. XX).

II.    JACQUELINE FENORE

Jacqueline Fenore is a female between the ages of 18 and 26. On March 25, 2025 she attempted to register for Selective Service through the government's website. Her application was rejected solely because she is female. Add.14.

## SUMMARY OF ARGUMENT

The ERA is now the 28th Amendment because it has satisfied all the requirements of Article V. Its ratification deadline is a legal nullity because Article V nowhere authorizes Congress to impose ratification deadlines on the States.

The Supreme Court in *Dillon v. Gloss*, 256 U.S. 368 (1921) found implied authority in Article V for Congress to set deadlines, but *Dillon* is not controlling because that language is dictum. Further, allowing Congress to impose deadlines is unconstitutional because it tips the balance of Article V's amendatory powers strongly in favor of Congress, and against the authority of the States.

The Supreme Court in *Coleman v. Miller*, 307 U.S. 433 (1939) acknowledged *Dillon's* dictum about Congress having authority to set deadlines, but that language, too, is dictum. *Coleman* is otherwise inapt.[2]

---

[2] The government argued below that *Coleman* also stands for the proposition that this case raises nonjusticiable political questions, but again, *Coleman* is inapt as this case does not raise any of the political question issues addressed in *Coleman*.

Even if Congress has authority to impose deadlines, the ERA's deadline is unconstitutional because it was placed in its preamble rather than in its text. The Supreme Court has never, even in dictum, authorized Congress to place deadlines in preambles. Moreover, language in preambles is not substantively enforceable and allowing Congress to place deadlines in preambles deprives the States of their equal amendatory authority under Article V.

This Court should apply a strict scrutiny standard when reviewing the constitutionality of the MSSA under the ERA and the Fifth Amendment.

The lower court wrongly denied EME associational standing on the grounds that its members who were injured were not identified by name.

**ARGUMENT**

I.    **THE ERA IS THE TWENTY-EIGHTH AMENDMENT BECAUSE THE REQUIREMENTS OF ARTICLE V HAVE BEEN SATISFIED**

The plain and clear text of Article V is unambiguous. It states that when an amendment is proposed by two-thirds of Congress and "ratified by the legislatures of three fourths of the several states," it "shall be valid to all intents and purposes, as part of this Constitution…." U.S. CONST. art. V; *Dillon v. Gloss*, 256 U.S. 368, 376 (1921). Nothing more is required *or* permitted. Thus, under the Supreme Court's

5

jurisprudence requiring a strict reading of the Constitution's text,[3] the ERA is now valid because it was proposed by two-thirds of Congress in 1972 and ratified by three-fourths of the states on January 27, 2020.[4]

President Biden agrees that the ERA is valid, Kinnard, M., *Biden Says the Equal Rights Amendment is the Law of the Land*, Associated Press, APNews.com, January 17, 2025, as do constitutional scholars, such as Laurence Tribe and Kathleen

---

[3] For example, in *Dobbs v. Jackson Women's Health*, 597 U.S. ___ (2022), the Supreme Court required a strict textual reading of the Constitution to justify its decision to overturn *Roe v. Wade*, 410 U.S. 113 (1973), reasoning that women's previously established constitutional right to abortion must be vacated because there is no right to abortion in the text of the Constitution. The Court said that the "constitutional analysis must begin with the language of the instrument…" as "this offers a 'fixed standard' for ascertaining what our founding document means." (citations omitted). Appellants disagree strongly with *Dobbs*, but if the Constitution must be read strictly even if it means depriving half the population of a basic human right they enjoyed for decades, then this Court must also read Article V strictly and conclude that the ERA is currently valid.

[4] In 2012 the Archivist issued a letter stating that he would publish the ERA when 38 states ratified it, regardless of the deadline. *Archivist Letter to Congresswoman Maloney*, October 25, 2012, ("Once NARA receives at least 38 state ratifications of a proposed constitutional amendment, NARA publishes the Amendment along with a certification of the ratifications and it becomes part of the Constitution.") Women responded by advocating more strongly for the ERA, which led to ratifications in Nevada in 2017 (S.J. Res. 2, 79th Leg.), Illinois in 2018 (S.J. Res. Const. Amend. 0004, 100th Gen. Assemb.), and Virginia in 2020. Rankin, S., *With Virginia's Ratification, ERA Fight Advances*, ASSOCIATED PRESS (Jan. 27, 2020). The Archivist recorded these votes but later added, "ratification actions occurred after Congress's deadline expired." NATIONAL ARCHIVES AND RECORDS ADMINISTRATION: EQUAL RIGHTS AMENDMENT, LIST OF STATE RATIFICATION ACTIONS, (https://www.archives.gov/files/foia/pdf/era-list-of-state-ratification-actions-03-24-2020.pdf).

Sullivan, *The Equal Rights Amendment At Long Last*, The Contrarian, January 17, 2025, and the American Bar Association, Temple, S., *ERA is the Law*, *Says ABA*, Democrats Abroad, August 8, 2024, as well as numerous government officials, see e.g., H.J. Res. 25, January 31, 2023 (dozens of congresspeople submit "Joint Resolution" declaring the ERA valid), and Gillibrand, K., Press Release, *Statement on President Biden Declaring the ERA the Law of the Land*, January 17, 2025.

### a.    The ERA's Ratification Deadline is Invalid

Despite Article V's clear language, the Supreme Court said more than a century ago in *Dillon v. Gloss*, 256 U.S. 368 (1921) that congressional authority to impose deadlines is implied in Article V, *Dillon* at 376. This language should be disregarded as dictum as it was not necessary to the Court's adjudication of the issues

before it.[5] In fact, this language is double-dictum because the amendment at issue in

*Dillon* was ratified long before its deadline expired. *Id*.[6]

Moreover, this court should disregard *Dillon's* dictum because the Court

nowhere addressed why Congress would have failed to include in Article V specific

language empowering Congress to set deadlines. This should have been an important

factor considering that the Framers were explicit when giving Congress other

authority in Article V, such as the ability to determine the mode of ratification, U.S.

CONST. ART. V. The Framers could have added their own deadline in Article V, as

they did with Article I, § 7 where they gave the President ten days to sign or veto a

---

[5] Language in *Dillon* allowing deadlines was described as a "holding" in *Coleman, id*., at 452, but dictum cannot be converted to a holding by declaration, especially where, as here, the language in *Coleman* describing *Dillon* as a holding was itself dictum. *Coleman* asked whether the Kansas legislature could ratify an amendment after first voting against it, and whether it could do so thirteen years after congressional proposal given that the amendment had no deadline. Both questions have nothing to do with whether Congress may set deadlines. On the timeliness of ratifications, *Coleman* said (in a plurality ruling from a divided court) only that Congress has authority to determine the reasonableness of the passage of time between proposal and ratification *if an amendment has no deadline*. *Id*. at 452-54. This renders *Coleman* inapt because the ERA has a deadline, albeit an invalid one.

[6] *Dillon* also conflicts with the Supreme Court's requirement in *Dobbs, supra,* that the Constitution must be read strictly. Strictly applying the Constitution's text should be easier here compared to *Dobbs* because that the deadline language in *Dillon* and *Coleman* is mere dictum, while the language granting women abortion rights in *Roe v Wade* was a majority ruling. The public will not long respect a Supreme Court that requires strict construction of the Constitution to rescind women's fundamental rights, but not to grant them.

bill passed by Congress. U.S. CONST. ART. I, § 7. The absence of any such language indicates that Congress did not want to limit the time the States have to ratify an amendment, nor did they want to give Congress such authority.

*Dillon's* dictum should also be disregarded because it was premised on the notion that States must ratify amendments contemporaneously with congressional proposal in order to ensure national consensus.[7] *Id*. at 375. This arcane view has not withstood the test of time, which was made clear when the Archivist published the 27th Amendment in 1992,[8] and Congress voted to validate it the same year, S. Con. Res. 120–102nd Congress (1991–92); H. Con. Res. 120–102nd Congress (1991–92), despite the fact that it had been ratified some *203 years* after proposal. Government officials accepted the 27th Amendment as valid despite its disregard for *Dillon's*

---

[7] Contemporaneity does not ensure national consensus. The 18th Amendment was ratified quickly but did not reflect consensus as it was repealed a few years later. And although it took 48 years to ratify the ERA, an arguably non-contemporaneous amount of time, national polling demonstrates clear consensus in support of the ERA. *Suffolk University/USA Today Issues Poll*, October 2018 (75% were more likely to vote for a candidate that supports the ERA).

[8] The Archivist published the 27th Amendment on May 7, 1992, immediately after the last state ratified it, *before* the Office of Legal Counsel ("OLC") advised him that, "the effective date of the amendment is the date on which it was ratified by the 38th State." *Opinions of the Office of Legal Counsel of the Dep't of Justice*, Congressional Pay Amendment, 16 Op. O.L.C. 85 (May 13, 1992). This stands in stark contrast to the Archivist's refusal to publish the ERA. The Archivist apparently understood that the OLC had no authority to prevent him from publishing the ERA as he had expressed his view in 2012 that the ERA must be published when ratified by 38 states, regardless of the deadline. See, n.4.

contemporaneity requirement *and* the Court's admonition that the 27th Amendment, in 1921, was *already too old to ratify*. *Id.*, at 375 (emphasis added). Either *Dillon* is no longer good law, or the 27th Amendment is not part of the Constitution.[9]

Perhaps most importantly, the ERA's deadline is invalid because it disrupts the balance of power between Congress and the States. Maintaining a balance of authority "was of utmost concern to the framers." Kalfus, M., *Why Time Limits on the Ratification of Constitutional Amendments Violate Article V*, 66 U. CHI. L. REV. 437, 452–53 (1999). Indeed, the 10th Amendment was adopted to further protect the States from having their powers diminished by Congress. *Nat'l League of Cities v. Usery*, 426 U.S. 833, 843 (1976) (10th Amendment "declares the constitutional policy that the Congress may not exercise power in a fashion that impairs the States' integrity or their ability to function effectively, in a federal system"); *See Strahan v. Coxe*, 127 F.3d 155, 167 (1st Cir. 1997) ("… while Congress may regulate the conduct of individuals, it may not generally regulate the conduct of the States.")

Only two federal appellate courts have expressly addressed the deadline's validity, but one resolved the issue on procedural grounds, ruling only in dictum that

---

[9] That the 27th Amendment was validated despite the passage of 203 years is reason enough to invalidate the ERA's deadline because it is effectively an official declaration that the passage of time between proposal and ratification has no bearing on an amendment's validity. The Constitution's integrity could not be so unimportant that dictum in an old Supreme Court case is more weighty than the plain language of the Constitution itself.

the deadline is valid. *Illinois v. Ferriero*, 60 F.4th 704, 716-719 (D.C. Cir. 2023).[10]

The 9th Circuit also ruled that the deadline is valid, *Valame v. Trump*, 157 F.4th 1172 (9th Cir. 2025). This court is not bound to follow either circuit.

### b.    The Deadline is Invalid Because it is in the Preamble

Even if Congress may impose deadlines, the ERA's deadline is invalid because it is in the preamble rather than the text. Preambles have no force of law because they "ha[ve] never been regarded as the source of any substantive power conferred. . .." *Jacobsen v. Massachusetts*, 197 U.S. 11, 22 (1905).[11]

Moreover, language in the ERA's preamble may be disregarded because the States only have authority to ratify amendments and preambles are not part of

---

[10] The District Court in *Ferriero* also ruled that the deadline was valid, but it, too, was dictum because the case was dismissed for lack of standing. *Virginia et al. v. Ferriero*, (same case) 1:20-cv-00242 (D.C. Dist.), Doc.117, March 5, 2021. Another District Court ruled that the ERA is not valid, primarily because the Archivist did not publish it, *Valame v. Biden*, No. 5:2023cv03018 (N.D. Cal.), thus "precluding its creation." Doc.61, pp.4-6. In support of this ruling, the *Valame* court cited *Elizabeth Cady Stanton Tr. v. Neronha*, No. 22-cv-00245-MSM (D.R.I.), another district court that found the ERA to be invalid because it has not yet been published in the Constitution. *Valame* at pp.4-5. Both courts misunderstand that publication is a ministerial act that has no bearing on an amendment's validity. *Dillon,* at 376.

[11] In 2020, attorneys general from 22 States agreed that the ERA's deadline is not binding on the States. *Letter from State Attorneys General to U.S. Congress* (February 22, 2020) ("[R]ather than including … [a deadline] in the ERA's text, Congress relegated a seven-year deadline to the joint resolution that proposed the ERA ... No court has found that such an external limit is at all binding" on the States).

amendments. *See, ex. rel. Ashcroft v. Fulton*, 642 S.W. 2d 617, 619-20 (Mo. 1982) (language in preamble proposing an amendment to the Missouri Constitution was disregarded because it was not part of the amendment); *Plugge v. McCuen*, 841 S.W. 2d 139, 140-41 (Ark. 1992) ("clearly the preamble is not part of the text of the amendment"); *see also, Equal Rights Amendment Extension, Hearings on H.J. Res. 134 Before the Subcomm. On Civ. and Const. Rights of the H. Comm. On the Judiciary*, 95th Cong. 57 (1978) (states "ratify[ ] the text of the Amendment and not the preliminary language of the resolution").

Nearly a century ago, but well after *Dillon*, Congress itself raised concerns about putting a deadline in the preamble of the 20th Amendment, with some saying it would be "of no avail" as it would not be "part of the proposed constitutional amendment." 75 Cong. Rec. 3856 (1932). Congress thus placed deadlines in the text of the next three amendments.

Nothing in Article V gives Congress authority to put substantive law in an amendment's preamble. The Framers did give Congress authority to determine the "mode of ratification," but mode refers to only two things: ratification by convention or legislative act. U.S. CONST. ART. V. Determining mode is thus a *procedural* choice that *facilitates* the States' Article V rights while imposing a deadline is forbidden because it is a *substantive* act that *restricts* them. *See*, *Block v. Board of School Lands*, 461 U.S. 273, 286-90 (1983) (limitation period is substantive, not procedural,

when integral to the right in controversy). *See* Kalfus, *Time Limits*, *supra*, at 464; Dellinger, W., *The Legitimacy of Constitutional Change: Rethinking the Amendment Process*, 97 HARV. L. REV. 386, 408–09 (1983).

Depriving the States of the authority to decide for themselves whether they want their amendatory powers restricted by Congress is constitutionally intolerable as the Framers were clear that the States' amendatory powers should be *equal* to those of Congress. THE FEDERALIST NO. 43 (Alexander Hamilton) ("Article V equally enables the general and the States governments"); THE FEDERALIST NO. 39 (James Madison) (the balance struck in Article V makes the amendment process "neither wholly national nor wholly federal"); THE FEDERALIST NO. 21 (Alexander Hamilton) (strong national government could harm the autonomy of the States).

Furthermore, Congress does not deserve expanded Article V rights because it has failed to treat the amendatory process with the integrity it deserves. No deadlines were added to any amendments for the first 130 years. They appeared relatively recently with the 18th in 1917, and only a handful of times since then, without consistency. The 19th did not have one at all, and when deadlines were imposed, some were placed in the text (18th, 20th, 21st, 22nd) while others were placed in the preamble. (23rd, 24th, 25th, 26th). Not until 1960 did Congress place a deadline in a

13

preamble, claiming this would "declutter" the text, 10 Cong. Rec. 6628 (1955).[12]

Then in 1978, Congress placed a deadline in the text *and* the preamble of a proposed amendment. 92 Stat. 3795 (1978). And despite the Supreme Court's clear admonition that the 27th Amendment was too old in 1921 to ratify, Congress approved its ratification more than 70 years later, in 1992. Such cavalier treatment of the solemn amendatory process is unbefitting our nation's foundational document.

Placing deadlines in preambles also raises serious constitutional questions about the amendatory process. For example, if Congress may place deadlines in preambles, can it also say in a preamble, "two-thirds of the States must approve this preamble"? And if Congress may impose extra-textual deadlines on the States, may the States impose extra-textual deadlines on Congress when they propose an Amendment through the convention process and include a preamble requiring Congress to propose the amendment within a certain period of time?

It is also worth considering that at least some members of Congress were troubled by the ERA's deadline, and may have insisted that it be placed in a preamble in order to facilitate its defeat in future litigation. This makes sense because the ERA

---

[12] If placing a deadline in a preamble were truly about decluttering, why would Congress "clutter" the ERA's text with language about delaying the effective date of the ERA for two years after ratification? Delaying the enforcement date does not restrict States' Article V rights, yet the States were able to vote on it because it was in the text. Imposing a deadline on ratification *does* restrict the States' Article V rights, yet they were unable to vote on it because it was in the preamble.

had no deadline when it was first filed with Congress in 1923, and when it was refiled repeatedly thereafter. Women insisted that the ERA not have a deadline because knew that it had taken many decades to ratify the 19th Amendment and that it would take much longer to ratify the ERA. Nevertheless, in 1971 and 1972 when the ERA was being debated in Congress, it did not have enough votes to pass. Only after the deadline was added in 1972 did both houses of Congress vote in favor of the ERA.[13]

Women were devastated by the addition of the deadline because they knew the ERA would not be ratified in time.[14] Yet even after the deadline expired and the ERA was three states shy of the 38 States it needed for ratification, women continued to fight, knowing that the deadline's validity could be challenged in court. This view became stronger when the 27th Amendment was adopted in 1992 because it was ratified more than two centuries after congressional proposal. Women knew that this lent support to their argument that the ERA's deadline was invalid.[15]

That Congress knew what it was doing and may have wanted to place the ERA's deadline in a preamble in order to ensure its defeat is supported by

---

[13] Murphy, W., *Unequal Protection of the Laws For Women is Constitutional Terrorism, So How Come Nobody Knows About It?*, 50 Ohio N. U. L. R. 197-261, at 217 (2024).

[14] *Id.* at 199, n.14.

[15] *Id*. at 228.

contemporary constitutional scholars, such as Harvard Law School's Laurence Tribe, who recently wrote, "Congress knew by the date of [the ERA's] submission to the States, March 22, 1972, precisely how to include a shelf date in the text of the amendment, but instead included a time limit only in the advisory resolution."[16]

In addition to strong legal arguments against the deadline's validity, this Court should be mindful of the fact that if it allows Congress to impose extra-textual deadlines, it will be condoning an antidemocratic procedure that gives Congress unilateral authority to amend the Constitution. Simply put, Congress could attach short deadlines to amendments preferred by the States, in order to defeat them, and long deadlines or none at all on amendments preferred by the national government.[17] No reading of Article V supports this view. Yet, if Congress has such authority, then the States no longer have a meaningful role, much less an equal one, in the amendatory process. This is inconsistent with the nature of American Democracy.

If Congress wants the authority to place ratification deadlines in preambles, it must amend first amend Article V to give itself that authority.

---

[16] Tribe, L., Sullivan, K., *The Equal Rights Amendment at Long Last*, The Contrarian, January 17, 2025, available at, https://www.contrariannews.org/p/the-equal-rights-amendment-at-long.

[17] Short deadlines can also cause states *to* ratify, as happened with the 18th Amendment. The point is not whether short or long deadlines cause certain results; it is that deadlines allow Congress to put pressure on the States in a way that undermines their constitutional powers under Article V.

### c. States Cannot Rescind Ratifications

Several states purport to have rescinded their ERA ratifications, but those actions are legal nullities[18] because Article V does not permit rescissions and the Supreme Court has never recognized a purported rescission as valid.[19] Indeed, other amendments have been validated despite purported rescissions. The 14th was adopted when three-fourths (28) of the States ratified it, even though New Jersey and Ohio had voted to rescind. 15 Stat. 706 (1868).[20] Cong. Globe, 40th Cong., 2d Sess. 4266, 4295-96 (1868); *see Coleman*, 307 U.S. at 448–49. Rescissions of the 15th and 19th were also not accepted as valid. Fishell, L.A., *Note, Reversals in the Federal Constitutional Amendment Process: Efficacy of State Ratifications of the Equal Rights Amendment*, 49 IND. L.J. 147, 150 (1973).

That Article V permits ratification by convention rather than by legislative act further proves that rescissions are not possible. The convention process is a unique,

---

[18] In his 2012 letter explaining the legal status of the ERA, the Archivist said, "a later recission of a state's ratification is not accepted as valid." See n.4.

[19] Rescissions were recognized as valid in *Idaho v. Freeman*, 529 F. Supp. 1107, 1150 (D. Idaho 1982), a case that was appealed to the Supreme Court but later vacated as moot. *N.O.W., Inc. v. Idaho*, 459 U.S. 809 (1982).

[20] The 14th Amendment was adopted July 9, 1868, when the 28th state ratified it. National Archives, Milestone Documents, *14th Amendment to the U.S. Constitution: Civil Rights* (1868). The 28 States included New Jersey and Ohio, *after* they rescinded on March 24, 1868 and January 15, 1868, respectively. Either rescissions are invalid, or the 14th Amendment was not ratified on July 9, 1868.

17

ad hoc event during which the States ratify through specially elected delegates who need not be members of the legislature. U.S. CONST. ART. V. When the convention is done, it is adjourned, never to exist again. The convention process was included in Article V to allow for greater public participation in the amendatory process, and to avoid the problem of entrenched political interests in state legislatures. Natelson, R., *Amending the Constitution by Convention: A More Complete View of the Founders' Plan*, Independence Institute, (2010) at 6. Because conventions expire, rescissions are not possible because the Framers would not have established two modes of ratification, but silently permitted rescissions under only one.

Rescissions are also invalid because amending the Constitution is a solemn event, not ordinary lawmaking, subject to shifting political winds. *Hollingsworth v. Virginia,* 3 U.S. (3 Dall.) 378, 381 (1798); *Hawke v. Smith*, 253 U.S. 221, 229 (1920) (ratification is not an act of legislation). Scholars emphasize that ratification must be a one-way ratchet as this prevents chaos, preserves the integrity of Article V, and respects the balance of State and National powers. See Jameson, J., A TREATISE ON CONSTITUTIONAL CONVENTIONS, 629-33 (4th ed., Riverside Press 1887); Bernstein, R.B., *The Sleeper Wakes: The History and Legacy of the 27th Amendment*, 61 FORDHAM L.REV. 497, 548 (1992); Dellinger, *Constitutional Change*, *supra*, at 421-27 ("… once an amendment is ratified, the state is committed. Otherwise, think of the constitutional chaos …"); Wright, D., "*An Atrocious Way to Run A*

*Constitution": The Destabilizing Effects of Constitutional Amendment Rescissions*,

59 DUQUESNE L. REV. 12, 17 (2021).[21]

## II.    BECAUSE THE ERA IS VALID, PLAINTIFFS ARE ENTITLED TO STRICT SCRUTINY REVIEW

Equal "protection" of the laws means ensuring that all laws, policies, and programs of the government *are enforced equally*,[22] and *applied equally*,[23] on behalf of women. The ERA does this by requiring that courts apply a "strict scrutiny" standard of judicial review. *Frontiero v. Richardson*, 411 U.S. 677, 691-92 (1973) (Powell, J., concurring) (when the ERA is adopted, it will require courts to apply "the strictest test of judicial scrutiny");[24] Joint Judiciary Committee Report on the Equal Rights Amendment, Report No. 92-359, 92d Congress, *Equal Rights For Men*

---

[21] If the States may rescind ratifications, may Congress rescind proposals?

[22] *See Thurman v. City of Torrington*, 595 F. Supp. 1521, 1527 (D. Conn. 1984) ("affording [women] inadequate [police] protection . . . is subject to the Equal Protection Clause.")

[23] *Whren v. U.S.*, 517 U.S. 806, 813 (1996) (". . .constitutional basis for objecting to discriminatory application of laws is the Equal Protection Clause").

[24] ERA ratification votes slowed after *Frontiero*. perhaps because the Court gave women strict scrutiny (albeit in a plurality), which is what the ERA gives women. This relieved the states of political pressure to ratify. Neale, T., CONG. RESEARCH SERV., R42979, THE PROPOSED EQUAL RIGHTS AMENDMENT: CONTEMPORARY RATIFICATION ISSUES, 14 (2018).

*And Women*, July 14, 1971, p.4 ( "[u]nder the text of the [ERA] . . . classifying by sex [like race] would … be subject to a strict standard of scrutiny . . .").

Strict scrutiny is the only standard that affords women full equality because it tolerates almost no sex discrimination by requiring the government to prove that a classification based on sex serves a "compelling" interest; is "narrowly tailored" to serve that interest; and uses the "least restrictive means" to achieve the government's goal. *Students for Fair Admissions v. Harvard,* 600 U.S. 181, 206, 213-230 (2023) (strict scrutiny requires a compelling government interest, narrow tailoring, and proof that there are no "workable race-neutral alternatives…") Without the ERA women's Equal Protection claims are reviewed under a weak standard known as intermediate scrutiny,[25] which requires the government to show only an "important" interest, rather than a compelling one, and demonstrate a "substantial relationship" between the sex classification and the interest, rather than narrowly tailoring the classification to further the government's goal. *U.S. v. Virginia*, 518 U.S. 515, 531-34 (1996). Intermediate scrutiny also utilizes no "least restrictive means" test the way strict scrutiny does. This is a crucial aspect of strict scrutiny review because it

---

[25] See *U.S. v. Virginia*, 518 U.S. 515, 531-34 (1996). Some courts refer to intermediate scrutiny as "heightened scrutiny" but this is obviously a misnomer as it is weaker than strict scrutiny, and should be described as "lowered scrutiny."

prevents all unnecessary discrimination. Without a least restrictive means test, unnecessary discrimination is allowed.

The MSSA is plainly unconstitutional under strict scrutiny because excluding women from registering for Selective Service serves no compelling government interest. Without a compelling interest, this Court need not assess whether such exclusion satisfies the narrowly tailoring and least restrictive means tests.

III.    **EVEN IF THE ERA IS NOT VALID, WOMEN ARE ENTITLED TO STRICT SCRUTINY REVIEW UNDER THE FIFTH AMENDMENT'S EQUAL PROTECTION DOCTRINE BECAUSE INTERMEDIATE SCRUTINY IS ITSELF UNCONSTITUTIONAL**

Even if the ERA is not valid, this Court should apply strict scrutiny under the 5th Amendment's Equal Protection doctrine because intermediate scrutiny is itself unconstitutional. As noted above, it discriminates against women by requiring the government to show only an "important" interest in discriminating against women, rather than a compelling one, and unlike strict scrutiny it requires neither narrow tailoring nor proof that the government has used the least restrictive means to achieve its purpose. In short, intermediate scrutiny permits the government to treat women differently and worse in the enactment, enforcement, and interpretation of all laws and policies. Such blatant discrimination cannot stand under any legitimate interpretation of a constitutional doctrine that purports to guarantee all "persons" *Equal* Protection of the laws. *Students for Fair Admissions, Inc.*, *supra*, at 206 (the

guarantee of Equal Protection "'cannot mean one thing when applied to one individual and something else when applied to [another].'" (citation omitted).[26]

Women suffer terribly under intermediate scrutiny because their Equal Protection rights are not *equal*. As less "protected" persons they endure disproportionately high rates of violence and abuse,[27] and they suffer harm to their

---

[26] It would not be unprecedented for this court to resist applying intermediate scrutiny on the grounds that it conflicts with women's fundamental rights. *See e.g., U.S. v. DeRobertis*, 538 F. Supp. 899, 909, n. 11  (N.D. Ill. 1982) (resisting Supreme Court precedent not requiring trial court interrogation of a defendant prior to jury waiver); *Westminster School District v. Mendez*, 161 F.2d 774, 779-80 (9th Cir. 1947) (en banc) (resisting precedent permitting racially segregated schools); *In re Booth,* 3 Wis. 1 (1854) (resisting precedent permitting slavery, and though the Supreme Court then overturned *In re Booth* in *Ableman v. Booth*, 62 U.S. 514 (1859), the Wisconsin Supreme Court refused to honor the Supreme Court's writ, *Ableman v. Booth*, 11 Wis. 501 (1859)). This Court can avoid the trouble of having to resist Supreme Court precedent simply by validating the ERA because the Supreme Court has already ruled that the ERA requires strict scrutiny. *Frontiero v. Richardson*, 411 U.S. 677, 691-92 (1973).

[27] U.N. General Assembly, *In-Depth Study on All Forms of Violence against Women: Report of the Secretary General,* A/61/122/Add.1 (6 July 2006) (inequality is the root cause of violence against women); U.N. Women*, Investing in Gender Equality and Women's Empowerment* (Oct. 31, 2010).

dignity,[28] autonomy, and humanity.[29] Inequality also causes negative health

consequences.[30] Because women are unequal, they are also excluded from state hate

---

[28] Women have been stigmatized for a long time *because* they do not serve their country equally. In 1915, Massachusetts State Senator Charles Browne said, "voting is a privilege earned through civic sacrifice, such as military service, which women do not undertake." *Debates on Woman Suffrage Referendum*, Mass. Archives, Legis. Records, Series 1915-03. More recently, on July 4, 2025, a post on X said, "Frankly women don't even deserve the vote because they don't … perform military service like every male in this country. Why is it that in 2025, women don't have to sign up for the draft, but men do … and then women get to vote and decide the fate of those men? Crazy."

Some may see avoiding the draft as a benefit to women, enabled by intermediate scrutiny, but asking women to accept second-class rights across the board as the price for enjoying so-called favorable discrimination in some contexts is anti-democratic and unconscionable, which likely explains why Black people are not advocating for intermediate scrutiny despite the loss of affirmative action rights under strict scrutiny in *Students for Fair Admissions v. Harvard,* 600 U.S. 181 (2023), even though intermediate scrutiny might well permit favorable discrimination, such as affirmative action, when strict scrutiny forbids it. Under strict scrutiny, women, like Black people, would still enjoy different treatment in certain circumstances, as when their rights to privacy and safety are at risk because these are compelling government interests. But strict scrutiny would otherwise forbid unequal treatment of women for the first time in history, ensuring maximum protection for women's rights, and forbidding discriminatory government actions and inactions by all branches, state and federal, in the context of employment, protection from abuse, civil rights, reproductive rights, parental rights, etc.

[29] Ho, J., *Finding Out What it Means to Me: The Politics of Respect and Dignity in Sexual Orientation Antidiscrimination*, 2017 UTAH L. REV. 463 (2017) (discussing legal foundations of dignity, autonomy, and humanity in American law).

[30] Krieger N., *Discrimination and Health Inequities*, 44 INT'L J. OF HEALTH SERV. 643, 655, 687-88 (2014), (meta-analysis showing negative health consequences).

crime laws, a problem researchers found to be causally related to higher rates of violence.[31]

Women are further harmed by inequality when they seek redress in the courts. *Brzonkala v. Virginia Polytechnic Institute and State University*, 132 F.3d 949, 971 (4th Cir. 1997) ("… gender bias permeates the court system and … women are most often its victims"). Congress enacted the Violence Against Women Act to confront this systemic "bias and discrimination" against women. H.R. conf. rep. no. 103–711, at 385 (1994); *see generally,* SENATE JUDICIARY COMMITTEE, *The Response to Rape: Detours on the Road to Equal Justice* (May 1993). Women also suffer harm by different and worse treatment of Title IX compared to Title VI, which enables schools to address sex discrimination, including sexual assault, under weak standards, compared to assaults based on other protected class categories.[32]

The subjugation of women began even before our Constitution was adopted, but became explicit when the 14th Amendment became law in 1868. It gave Equal Protection rights to "persons," but women's Equal Protection lawsuits were

---

[31] Hatzenbuehler, M. L., et al., *State-Level Polices and Psychiatric Morbidity in Lesbian, Gay, and Bisexual Populations*. 99 AM. J. PUBLIC HEALTH (12) 2275 (2009) (higher rates of psychiatric disorders among persons in states that did not extend protections against hate crimes to them, compared to states that did).

[32] Murphy, W., *Krakauer's Missoula, Where Subversive Meets Verisimilitude*, 42 Journal of College and University Law, no. 2, 479-516, at 483-84 (2016).

unsuccessful because the Supreme Court did not recognize women as *persons* who could *assert* Equal Protection rights until *Reed v. Reed*, 404 U.S. 71, 76-77 (1971).[33]

*Reed* was an improvement over constitutional invisibility, but only barely, because it held that women's Equal Protection rights would be *unequally enforced* under a minimal standard of rational basis review, which is much weaker than strict or even intermediate scrutiny because it requires the government to show only that a discriminatory law or policy bears a "rational" relationship to a "legitimate" interest.[34] Two years after *Reed*, rational basis was elevated to the full equality standard of strict scrutiny in *Frontiero* but that status was short-lived because *Frontiero* was overturned three years later in *Craig*, which reduced women's strict scrutiny rights to intermediate scrutiny. Women remain unequal today.[35]

This Court should seize the opportunity to revisit and embrace *Frontiero*, where a plurality of the Supreme Court rightly adopted strict scrutiny for women. *Frontiero* based its decision on the nature of femaleness as a suspect class, women's long suffering because of their femaleness, and women's alignment with race as a

---

[33] Murphy, W., *Constitutional Terrorism, supra*, n.15, at 210-215.

[34] *Id.*, at 217.

[35] As Justice Antonin Scalia candidly put it, the Constitution does not *require* discrimination against women, but neither does it prohibit it. Condon, S., Scalia: *Constitution Doesn't Protect Women or Gays From Discrimination*, CBSNews.com, January 4, 2011.

category worthy of strict scrutiny because sex, like race, is determined at birth and immutable. *Frontiero* at 691-92.[36]

The fact that *Craig* is binding precedent is no barrier to this Court considering whether the *Frontiero* Court got it right. Indeed, that is exactly how the Supreme Court's misguided "separate but equal" ruling in *Plessy v. Ferguson* 163 U.S. 537 (1895) was corrected. *Plessy* allowed discrimination against Black people in a manner similar to the way *Craig* allows discrimination against women. *Plessy* was eventually overturned in *Brown v. Board of Education*, 347 U.S. 483 (1954) but *Brown* might never have happened if judges in the lower courts had not expressed their discontent with *Plessy.* See e.g., *Briggs v. Elliott*, 91 F. Supp. 529 (E.D.S.C. 1951) (Waring, J., dissenting) (condemning Plessy and emphasizing that the guarantee of Equal Protection applies to "all" persons… (p.541). "We must give first place to the rights of the individual citizen…"and "when and where [s]he seeks only equality of treatment before the law, h[er] suit must prevail…" p.546, "To me the

---

[36] The Supreme Court overturned *Frontiero's* strict scrutiny standard without explanation and replaced it with intermediate scrutiny in *Craig v. Boren*, 429 U.S. 190 (1976). Only Justice Rehnquist, in a dissenting opinion, acknowledged the change when he bemoaned the fact that women were given intermediate scrutiny because he believed they deserved only rational basis scrutiny. Indeed, he wrote, the "only redeeming feature of the Court's opinion … is that it [ ] signals a retreat by those who joined the plurality opinion in *Frontiero* … from their view that sex is a 'suspect' classification [worthy of strict scrutiny] for purposes of equal protection analysis." *Id*. at 217.

situation is clear and important, particularly at this time when our national leaders are called upon to show to the world that our democracy means what it says and that it is a true democracy and there is no under-cover suppression of the rights of any of our citizens … [we] should follow the intendment and meaning of the Constitution of the United States and … not … deny equal protection of its laws to any … citizens." *Id.*, at 546, 548.)

This Court should do for women what Judge Waring did for Black people in *Briggs*. In support of this approach, the Court can cite *Dobbs v. Jackson Women's Health Organization,* 597 U.S. __ (2022) which admonished federal courts to "heed the Constitution['s]" plain text, slip op. at 9. If the Constitution's plain text controls, then women must be granted full legal equality our Constitution grants *Equal* Protection rights to persons, and women are certainly persons.

Appellants urge this Court to write an opinion (or even a well-placed footnote) criticizing intermediate scrutiny as unconstitutional - recognizing it as women's *Plessy* - and urging the Supreme Court to reignite *Frontiero's* strict scrutiny ruling as women's long-deserved and constitutionally required *Brown v. Board of Education* correction.

## IV. THE MSSA IS UNCONSTITUTIONAL UNDER STRICT SCRUTINY

Under strict scrutiny the MSSA is unconstitutional because there is no compelling reason to exclude women from Selective Service. Indeed, the

27

government made no such claims below, relying instead on *Rostker v. Goldberg*, 453 U.S. 57 (1981) to defend the constitutionality of the MSSA. In *Rostker*, the Supreme Court upheld the exclusion of women because, at the time, women were ineligible to serve in combat, thus were less ready for military service compared to men, should a draft be called. *Id*. at 64-72. This is no longer true as women now serve on the front lines in all military branches. National Public Radio, *Pentagon Says Women Can Now Serve in Front-Line Ground Combat Positions*, NPR.org, (Dec. 3, 2015).

The District Court ruled that *Rostker* is controlling, and that only the Supreme Court can overrule itself, Add.19-20, but *Rostker* may be disregarded because the underlying facts have changed. A District Court judge in New Jersey relied on this rationale in a case like this one. *Kyle-Labell v. Selective Service*, 364 F. Supp. 3d 394, 405-08 (D.N.J. 2019) (declining to follow *Rostker* because women can now fight in combat, reasoning that, "When the facts of a Supreme Court decision 'do not line up closely' … it cannot be said that the decision 'directly controls' the new case", *quoting, Jefferson City v. Acker*, 210 F.3d 1317, 1320 (11ᵗʰ Cir. 2000)).[37]

---

[37] *Rostker* should also be distinguished because it applied intermediate scrutiny and Appellants' position in this case is that intermediate scrutiny is inapplicable because it is constitutionally invalid.

## V.    EQUAL MEANS EQUAL HAS ASSOCIATIONAL STANDING

The District Court ruled that Plaintiff Equal Means Equal lacks standing because the two female members of EME who tried to register for Selective Service, but were rejected based on their sex, did not identify themselves by name in the complaint. Add.9-12. The judge erred.

Associational standing does not require identification by naming. It is enough, at the pleading stage, that the complaint alleges facts sufficient to establish that least one member has standing in their own right; the interests the group seeks to protect are germane to its purpose; and neither the claim nor the relief sought require the participation of individual members. *Students for Fair Admissions v. President and Fellows of Harvard College,* 980 F.3d 157, 182-83  (1st Cir. 2020).

As the District Court acknowledged, this court has not consistently required the naming of members. Add.10. Here, the District Court relied on *Draper v. Healey*, 827 F.3d 1 (1st Cir 2016), but *Draper* is inapt because it relied on *Summers v. Earth Institute*, 555 U.S. 488, 499 (2009) and *Summers* does not stand for the principle that a complaint seeking associational standing must identify an injured member by name. In *Summers*, associational standing was denied because the complaint alleged only that some unidentified member might be injured in the future. The failure was not that a member of the organization was not named, it was that no actual person, named or unnamed, had been injured or faced imminent injury. *Id*. at 495.

29

This case is unlike *Summers*. It alleges detailed information about the members who tried to register for Selective Service, the month and year when they tried to register, and that were rejected solely because they are female.[38]

## CONCLUSION

Women have been serving this country since the dawn of our nation, and have been fighting in combat in all military branches since 2015. This year alone, two women have been killed in battle while defending the United States on foreign soil, but these women were not allowed to register for Selective Service, while men with no connection to the military were allowed to register. How can any court uphold a system of laws that allows women to fight in combat, but forbids them to put their names on a list of people who *might* be called to fight in combat?

If women can sacrifice their lives for this country, then they can register for the draft. And whether or not they register, the fact that they *do* give their lives for this country is reason enough for all courts to use their adjudicative authority to establish women's full legal equality once and for all. No woman soldier should bleed to death on the front lines of battle defending a constitution that denies her basic legal equality. Women serve equally - they should be treated equally. Period.

---

[38] If this court is inclined to deny standing because EME's members have not been identified by name, EME will share their names with the court and all parties, or, if necessary, refile the members' claims with their identities revealed.

Respectfully submitted,

For Appellants,

/s/ Wendy J. Murphy
Cheryl Jacques Law Office
717 Northampton Street #72
Holyoke, MA 01040
BBO#550455
617-422-7410
wmurphy@nesl.edu

## CERTIFICATE OF COMPLIANCE

I hereby certify that Appellants' Brief complies with the word limit of Rule 32(a)(7) because it contains less than 13,000 words, excluding the parts exempted by Rule 32(f). I further certify that this motion complies with Rule 32(a)(5) because it is set in a plain, proportionally spaced typeface, 14-point Times New Roman font.

/s/Wendy J. Murphy

Wendy J. Murphy

Dated: August 3, 2026

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing brief and the addendum was served on all parties of record via the ECF filing system.

/s/Wendy J. Murphy

Wendy J. Murphy

Dated: August 3, 2026

UNITED STATES COURT OF APPEALS

FOR THE FIRST CIRCUIT

_____

No. 26-1596

EQUAL MEANS EQUAL; HEROICA FOUNDATION;
JACQUELINE FENORE,

*Plaintiffs-Appellants,*

DONALD J. TRUMP, in his official capacity as President of the United
States; CRAIG BROWN, in his official capacity as acting director of
the SELECTIVE SERVICE SYSTEM; SELECTIVE SERVICE SYSTEM

*Defendants-Appellees*.

_____

**ADDENDUM TO APPELLANTS' BRIEF**

# TABLE OF CONTENTS

**DISTRICT COURT RULING** …………………………………1 - 20

**DISTRICT COURT JUDGMENT** …………………………….21

**TRANSCRIPT** ……………………………………………….22 - 40

**U.S. CONST. ART. V** ………………………………………..41

**U.S. CONST. AMEND. XIV** …………………………………...41 - 42

**50 U.S.C., § 3801** ……………………………………………..43

**50 U.S.C., § 3802** ……………………………………………..44

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| EQUAL MEANS EQUAL, HEROICA FOUNDATION, JACQUELINE FENORE, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD JOHN TRUMP, in his official capacity as President of the United States; CRAIG BROWN, in his official capacity as acting director of the Selective Service System; SELECTIVE SERVICE SYSTEM, <br><br> Defendants. | CIVIL ACTION NO. 25-10806-WGY |

YOUNG, D.J.                                                  April 21, 2026

## MEMORANDUM AND ORDER

Jacqueline Fenore ("Fenore") attempted to register for the Selective Service and was rejected because she is a woman. Fenore, along with the Equal Means Equal and Heroica Foundation ("Equal Means Equal")[1], allege that the Military Selective Service Act, 50 U.S.C. § 3801 et seq., ("the Selective Service Act" or "the Act") discriminates against women by prohibiting

---

[1] Equal Means Equal is a project of the Heroica Foundation, a nonprofit organization.  Compl. ¶ 3.

[1]

Add.1

them from registering for the Selective Service and request declaratory and injunctive relief.  Fenore and Equal Means Equal bring two counts, both challenging the constitutionality of the Act under the purported Equal Rights Amendment ("the ERA") (count I), and the Fifth Amendment (count II).

The Defendants -- President Donald Trump, Acting Director of Selective Service Craig Brown, and the Selective Service System ("the Public Officials") -- move to dismiss all counts on the grounds that this Court lacks subject matter jurisdiction over this action because Fenore and Equal Means Equal lack Article III standing.  The Public Officials also move to dismiss both claims based on Fenore and Equal Means Equal's failure to state a claim.

For the reasons stated at the hearing, the motion to dismiss as to count I was, and is, **ALLOWED** as to both Equal Means Equal and Fenore.  For the reasons explained below, the motion to dismiss as to count II is also **ALLOWED** as to both Equal Means Equal and Fenore.

## I.  BACKGROUND

### A.    Procedural History

Equal Means Equal and Fenore filed a suit against the Public Officials.  Compl. ¶ 1, 4-6, ECF No. 1.  Equal Means Equal alleges two claims of gender discrimination, and requests declaratory and injunctive relief.  Id. at 11; ¶¶ 27-40.  First,

[2]

Add.2

Equal Means Equal alleges that the Selective Service Act violates the ERA -- as it posits, the so-called 28th Amendment.[2] Id. ¶¶ 27-34.  Second, Equal Means Equal alleges that the Selective Service Act violates the Fifth Amendment guarantee to equal protection of the laws based on due process.  Id. ¶¶ 35-40.  The Public Officials move to dismiss all counts.  Defs.' Mot. Dismiss, ECF. No 8; Mem. Points & Authorities Supp. Defs.' Mot. Dismiss ("Defs.' Mem."), ECF No. 9.  The parties have fully briefed the issues.  Pls.' Opp'n Defs.' Mot. Dismiss ("Opp'n"), ECF No. 11; Reply Supp. Defs.' Mot. Dismiss, ECF No. 15; Notice of Supp. Authority, ECF No. 26.  This Court held a hearing on March 24, 2026, dismissing count I and taking count II under advisement.  Electronic Clerk's Notes, ECF No. 34.

**B.   Facts Alleged**

On March 28, 2025, Fenore -- a female -- attempted to register for Selective Service on the website "https://www.sss.gov/register/".  Compl. ¶ 11.  Her registration was rejected.  Id.  Two other unnamed female members of Equal Means Equal also unsuccessfully attempted to register for Selective Service.  Id. at ¶ 12.  The Public Officials do not

---

[2] The Court disposed of this argument from the bench in light of controlling precedent.  But see Julie C. Suk, Not the People: How the Courts Cuts Voters Out of Amendment, 77 FLA. L. REV. 1337 (2025) (acknowledging but decrying this precedent).

dispute that these registrations were denied because the applicants are female.

Fenore alleges that apart from her gender, she is "otherwise qualified" to register for Selective Service. Compl. ¶ 11. The Public Officials do not dispute this assertion.

## II. ANALYSIS

### A. Pleading Standard

To withstand a motion to dismiss, a complaint must "state a claim upon which relief can be granted . . . ." Fed. R. Civ. P. 12(b)(6). The complaint must include sufficient factual allegations that, accepted as true, "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). Courts "draw every reasonable inference" in favor of the plaintiff, Berezin v. Regency Sav. Bank, 234 F.3d 68, 70 (1st Cir. 2000), but disregard statements that "merely offer legal conclusions couched as fact or threadbare recitals of the elements of a cause of action," Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011) (brackets, ellipsis, and quotations omitted).

### B. Equal Means Equal and Fenore Have Article III Standing

The Public Officials argue that the Court is without subject matter jurisdiction over this action because Equal Means Equal and Fenore lack Article III standing. Defs.' Mem. at 8. Standing requires an injury in fact that is (1) concrete and

[4]

Add.4

particularized, and actual or imminent; (2) traceable to the defendant's actions; and (3) redressable by court action.  See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. 167, 180-81 (2000) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)).  "The first requirement, injury in fact, requires the plaintiff to demonstrate an injury that is 'concrete,' 'particularized,' and 'actual or imminent, not speculative.'" Diamond Alternative Energy, LLC v. Environmental Prot. Agency, 145 S. Ct. 2121, 2133 (2025) (quoting Food & Drug Admin. v. Alliance for Hippocratic Med., 144 S. Ct. 1540, 1556).

"An injury in fact must be 'concrete,' meaning that it must be real and not abstract."  Food & Drug Admin., 144 S. Ct. at 1556 (2024) (citing TransUnion LLC v. Ramirez, 141 S. Ct. 2190, 2204 (2021)).  The injury must also be particularized -- affecting "the plaintiff in a personal and individual way." Lujan, 504 U.S. at 560 n.1.  Physical and monetary injuries are archetypal, historically representative injuries in fact.  See Food & Drug Admin., 144 S. Ct. at 1556; Webb v. Injured Workers Pharmacy, LLC, 72 F.4th 365, 372 (1st Cir. 2023) (citing Transunion, 141 S. Ct. 2190)).

On the other hand, "stigmatic", "dignitary", and "stereotyping" injuries are generally more difficult to establish in relation to a required historical analogue as

[5]

Add.5

articulated in Spokeo, Inc. v. Robins, 578 U.S. 330, 340-41 (2016) and Transunion, 141 S. Ct. 2190, 2200. See also Opiotennione v. Bozzuto Mgmt. Co., 130 F.4th 149, 156 (4th Cir. 2025) (quoting Allen v. Wright, 468 U.S. 737, 755 (1984)).

### 1. **Standing Case Law** and **the Selective Service Act**

The First Circuit has not directly addressed whether denial of registration under the Selective Service Act represents an injury in fact for purposes of Article III standing. It did, however, decide another case brought by Equal Means Equal that tested the group's standing to bring a challenge relating to the ERA. Equal Means Equal v. Ferriero, 3 F.4th 24 (1st Cir. 2021).

In Ferriero, Equal Means Equal brought suit against the Archivist of the United States (at the time, David S. Ferriero), seeking to compel him to publish the ERA. Id. at 27. At the district court, Judge Casper ruled that Equal Means Equal lacked Article III standing to move forward based on the alleged harm resulting from the Archivist's failure to publish. Equal Means Equal v. Ferriero, 478 F. Supp. 3d 105, 110 (D. Mass. 2020) (Casper, J.). She also ruled that the individually named plaintiff lacked standing. Id. at 119. The individual alleged that she "personally suffered violence and unequal protection and enforcement of the laws based on gender." Id. at 118 (internal quotations omitted). The court ruled, however, that past violence did not evidence a threat of future violence, and

[6]

Add.6

that a general lack of equal protection represented a type of "generalized injury" that was "neither particularized nor concrete". Id.

On appeal, Judge Barron, writing for the First Circuit panel, affirmed the dismissal of the suit based on a lack of standing without reaching the merits of the ERA arguments. Ferriero, 3 F.4th at 31. The First Circuit embraced similar reasoning as the district court, ruling that the individual plaintiff did not identify a sufficient causal link between the Archivist's failure to publish the ERA and an increased risk of gender-based violence. Id. at 29. As Ferriero did not challenge the Selective Service Act, it does not control here.

Both parties also cite a 2003 case from this district that is inapposite to this case. In Schwartz v. Brodsky, 265 F. Supp. 2d 130 (D. Mass. 2003) (Harrington, J.), Judge Harrington granted the Government's motion to dismiss a claim by four men and one woman challenging the Selective Service Act under constitutional equal protection. Id. at 135. In a footnote, the court observed that:

> As to Plaintiff Foley, lack of standing provides the Court an alternative ground for dismissal. Individuals "who have never been registered with the Selective Service System and are not under any compulsion to register in the near future" suffer no "distinct and palpable harm nor imminent threat of concrete harm ... sufficient to establish standing...." Goldberg v. Rostker, 509 F. Supp. 586, 591 (E.D. Pa. 1980), overruled

[7]

Add.7

> on other grounds by <u>Rostker</u> v. <u>Goldberg</u>, 453 U.S. 57,
> 101 S. Ct. 2646, 69 L. Ed. 2d 478 (1981).

<u>Id.</u> at 130 n.1.

Schwartz is distinguishable from the present fact pattern because the female plaintiff in <u>Schwartz</u> did not attempt to register for Selective Service, was not denied registration for selective service, and did not plead any desire to serve her country via participation in the Selective Service System. <u>Cf.</u> Compl., <u>Schwartz</u>, 265 F. Supp. 2d 130 (No. CIV.A. 03-10005-EFH), ECF No. 1.

While the First Circuit thus has not addressed this exact question, one other district has. In <u>Kyle-Labell</u> v. <u>Selective Serv. Sys.</u>, 364 F. Supp. 3d 394, 401 (D.N.J. 2019), Judge Salas ruled that a female plaintiff who unsuccessfully registered under the Selective Service Act possessed standing as required for Article III justiciability. <u>Id.</u> at 401. The same court ruled that not being able to register for the draft was a unique injury distinguishable from the plaintiff's ability immediately to enlist in the military. See <u>Kyle-LaBell</u> v. <u>Selective Serv. Sys.</u>, No. CV155193ESJAD, 2018 WL 1535230, at *4-5 (D.N.J. Mar. 29, 2018).

[8]

Add.8

**2. Equal Means Equal Lacks Article III Associational Standing**

The Public Officials argue that this Court is without subject matter jurisdiction because Equal Means Equal and Fenore lack Article III standing.  The Public Officials allege that both the organization and the individual plaintiff have failed to establish injury in fact, and that Equal Means Equal does not identify its affected members as required for associational standing.  Defs.' Mem. 9, 13.  Equal Means Equal does not claim organizational standing.  Opp'n 19 n.34. Organizational standing requires harm to an organization's "core[] activities" rather than a "coming to the nuisance."  American Ass'n of Univ. Professors v. Rubio, 802 F. Supp. 3d 120, 180 (D. Mass. 2025), judgment entered, No. CV 25-10685-WGY, 2026 WL 524753 (D. Mass. Jan. 22, 2026), appeal docketed, No. 26-1195 (1st Cir. Feb. 24, 2026).

Equal Means Equal lacks associational standing to bring these claims.  Equal Means Equal has pled that two of its members -- both women -- also applied for and were rejected from registration under the Selective Service Act.  Compl. ¶ 12.  The Public Officials do not dispute this allegation.  Equal Means Equal, though, has failed to name either member.  Under First Circuit precedent, Equal Means Equal cannot be found to have established associational standing without naming its members.

[9]

Add.9

For an organization to claim associational standing, it "must show that at least one of its members has standing in her own right." Ferriero, 3 F.4th at 29 (citing Council of Ins. Agents & Brokers v. Juarbe-Jiménez, 443 F.3d 103, 108 (1st Cir. 2006)). The First Circuit has also stated that the organization claiming associational standing must "identify" that member. See Housatonic River Initiative v. United States Env't Prot. Agency, New England Region, 75 F.4th 248, 265 (1st Cir. 2023) (quoting Summers v. Earth Island Inst., 555 U.S. 488, 499 (2009)).

In Draper v. Healey, 827 F.3d 1 (1st Cir. 2016), Justice Souter (sitting by designation in retirement) interpreted Summers to require the naming of the injured plaintiff for an organization to establish associational standing. Id. at 3.

This explicit naming requirement, however, has not been consistently applied across the First Circuit in recent years. In Faculty, Alumni, & Students Opposed to Racial Preferences v. Harvard L. Rev. Ass'n, No. CV 18-12105-LTS, 2019 WL 3754023 (D. Mass. Aug. 8, 2019) (Sorokin, J.), Judge Sorokin wrote that "the Court need not resolve whether cases like Draper and Summers mandate the naming of names at the pleading stage." Id. at *6. Judge Sorokin ultimately ruled that the association lacked standing because it failed to list any descriptive qualities about the members of association claiming injury. Id. at *7.

[10]

Add.10

Judge Sorokin noted that in other cases, organizations claiming associational standing had proffered ethnicities, test scores, and academic backgrounds of the individual member who was alleged to have been injured.  Id. at *6 (citing Compl. ¶¶ 15-24, Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., 261 F. Supp. 3d 99 (D. Mass. 2017) (Burroughs, J.) (No. 14-cv-14176-ADB), ECF No. 1, aff'd sub nom., Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., 980 F.3d 157 (1st Cir. 2020), rev'd on other grounds, 143 S. Ct. 2141 (2023)).

In Housatonic River Initiative v. United States Env't Prot. Agency, 75 F.4th at 265 (1st Cir. 2023), associational standing was upheld when affidavits naming individuals were submitted as a part of the administrative record.

Finally, in 2025, a First Circuit panel refused to terminate the associational standing of an organization despite its failure to name injured individuals.  See Capen v. Campbell, 134 F.4th 660, 667-68 (1st Cir. 2025).  The First Circuit explained that the organization could later add named members and cure any standing issues.  Id. at 668.  After the appeal returned to the district court, the plaintiffs added initials only ("'E.H.,' 'F.D,' 'T.M.,' 'W.D,' and 'J.R.'") to represent named members of the organization.  See First Am. Compl. ¶ 21, Capen v. Campbell, No. 22-cv-11431-FDS (D. Mass. Sept. 4, 2025),

[11]

Add.11

ECF No. 83.  That case is currently stayed until July 2026 while the parties await the Supreme Court's disposition of a case with similar issues.  Electronic Clerk's Notes, <u>Capen</u>, No. 22-cv-11431-FDS, ECF No. 95.

Because neither <u>Draper</u> nor <u>Summers</u> have been explicitly overruled either by this Circuit nor by the Supreme Court, the explicit naming of individuals to establish associational standing is required by precedent.  While the First Circuit recently allowed an associational standing claim to progress without such naming, that decision did not overrule <u>Draper</u> or <u>Summers</u>.  As this Court is duty-bound to follow First Circuit precedent, the Court **GRANTS** the Government's 12(b)(1) motion to dismiss based on a lack of subject matter jurisdiction for Equal Means Equal without prejudice.

### 3. Fenore has Article III Individual Standing

Fenore, as an individual, has demonstrated standing as required by Article III of the Constitution.  The Public Officials argue that Fenore cannot claim injury on the part of men who are forced to register.  Defs.' Mem. 8-9; <u>cf.</u> <u>Valame</u> v. <u>Trump</u>, 157 F.4th 1172 (9th Cir. 2025) (in which a male claimed injury by being forced to register under the Selective Service Act against his wishes).  The Public Officials' citation to <u>Valame</u> is unpersuasive because, unlike that case, Fenore is

[12]

Add.12

claiming an independent injury to herself as a woman, incurred because she is a woman.  Compl. at 8.

The Public Officials further contest that Fenore has suffered an injury in fact.  Defs.' Mem. 9.  Fenore claims two types of injury in response: a traditional injury based on a stigmatic injury and discriminatory exclusion.

To establish a stigmatic injury, Fenore must show that she was "personally subject to discriminatory treatment" and "identification of some concrete interest."  Allen v. Wright, 468 U.S. 737, 757 n.22 (1984).  Fenore has satisfied both requirements.  She has been personally subject to discriminatory treatment as her registration was denied because of her gender, and she has identified a concrete interest -- a desire to engage in a specific form of military service via registration with the Selective Service.

The First Circuit recently considered stigmatic injuries in the context of disability testers.  See Laufer v. Acheson Hotels, LLC, 50 F.4th 259 (1st Cir. 2022), vacated and remanded on mootness grounds, 144 S. Ct. 18 (2023).  In Laufer, Judge Thompson wrote for the panel that "[d]ignitary harm or stigmatic injuries caused by discrimination have long been held a concrete injury in fact . . . ."  Id. at 274 (citing Heckler v. Mathews, 465 U.S. 728, 738-40 (1984)); Allen, 468 U.S. at 755; Carello v. Aurora Policemen Credit Union, 930 F.3d 830, 833-34 (7th Cir.

[13]

Add.13

2019) ("There is no doubt that dignitary harm is cognizable; stigmatic injury is 'one of the most serious consequences' of discrimination.") (citation omitted)).  See generally Note, Acheson Hotels, LLC v. Laufer, 138 HARV. L. REV. 285 (2024).

The Public Officials did not contest the first prong of the Allen test at oral argument, conceding that Fenore applied for and was rejected on the basis of her gender.  Rather, the Public Officials assert that Fenore fails the second prong of the Allen test.  The Public Officials argue that Fenore is not injured because she has no "concrete interest" in registration since she may voluntarily enlist in the military at the present time. Defs.' Mem. 10.  Fenore's desire to register for Selective Service, however, is distinct from a desire to enlist immediately in the military.  Selective Service registration represents Fenore's desire to be automatically considered for the draft should Congress and the President trigger it.  See Opp'n 18.  Conversely, immediate enlistment represents a desire to serve at the current moment, when there is there no ongoing "national emergency"[3] and the current administration appears at pains to reduce the career paths open to women's service in the United States Army.  See, e.g., the current Secretary of Defense

---

[3] Return to the Draft, SELECTIVE SERVICE SYSTEM https://www.sss.gov/about/return-to-draft/ [https://perma.cc/KZ5G-SHRA] (last visited Mar. 26, 2026).

[14]

Add.14

stating prior to his appointment that "I'm straight up saying that we should not have women in combat roles."[4]

Variations of service commitments and willingness to serve in different circumstances are replete within our military.  The National Guard, Reserves, and Inactive Ready Reserve all represent different tiers of service which individuals may elect to pursue.[5]  Under the Public Officials' logic, a woman would have no standing to sue for gender-based exclusion from the National Guard or Army Reserves, so long as active duty enlistment was permitted.  The availability of active duty enlistment does not eliminate the injury caused by gender-based restrictions on other forms of military service availability.

The Public Officials' standing argument also contradicts Supreme Court precedents that implicitly upheld standing for women excluded from other military settings.  See, e.g., United States v. Virginia, 518 U.S. 515, 523 (1996).  In Virginia, the plaintiff's "concrete interest" of participating in another subset of military service (attending a military academy that, at the time, did not even require military service upon

---

[4] THE SHAWN RYAN SHOW: #143 Pete Hegseth - Secretary of Defense Nominee at 00:57:02 (Spotify, Nov. 7, 2024).

[5] Morgan Thomas, Military 101: Understanding the Differences between Active Duty, National Guard and Reserves, THE COUNCIL OF STATE GOVERNMENTS (Dec. 19, 2023), https://www.csg.org/2023/12/19/military-101-understanding-the-differences-between-active-duty-national-guard-and-reserves/ [https://perma.cc/TL2H-WA8Z].

graduation) was "concrete" enough for justiciability.[6]  Under the Public Officials' logic, the plaintiff in Virginia would also lack standing to sue because she could simply have enlisted on active duty[7] or attended a less distinguished Reserve Officers' Training Corps program at a women's-only school.  See Virginia, 518 U.S. at 526-27.  The standing issue was not explicitly raised in that case.  Yet, the federal courts that heard the case at every level necessarily exercised subject matter jurisdiction to hear the claim under Article III based on the alleged injury of the plaintiff's rejection from the Virginia Military Academy on the basis of her gender.

Since the availability of active duty enlistment does not extinguish an injury resulting from exclusion from different forms of military availability, and because of the precedent established in Virginia, 518 U.S. 515, the Court rules that Fenore has Article III standing to proceed individually.[8]

---

[6] "The mandatory commissioning policy requiring a cadet to accept a commission for active military duty upon graduation [was] abolished" in 1990.  Gary Robertson, On The Line, VIRGINIA BUSINESS (Feb. 27, 2022) https://virginiabusiness.com/on-the-line/ [https://perma.cc/8ELR-W9FA].

[7] See Women's Armed Services Integration Act of 1948, Pub. L. 625, 62 Stat. 356 (1948).

[8] Having ruled that Fenore has standing based on a stigmatic injury, the Court need not, and does not, decide whether discriminatory exclusion from participation in a public program constitutes a traditionally recognized injury.  See Opp'n 16.

[16]

Add.16

**C.    The Selective Service Act does not Violate the Fifth Amendment under Supreme Court Precedent**

Fenore claims that the Selective Service Act violates the equal protection component of the Fifth Amendment's due process clause.  Compl. ¶ 1, 35-40.  As the Supreme Court has directly ruled on this question, the motion to dismiss as to count II is **ALLOWED**.

In Rostker v. Goldberg, 453 U.S. 57 (1981), the Supreme Court held that the male-only draft did not violate the due process clause.  Id. at 83.  The Court applied a somewhat opaque standard of scrutiny that balanced gender-based discrimination with the deference normally given in military affairs.  Id. at 69-70.  The Court's reasoning rested heavily on the then-operative ban on women serving in combat.  Id. at 76.  Rostker was most recently challenged in 2020, when the Supreme Court denied certiorari in the case of National Coal. for Men v. Selective Serv. Sys., 141 S. Ct. 1815 (2021) (on appeal from the Fifth Circuit).  Justice Sotomayor, joined by Justices Breyer and Kavanaugh, wrote respecting the denial of certiorari.  She acknowledged the change in circumstances underlying Rostker in the forty years since its publication, to include a lifting of the former ban on females in combat positions.  Id. at 1816.  She supported the denial of certiorari, however, in light of Congress's consideration of a report from the National

[17]

Add.17

Commission on Military, National, and Public Service

recommending that the draft be opened to women.  Id.  In the

five years since National Coalition for Men was decided,

drafters of the annual National Defense Authorization Act have

attempted and failed to include women in Selective Service.[9]

Fenore argues that the Rostker decision rested heavily on

the then-policy excluding women from combat in the armed forces.

Compl. ¶ 15; see Rotsker, 453 U.S. 76-78.  Since women are now

permitted to serve in all combat roles, Fenore argues, the Court

is not bound by Rotsker.[10]  She argues that these changed

circumstances undercut the factual record on which the Rostker

decision rests and allow this Court to disregard the typical

rules of stare decisis.  See Opp'n 14.

The First Circuit considered this question in 2011 in Elgin

v. United States Dep't of Treasury, 641 F.3d 6 (1st Cir.

2011), aff'd sub nom. Elgin v. Department of Treasury, 567 U.S.

1 (2012).  Speaking for the court, Judge Boudin dismissed the

case on technical grounds without reaching the merits -- though

---

[9] See Brad Dress, GOP Senators Push to Take Out Provision in Defense Bill to Draft Women in Military, THE HILL (Dec. 5, 2024) https://thehill.com/policy/defense/5025205-senate-republicans-oppose-women-selective-service-system/ [https://perma.cc/23MM-DG43].

[10] The Department of Defense voluntarily opened all combat positions to women in 2015.  See Remarks on the Women-in-Service Review, UNITED STATES DEPARTMENT OF WAR (Dec. 3, 2015), https://www.war.gov/News/Speeches/Speech/Article/632495/remarks-on-the-women-in-service-review/ [https://perma.cc/WSL4-75LM].

[18]

acknowledging that "[t]he substantive constitutional claims in this case are unpromising, given that one conflicts with governing Supreme Court precedent" (in reference to the equal protection claim). Id. at 12. In a concurrence, Judge Stahl acknowledged that while the underlying logic of Rostker was no longer operative given women's ability to enter combat roles, "[n]o part of Rostker has been overruled" and that deciding otherwise ought be "a task left solely to the Supreme Court." Id. at 22-24.

At oral argument, Fenore pointed to the voting rights context for the proposition that "things have changed dramatically," warranting judicial reconsideration. Shelby Cnty. v. Holder, 570 U.S. 529, 547 (2013). In Shelby County, the Supreme Court ruled a section of the Voting Rights Act unconstitutional because formulas utilized by the statute were based on "decades-old data and eradicated practices." Id. at 551. The changed circumstances, the Court determined, allowed it to reconsider the question of the section's constitutionality. Id. at 556-57.

This Court is, nevertheless, "in no position to overrule binding Supreme Court precedent." United States v. Diggins, 36 F.4th 302, 311 (1st Cir. 2022) (citing United States v. McIvery, 806 F.3d 645, 653 (1st Cir. 2015)). See also National Inst. of Health v. American Pub. Health Ass'n, 145 S. Ct. 2658, 2663

[19]

Add.19

(2025) (Gorsuch, J., concurring in part and dissenting in part). The equal protection challenge to the Military Selective Service Act is thus, as emphasized by the First Circuit in <u>Elgin</u>, foreclosed by binding Supreme Court precedent.  Accordingly, this Court must grant the Public Officials' motion to dismiss count II as to Fenore.

### III.  CONCLUSION

The Court rules that Equal Means Equal has not demonstrated associational standing as required by First Circuit precedent. Fenore has demonstrated individual standing on the basis of a stigmatic injury.  The motion to dismiss as to count I was **ALLOWED** at the hearing, <u>see</u> Electronic Clerk's Notes, ECF No. 34, for the reasons discussed on the record.

The motion to dismiss as to count II is **ALLOWED** as to Equal Means Equal due to its lack of standing, and **ALLOWED** as to Fenore due to binding Supreme Court precedent foreclosing an equal protection claim against the Selective Service Act.

**SO ORDERED.**

/s/ William G. Young
WILLIAM G. YOUNG
DISTRICT JUDGE[11]

---

[11] This is how my predecessor, Peleg Sprague (D. Mass. 1841-1865), would sign official documents.  Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 48 years.

[20]

Add.20

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

Equal Means Equal, et al
**Plaintiffs**


CIVIL ACTION
V.                                                NO. 25cv10806-WGY


Donald John Trump, et al
**Defendants**

**ORDER OF DISMISSAL**


**YOUNG D.J.**,

In accordance with the Court's MEMORANDUM AND ORDER of April 21, 2026, it is hereby ORDERED that this case is DISMISSED.


By the Court,

**/s/Matthew A. Paine**


Deputy Clerk


April 21, 2026

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS (Boston)

No. 1:25-cv-10806-WGY

EQUAL MEANS EQUAL and JACQUELINE FENORE, individually and on behalf of others similarly situated,
        Plaintiffs

vs.

DONALD J. TRUMP, in his official capacity as President of the United States, et al,
        Defendants

* * * * * * * *

For Hearing Before:
Judge William G. Young

Motion To Dismiss

United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
Tuesday, March 24, 2026

* * * * * * *

REPORTER: RICHARD H. ROMANOW, RPR
Official Court Reporter
United States District Court
One Courthouse Way, Room 5510, Boston, MA 02210
rhr3tubas@aol.com

Add.22

A P P E A R A N C E S


WENDY J. MURPHY, ESQ.
   Cheryl A. Jacques Law Office
   717 Northampton Street, #72
   Holyoke, MA 02116
   (617) 699-3531
   E-mail: Wmurphy@nesl.edu
   For Plaintiffs


LIAM C. HOLLAND, ESQ.
   United States Department of Justice, Civil Division
   Federal Programs Branch
   P.O. Box 883
   Washington, DC 20044
   (202) 514-4964
   Email: liam.c.holland@usdoj.gov
   For Defendants

P R O C E E D I N G S

(Begins, 2:30 p.m.)

THE CLERK:  Civil Action Number 25-10806, Equal Means Equal, et al vs. Trump, et al.

THE COURT:  And would counsel identify themselves.

MS. MURPHY:  Good afternoon, nice to see you again, your Honor.

(Pause.)

MR. HOLLAND:  Good afternoon --

THE COURT:  You need to put your name on the record, although I recognize her as Ms. Murphy.

MS. MURPHY:  Oh, I'm so sorry.

THE COURT:  That doesn't get her anywhere, but she has appeared before me before, that's all.

(Laughter.)

THE COURT:  And counsel?

MR. HOLLAND:  Okay.  Liam Holland for the United States Department of Justice and the federal defendants, your Honor.

MS. MURPHY:  And Wendy Murphy on behalf of the plaintiffs, and I apologize, your Honor.

THE COURT:  Oh, no apology is necessary. Ms. Murphy, you've got a long road to hoe here.  I'll hear you.

MS. MURPHY:  Um, it's the defendant's motion, but

you'd rather just hear from me?  Okay.

THE COURT:  I'll let you go first on their motion.

MS. MURPHY:  Okay.  Fair enough.

Your Honor, if you'll indulge me, just a little introductory moment here, um --

THE COURT:  You've got 10 minutes, but go ahead.

MS. MURPHY:  I'll go fast.

The words "Equal Justice Under Law" are carved in stone on our United States Supreme Court building in Washington, D.C., but those words have never ever applied to women.  Ever.  So we're here today not only asking you to strike down the Selective Service Act as unconstitutional, because it excludes women, but to do so --

THE COURT:  The Supreme Court has ruled otherwise.

MS. MURPHY:  I understand that.  But, your Honor, women are now serving on the front lines of battle, bleeding to death for their country in service, in combat, they deserve to be seen as fully equal persons under the law now.  Their time has come.

And --

THE COURT:  Evidently, and you have appeared before me, and I hold you in great respect, Ms. Murphy, but that's not an argument to make to me, I also have an oath, and my oath is to follow the decisions of those

courts with higher commission.  I'm sworn to do that. You're making the policy argument before me.

MS. MURPHY:  Well I have a legal argument as well, your Honor, because I'll --

THE COURT:  Well let's get to that, because I'm bound -- I'll tell you straight out, I'm bound by this.

MS. MURPHY:  The *Rostker* case, from 1981, does say that the Selective Service Act is constitutional, despite the fact that it explicitly discriminates against women.  It was upheld solely -- the only basis for the Court's decision was that women were not eligible for the draft, because they were not then eligible to fight on the front lines of combat.  That has changed now.  And the Supreme Court has said, in a couple of different cases, that where the underlying conditions of the Supreme Court's ruling have changed, the calculation changes.  So it is a new question for you to decide, your Honor.  You're not bound by a decision where the circumstances underlying that ruling are no longer valid.

And Judge Salas, in the New Jersery Federal District Court, said exactly that when she not only granted standing to the female plaintiff, but said, "I'm not bound by *Rostker,* because the conditions underlying that ruling are no longer applicable."

THE COURT:  I grant you that there's standing for the female plaintiff, or at least subject to hearing the other side, I think she has standing.  But I do have standing questions with respect to the associational standing of the Equal Means Equal group.  But as to Ms. Fenore, she has standing.

Now, um -- and you know where -- and I have every respect for Judge Salas, but, you know, that case hasn't changed the legal landscape?

MS. MURPHY:  Well my point about citing Judge Salas, your Honor, and that's the *Kyle-Labell* case, is that she didn't just find standing, she also said, point-blank, "I am not bound by *Rostker*.  Yes, that's a Supreme Court case, yes, I'm generally bound by the Supreme Court's precedent, but not in this case."

THE COURT:  And why?

MS. MURPHY:  Because the conditions have changed and she's --

THE COURT:  What was the judgment in that case?

MS. MURPHY:  That case is still pending.

THE COURT:  All right.

MS. MURPHY:  But it was a motion to dismiss in part on the grounds by the government, by the same government, arguing that the case had to be dismissed, because *Rostker* is the law, and a lower-court judge, the

District Court, doesn't have authority to disregard the Supreme Court precedent.  Judge Salas and I agree that it's not disregarding precedent when the precedent is based on conditions -- the only basis for the Court's ruling are conditions that no longer exist.  In other words, your Honor, it presents to you a brand-new question that the Supreme Court has not yet decided. And so you won't be disregarding precedent at all.

THE COURT:  Perhaps you want to go to the proposed Equal Rights Amendment.

MS. MURPHY:  Your Honor, the Equal Rights Amendment is currently the law of the land.  I'm delighted to tell you that a --

THE COURT:  It's untimely, isn't it?

MS. MURPHY:  I'm sorry?

THE COURT:  It's untimely, Congress has a time-limit there.

MS. MURPHY:  I'm delighted to let you know that a contemporary of yours, Professor Lawrence Tribe, from Harvard Law School, agrees with me that the deadline is invalid, and when a deadline on an amendment's ratification is invalid, and the amendment has been ratified by the necessary number of states, the amendment is valid.  The American Bar Association agrees with me, many constitutional scholars agree with me, but

the government disagrees with me, but they're wrong.

Your Honor, the Equal Rights Amendment is valid, because Article V is clear and unambiguous that an amendment becomes law when only two things happen, Congress proposes it, the states ratify it.  And those things have happened.

THE COURT:  Doesn't a proposal include the deadline?

MS. MURPHY:  The proposal does not include the deadline because the proposal -- that thing that Congress proposes, is the text of the amendment.  The deadline is in the preamble, it's in the introductory clause, it's in the "set-up," if you will.  That is not law, that is not enforceable substantive law.

Multiple amendments before had put a time-limit in the text of the amendment, that was arguably enforceable.  And I don't want to concede, because I think deadlines in general are anticonstitutional, but let's just talk about the preambulatory space where this deadline appears.

Because it is not substantive law, it is not enforceable, the states only ratify the text of an amendment, they do not ratify preambles.  Again, this is what Professor Tribe, and the American Bar Association -- and President Biden, I might add, agree

with us on, that it's not enforceable unless it's in the text, and I'd go so far to say that even in the --

THE COURT:  No court agrees with it.

MS. MURPHY:  Well you can, that's why we're here. That's why we're here.  Your Honor, the reason --

THE COURT:  I take my responsibilities very seriously, and I can.  I can.  But the answer to my question is that no court has agreed with that analysis.

MS. MURPHY:  Your Honor, only a couple of courts have even had the opportunity.  There's no big stack of courts that have ruled.  Again, lots of public officials agree with us.  Yes, they're not courts, but they're persuasive.  And the fact that you have the authority to see it our way is a valid position for us to take.  The Supreme Court has not ruled on the constitutionality of a deadline in a preamble, that's --

THE COURT:  I don't challenge the full faith, I don't challenge your argument, as an argument, but it's also true, as a matter of actual historical truth, that never has an amendment to the United States Constitution been declared invalid in litigation, there's always been a more sweeping affirmation that the amendment is in -- the preamble of the Constitution says, is the expression of "We, the people."  It's quite something to ask a Court to say -- to declare that the Constitution has

been amended.

MS. MURPHY:  Your Honor, I would suggest to you that because well over 80 percent of the American people support the Equal Rights Amendment, that that's pretty sweeping.  And I go so far to say that the cases are very clear that when there is a dispute about what the Constitution means, which is this dispute -- it's rare, it's unusual, I agree, but when there is a dispute about what the Constitution means, it is exactly the courts that ought to decide, it is the courts where we go to say "Does Article V mean what it says?"

THE COURT:  2 more minutes.  And what about the standing of Equal Means Equal?

MS. MURPHY:  Well, as the Court has indicated, standing in general for Ms. Fenore, I think is not disputed.

I would point the Court to the *Students For Fair Admissions* case for pretty clear guidance on the standing for the organization.  Again, we're not seeking organizational standing, but associational standing, where their two members tried, just like Ms. Fenore did, and failed to be registered for the draft, they were rejected solely because they were female.  That is exactly what happened in the Harvard case, the *Students For Fair Admissions* case.

They were Asian students, who applied to Harvard, were rejected on the basis of their race, they were members of SFFA, and that was enough, for SFFA to have its own --

THE COURT:  I don't have a problem -- as a practical matter dealing with the case, I don't have a problem with Ms. Fenore having standing, and if you have members -- and that's undisputed, and we'll ask the government here, um, with respect to the attack on the Selective Service law.  But you're saying there's standing to declare that the Constitution has been amended.  I have some issue with that.

MS. MURPHY:  Well, your Honor, they have the same standing that Ms. Fenore has, they just have it through the organization in the same way that ***Students For Fair Admissions*** had standing in that case, and they also had a single-live named plaintiff as an individual plaintiff.  That was my only point about that.

THE COURT:  Thank you.  I appreciate it.  And we'll hear the government.

MR. HOLLAND:  Thank you, your Honor.

I do want to start out with the standing issue.  We do dispute that Ms. Fenore has standing as well.

In ***Allen v Wright***, the Supreme Court held that a stigmatizing injury alone is insufficient to establish

Article III standing.  Rather, the Court explained that stigmatic injury is only judicially cognizable to the extent that the plaintiff is personally subject to discriminatory treatment, and the subject --

THE COURT:  Isn't she?  I mean she sought to register for the draft.

MR. HOLLAND:  So she has to be both -- there's two prongs.  She has to be personally subject to the discriminatory treatment -- and I'll concede that by registering for the draft she was subject to discriminatory treatment, but the subject of the discriminatory treatment has to involve a concrete interest, and that is where Ms. Fenore doesn't actually show a concrete interest in her being on this list of people who are compelled to join an organization that she may join voluntarily.

There is no case I've seen, other than the ***Kyle-Labell*** case, but there's no Supreme Court case that's found standing and concrete injury on that basis.  Yeah, I think the plaintiff's best case is --

THE COURT:  I understand you.  Your concern -- not "concern," but your argument is, if she wants to be a member of our Armed Forces, assuming she meets some physical requirements, which are nondiscriminatory, all she has do is go to the nearest recruiting office?

MR. HOLLAND: Exactly. She's welcome now. She's welcome at the -- she says that her interest is that she wants to serve at the time the draft is needed, and there's no reason to believe that she'd be unable to do so, she could walk right into a recruiting office and join up and serve the country.

I think the plaintiffs' best cases for like discriminatory exclusion that they cite are the jury-exclusion cases. For example, the plaintiffs cite *Carter v. Jury Commissioner of Bloom County.* But I think those are fundamentally different cases.

As your Honor is aware, you know, you can't just volunteer to join a jury, a jury has to be a randomly-selected group of individuals to protect the defendant's constitutional rights, who are there from a cross-section of the community. And so when the Commission in those communities were excluding black people or women from the jury pool, the people who wanted to serve on the jury had no way of doing so, and that is fundamentally different than Ms. Fenore's interest in being on a list of people who are compelled to serve in the military against their will. There is no concrete interest that Ms. Fenore has articulated in being on that list. She's welcome to join the military and to serve the country with all the men who are in the

military.

And so we respectfully disagree that she has established the *Allen v. Wright,* the factors, and I do respectfully submit that what Ms. Murphy has represented are largely really important interests, but they're not Article III interests in the moral and legal principles of respecting women's rights to be treated equally. We're not denying those are important interests, but they're just not the type of Article III cognizable interests.

With respect to the other two entity plaintiffs, I think Ms. Murphy has admitted, and it's in Footnote 34 of their brief, that they're not seeking organizational standing. And to be clear, there's two types of ways an entity can establish standing, organizational and associational.

For associational, a key component of that is to identify the injured members, unless every member of the organization is injured. And under the First Circuit's opinion in 2016, in *Draper v. Healey*, the First Circuit made clear that that identification of the injured member must be in the complaint at the pleading stage and the complaint includes no identified injured members. And on that basis, I think the plaintiffs have not established, at the pleading stage, associational

standing.

You know, I -- I don't think that all members of these organizations have standing because, in order to enter effective declaratory injunctive relief, that the declaratory injunctive relief must be presumed -- the defendants must be presumed to do something.

THE COURT:  Now Equal Rights.

MR. HOLLAND:  Sure.

So the, um -- as your Honor indicated, the plaintiffs' claims -- so the Equal Rights Amendment is not part of the Constitution because it was not ratified before the deadline, 3/4ths of the states --

THE COURT:  She has an answer, her answer is that it's in the preamble.

MR. HOLLAND:  It is in the preamble.  So I think the Court should review the D.C. Circuit's opinion -- if it hasn't already, the D.C. Circuit's opinion of *Illinois v. Ferriero*, from 2023.

So the Supreme Court established, in a case called *Dillon v. Gloss*, in 1921, that Congress had the authority to set a deadline, and when the Supreme Court said as much, in *Dillon v Gloss*, it explained the basis for that deadline.  It said that the authority of Congress to set a deadline is "incidental to the power to establish matters of detail that flow from its powers

to designate the Mode of Ratification in Article V." Right?  And in every -- in every -- Congress has exercised its power to designate the Mode of Ratification in every single proposed Constitutional amendment, including those that become part of the Constitution, in the preamble or the proposing clause.

So because the -- because the source of the authority is the ability to choose the mode and the ability to regulate the mode, it flows from that reasoning that you can also include incidental powers, as the Supreme Court has said in *Dillon v Gloss,* in the proposing clause, and putting it there doesn't render it invalid.

You know not only has the D.C. Circuit, in *Illinois v. Ferriero*, agreed with that approach, but recently in *Valame v. Trump*, the Ninth Circuit rejected not only the ERA claim on the same basis, I believe, but also the similar Equal Protection claim with respect to the military Selective Service Act being unconstitutional and on changed facts.

THE COURT:  Well of course that's not this circuit, and --

MR. HOLLAND:  That's true.

THE COURT:  -- as I indicated, it is my sworn oath.  What the Ninth Circuit has done is persuasive,

not controlling.  But I'm aware of it.  And I thank you.

MR. HOLLAND:  Well if you want to discuss that issue, your Honor, I think what is controlling are the Supreme Court's precedents about, um, overturning their own precedents.

(Laughs.)

MR. HOLLAND:  And so one example is *State Oil Company vs. Kahn*, which is relied on in, for example, the Fifth Circuit's opinion on this issue.

And, you know, I think the case law is pretty clear that insofar as the changed facts are like legislative facts that were part of the Court's basis for declaring a law -- a claim of this same law constitutional, only the Supreme Court can revisit that opinion.  And so Ms. Murphy is free to seek cert in this case and ask the Supreme Court to overturn its decision based on those changed facts.

But we'd respectfully submit that based on cases like *State Oil vs. Kahn*, that this Court does not have the authority to do so.  That was Judge Stall's concurring opinion, for example, in the First Circuit's *Elgin* case, he said the same thing.  And again, the Ninth Circuit has just said that in *Valame* as well.

THE COURT:  All right.  The Court respectfully agrees with the government with respect to the arguments

concerning the proposed Equal Rights Amendment.  Under the controlling cases -- and I'm not speaking to policy at all, nor did government counsel, but under the controlling cases, this Court is bound to follow the precedent of courts with a higher commission and must dismiss the counts brought, both by Ms. Fenore and by Equal Means Equal, that seek a declaration that the Equal Rights Amendment has, um, by operation of law, um, been adopted.  Those counts are dismissed.

As to the assault on the Selective Service Act, the Court will take that under advisement and render a prompt decision.

That's the order.  Thank you very much.

(Ends, 2:50 p.m.)

C E R T I F I C A T E


     I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

hereby certify that the forgoing transcript of the

record is a true and accurate transcription of my

stenographic notes, before Judge William G. Young, on

Tuesday, March 24, 2026, to the best of my skill and

ability.


/s/ Richard H. Romanow 06-22-26
_____
RICHARD H. ROMANOW  Date

Add.40

**<u>U.S. Constitution, Article V</u>**

"The Congress, whenever two thirds of both houses shall deem it necessary, shall propose amendments to this Constitution, or, on the application of the legislatures of two thirds of the several states, shall call a convention for proposing amendments, which, in either case, shall be valid to all intents and purposes, as part of this Constitution, when ratified by the legislatures of three fourths of the several states, or by conventions in three fourths thereof, as the one or the other mode of ratification may be proposed by the Congress; provided that no amendment which may be made prior to the year one thousand eight hundred and eight shall in any manner affect the first and fourth clauses in the ninth section of the first article; and that no state, without its consent, shall be deprived of its equal suffrage in the Senate."

**<u>U.S. Constitution, Amendment XIV</u>**

Section 1.

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

Section 2.

Representatives shall be apportioned among the several states according to their respective numbers, counting the whole number of persons in each state, excluding Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the executive and judicial officers of a state, or the members of the legislature thereof, is denied to any of the male inhabitants of such state, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such state.

Section 3.

No person shall be a Senator or Representative in Congress, or elector of President and Vice President, or hold any office, civil or military, under the United States, or under any state, who, having previously taken an oath, as a member of Congress, or as an officer of the United States, or as a member of any state legislature, or as an executive or judicial officer of any state, to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof. But Congress may by a vote of two-thirds of each House, remove such disability.

Section 4.

The validity of the public debt of the United States, authorized by law, including debts incurred for payment of pensions and bounties for services in suppressing insurrection or rebellion, shall not be questioned. But neither the United States nor any state shall assume or pay any debt or obligation incurred in aid of insurrection or rebellion against the United States, or any claim for the loss or emancipation of any slave; but all such debts, obligations and claims shall be held illegal and void.

Section 5.

The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.

**50 U.S. Code, § 3801**

a.  This Act may be cited as the "Military Selective Service Act".

b.  The Congress declares that an adequate armed strength must be achieved and maintained to insure the security of this Nation.

c.  The Congress further declares that in a free society the obligations and privileges of serving in the armed forces and the reserve components thereof should be shared generally, in accordance with a system of selection which is fair and just, and which is consistent with the maintenance of an effective national economy.

d.  The Congress further declares, in accordance with our traditional military policy as expressed in the National Defense Act of 1916, as amended, that it is essential that the strength and organization of the National Guard, both Ground and Air, as an integral part of the first line defenses of this Nation, be at all times maintained and assured. To this end, it is the intent of the Congress that whenever Congress shall determine that units and organizations are needed for the national security in excess of those of the Regular components of the Ground Forces and the Air Forces, and those in active service under this chapter, the National Guard of the United States States, both Ground and Air, or such part thereof as may be necessary, together with such units of the Reserve components as are necessary for a balanced force, shall be ordered to active Federal service and continued therein so long as such necessity exists.

e.  The Congress further declares that adequate provision for national security requires maximum effort in the fields of scientific research and development, and the fullest possible utilization of the Nation's technological, scientific, and other critical manpower resources.

f.  The Congress further declares that the Selective Service System should remain administratively independent of any other agency, including the Department of Defense.

Add.43

**50 U.S. Code, § 3802**

a.  Except as otherwise provided in this chapter it shall be the duty of every male citizen of the United States, and every other male person residing in the United States, who, on the day or days fixed for the first or any subsequent registration, is between the ages of eighteen and twenty-six, to present himself for and submit to registration at such time or times and place or places, and in such manner, as shall be determined by proclamation of the President and by rules and regulations prescribed hereunder. The provisions of this section shall not be applicable to any alien lawfully admitted to the United States as a nonimmigrant under section 1101(a)(15) of title 8, for so long as he continues to maintain a lawful nonimmigrant status in the United States.

b.  Regulations prescribed pursuant to subsection (a) may require that persons presenting themselves for and submitting to registration under this section provide, as part of such registration, such identifying information (including date of birth, address, and social security account number) as such regulations may prescribe.