UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT


No. 26-1596


EQUAL MEANS EQUAL; HEROICA FOUNDATION;
JACQUELINE FENORE,


Plaintiffs-Appellants,


DONALD J. TRUMP, in his official   capacity as President of the United
States; CRAIG BROWN, in his official capacity as acting director of the
SELECTIVE SERVICE SYSTEM; SELECTIVE SERVICE SYSTEM


Defendants-Appellees.

_____


**JOINT APPENDIX**

**TABLE OF CONTENTS**

NOTICE OF APPEAL ………………………………………………………..1-2

COMPLAINT…………………………………………………………………..3-15

DEFENDANT'S MOTION TO DISMISS AND MEMORANDUM………...16-46

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION……………....47-77

DEFENDANT'S REPLY……………………………………………………...78-92

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| EQUAL MEANS EQUAL; HEROICA FOUNDATION; JACQUELINE FENORE, Individually and on behalf of others similarly situated<br>          Plaintiffs,<br><br>v.<br><br>DONALD TRUMP, in his official capacity as President of the United States; CRAIG BROWN, in his official capacity as acting director of the SELECTIVE SERVICE SYSTEM<br>          Defendants. | Case No. 1:25-cv-10806 |

**NOTICE OF APPEAL**

Notice is hereby given that Plaintiffs in the above-named matter hereby appeal to the

United States Court of Appeals For the First Circuit from the Memorandum and Order entered in

this action on April 21, 2026

Respectfully submitted,

The Plaintiffs,

By their attorney,

/s/ Wendy Murphy

Cheryl Jacques Law Office
717Northampton Street #72
Holyoke, MA 01040
BBO#550455

Dated: May 19, 2026

J.A. 1

**CERTIFICATE  OF  SERVICE**

I hereby certify that a true copy of the above document was served upon the attorneys of record for each party by the ECF filing system.

/s/ Wendy J. Murphy

Wendy J. Murphy

Dated:  May 19,  2026

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

EQUAL MEANS EQUAL;
HEROICA FOUNDATION;
JACQUELINE FENORE,
individually and on behalf of
others similarly situated

           Plaintiffs,

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

Civil Action No. 25-cv-

DONALD J. TRUMP, in his official
capacity as President of the United
States; CRAIG BROWN, in his
official capacity as acting director of
the SELECTIVE SERVICE
SYSTEM; SELECTIVE SERVICE
SYSTEM

           Defendants.

WENDY MURPHY
Women's and Children's Advocacy Project
New England Law | Boston
154 Stuart Street
Boston, MA 02116
617-422-7410
MA BBO#550455
Wmurphy@nesl.edu

J.A. 3

## INTRODUCTION

1.      This is a facial and as-applied challenge to the constitutionality of the Military Selective Service Act (MSSA), 50 U.S.C., § 3801 et seq., which requires "every male citizen" to register for the draft. Plaintiff Jacqueline Fenore is female. Her Selective Service application was rejected because she is female. Plaintiff Equal Means Equal (EME) is an organization that represents women, and advocates for women's equality. Two of EME's female members attempted to submit applications to register for Selective Service. Their applications were rejected because they are female. Plaintiffs seek declaratory and injunctive relief.

## PARTIES

2.      Plaintiff Jacqueline Fenore is a female whose age is between 18-25. She is a resident of Massachusetts.

3.      Plaintiff EME is a project of Plaintiff Heroica Foundation, a national 501(c)(3) organization. EME's sole mission is to establish women's equality under the United States Constitution. EME has been a national leader in the fight for women's equality for many years.

4.      Defendant Selective Service System is an independent agency within the Executive Branch of the Federal Government. The Selective Service System collects and maintains information on individuals who register for the draft.

5.      Defendant Craig T. Brown is Acting Director of the Selective Service

System.

6. Defendant Donald J. Trump is President of the United States, Commander of Chief of the United States Military, and head of the executive branch.

JURISDICTION

7. Plaintiffs bring this action under the Twenty-Eighth Amendment to the United States Constitution, (hereafter the ERA), and the Equal Protection guarantee of the Fifth Amendment. The ERA states, "Equality of rights shall not be denied or abridged by the United States or by any state on account of sex." The Due Process Clause of the Fifth Amendment forbids the federal government to deny equal protection of the laws. *Bolling v. Sharpe*, 347 U.S. 497 (1954); *David v. Passman*, 442 U.S. 228, 234 (1979).

8. This court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

VENUE

9. Venue is proper because Plaintiff Jacqueline Fenore resides in this District and events giving rise to this action occurred in this District.

FACTS

10. The United States has not had a draft since 1973, but it does currently have a Selective Service System that requires males aged 18-25 to register for the draft. Females of any age are forbidden to register.

11. On March 28, 2025, Plaintiff Jacqueline Fenore attempted to register for

Selective Service by submitting her name and other required information through the MSSA website. https://www.sss.gov/register/. The first question in the form asks the applicant to check a box indicating whether they are male or female. This same section contains the phrase: "Current law does not permit females to register." Ms. Fenore checked the box for female and submitted her application. Her registration was rejected solely because she is female. She is otherwise qualified to register for Selective Service.

12.     Two female members of EME whose ages are between 18 and 25 attempted to register for Selective Service in March 2025, but their applications were rejected solely because they are female. They are otherwise qualified to register for Selective Service.

13.     Although the Supreme Court has previously ruled that it is not unconstitutional under the Fifth Amendment to deny women the opportunity to register for Selective Service, *Rostker v. Goldberg*, 453 U.S. 57 (1981), *Rostker* was decided nearly forty years before the ERA was ratified in 2020.

14.     Regardless of the ERA, *Rostker* is no longer good law because it was decided under a judicial review standard of intermediate scrutiny. Intermediate scrutiny cannot be sustained under the ERA or the Fifth Amendment's Equal Protection guarantee because it subjects females to unequal protection of the laws

while other people enjoy the more protective fully equal judicial review standard of strict scrutiny.

15.     *Rostker* was decided at a time when women were forbidden to engage in combat. Women today engage in combat in all military branches. News Release, *Pentagon Says Women Can Now Serve in Front-Line Ground Combat Positions*, NPR (Dec. 3, 2015). The National Commission on Military, National, and Public Service recently asserted its view that women should be allowed to register for Selective Service. Report, *The Final Report of the National Commission on Military, National, and Public Service,* (Mar. 25, 2020).

16.     Plaintiffs and all women are harmed because Defendants intentionally exclude women from Selective Service.

17.     Plaintiffs and all women have suffered stigmatic injury by the public perception that they are unworthy of registering for Selective Service.

18.     A case similar to this one was recently filed in the Northern District of California. *Valame v. Biden*, Docket No. 5:2023cv03018. Vickram Valame, a male, asserted only one claim -- that MSSA discriminates against him and violates his rights under the ERA because women are not required to register for Selective Service. His complaint was dismissed by the District Court, and his appeal is now pending before the Ninth Circuit. *Valame v. Biden*, 24-369. His case will likely be decided by the United States Supreme Court where two questions will be

addressed: First, whether the ERA is valid, and second, whether women may/must register for Selective Service.

19.    Mr. Valame's case is not the proper vehicle by which the Supreme Court should decide such important constitutional questions about women's rights. Only a lawsuit filed by women on behalf of women can adequately represent the interests at stake for women. While men may have standing to complain about women not being allowed to register for Selective Service, it is women who have *constitutionally* been denied the opportunity to register, thus women should have priority voice in any legal battle that seeks to determine *their* constitutional rights.

20.    In addition to Mr. Valame's case, two other Supreme Court cases threaten women's rights. The first was decided in 2020 and held that transgender people fall under the legal definition of "sex" as that term is used in Title VII of the Civil Rights Act of 1964. *Bostock v. Clayton County*, 590 U.S. 644 (2020). Plaintiff EME submitted an amicus brief in support of transgender people in *Bostock*, urging the court to protect all people equally against discrimination.

21.    A second case was filed soon after *Bostock* and is currently pending before the Supreme Court. *U.S. v. Skrmetti*, Docket No. 23-477. *Skrmetti* urges the Court to extend *Bostock* by granting transgender people Fourteenth Amendment Equal Protection rights under the definition of "sex." A ruling is expected in June 2025. Women support Equal Protection rights for all people, but lawyers for transgender

people in *Skrmetti* asked the Supreme Court to adopt only intermediate scrutiny and to do so under the legal definition of "sex." This threatens to reaffirm and legitimize intermediate scrutiny for women at a time when women are adamantly opposed to intermediate scrutiny and *have been fighting against intermediate scrutiny* for decades.

22.    *Bostock*, *Skrmetti* and *Valame* involve the most fundamental of human rights for women - legal equality - yet women had/have no formal party status in those cases. Plaintiffs here seek to assert a meaningful voice for women at this critical time of judicial decision-making regarding women's status under the United States Constitution.

23.    While men and transgender people have a right to their opinion about what the judicial review standard ought to be for "sex", women alone should speak for women's rights, and they do not want intermediate scrutiny because it enables the government to deny them equal protection of the laws. For example, women are excluded from protection under the Massachusetts hate crime statute, G.L. c. 265, § 39. Women want and deserve *equal* protection of all laws, including especially laws against violence and abuse, which is only possible under strict scrutiny. Women do not want men or transgender people speaking for them when the Supreme Court decides whether women are *worthy* of *equal* protection of the laws under strict scrutiny.

24.     Unequal protection of the laws for women became constitutionally explicit in 1868 when the Fourteenth Amendment was adopted because it used the word "male" to exclude women from voting rights and Equal Protection rights. Women responded by fighting to fix the Fourteenth Amendment, first by establishing their own voting rights in 1920, and then in 1923, by launching a still unsettled fight for the ERA and Equal Protection rights.

25.     Women have made some progress since 1868, but they remain second-class citizens today because the Equal Protection guarantees of the Fifth and Fourteenth Amendments are enforced under the meager protections of intermediate scrutiny, which permits unequal treatment of women under all laws and by all government officials in all branches, state and federal, at all times. As Justice Antonin Scalia rightly put it in 2010, the Constitution does not require discrimination against women, "the only issue is whether it prohibits it. It doesn't." Condon, S., Scalia: *Constitution Doesn't Protect Women or Gays From Discrimination*, CBSNews.com, January 4, 2011, https://www.cbsnews.com/news/scalia-constitution-doesnt-protect-women-or-gays-from-discrimination/.

26.     This lawsuit asks the court to end women's constitutional inequality once and for all by adopting strict scrutiny under the ERA and the Fifth Amendment.

CLAIMS FOR RELIEF

## I.    TWENTY-EIGHTH AMENDMENT (ERA)

27.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

28.    An amendment duly proposed by Congress becomes part of the Constitution when three-fourths (38) of the states ratify it. U.S. Const. art. V. The ERA was duly proposed by Congress in 1972. Virginia became the thirty-eighth state to ratify it on January 27, 2020.

29.    While there is some disagreement about the ERA's validity because its ratification deadline expired before the last state ratified, many government officials and constitutional scholars believe the ERA is valid because the deadline is unconstitutional.[1]

30.    The ERA guarantees Plaintiffs and all women equality of rights and

---

[1] See e.g., H.J. Res.25, January 31, 2023 (dozens of congresspeople submit "Joint Resolution" declaring the ERA "valid"); President Biden declared the ERA valid in January 2025, https://8fdaf192-a63f-4cc1-ba4830c5727fb699. usrfiles.com/ugd/8fdaf1_25791c80811242ed998b71-5c28a6a2e8.pdf; American Bar Association declared the ERA valid in 2024, https://www.americanbar.org/ content/dam/aba/administrative/news/2024/am-res/601.pdf; Senator Kirsten Gillebrand declared the ERA valid in 2025, https://www.gillibrand.senate.gov/ news/press/release/gillibrand-statement-on-president-biden-declaring-the-era-as-the-law-of-the-land/; Law professors Lawrence Tribe and Kathleen Sullivan declared the ERA valid in 2025, https://contrarian.substack.com/p/the-equal-rights-amendment-at-long?utm_medium=ios.

forbids discrimination "on account of sex."

31.    Defendants have denied Plaintiffs equality of rights by prohibiting Plaintiffs from registering for Selective Service.

32.    Prohibiting Plaintiffs from registering for Selective Service serves no compelling government interest, is not narrowly tailored to serve any compelling government interest and is not the least restrictive means of achieving any compelling government interest.

33.    The categorical exclusion of women from Selective Service registration serves no compelling government interest, is not narrowly tailored to serve any compelling government interest and is not the least restrictive means of achieving any compelling government interest.

34.    Therefore, Plaintiffs and all women have been injured and will continue to suffer injury.

## II.    FIFTH AMENDMENT EQUAL PROTECTION

35.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

36.    The Fifth Amendment guarantees Equal Protection of the laws.

37.    Plaintiffs and all women have been denied Equal Protection of the laws.

38.    Prohibiting Plaintiffs from registering for Selective Service serves no

compelling government interest, is not narrowly tailored to serve any compelling government interest and is not the least restrictive means of achieving any compelling government interest.

39.    The categorical exclusion of women from Selective Service registration serves no compelling government interest, is not narrowly tailored to serve any compelling government interest and is not the least restrictive means of achieving any compelling government interest.

40.    Therefore, Plaintiffs and all women have been injured and will continue to suffer injury.

PRAYER FOR RELIEF

Plaintiffs respectfully request that this court grant declaratory and injunctive relief, including the following:

A. Issue a declaratory judgment that the categorical exclusion of women from Selective Service registration is unconstitutional under the ERA;

B. Issue a declaratory judgment that prohibiting Plaintiffs from registering for Selective Service is unconstitutional under the ERA;

C. Issue a declaratory judgment that the categorical exclusion of women from Selective Service registration is unconstitutional under the Fifth Amendment;

D. Issue a declaratory judgment that prohibiting Plaintiffs from registering for Selective Service registration is unconstitutional under the Fifth Amendment;

E.  Issue an injunction prohibiting the exclusion of Plaintiffs from Selective Service registration;

F.  Issue an injunction prohibiting the exclusion of women from Selective Service registration;

G.  Award Plaintiffs reasonable attorney's fees;

H.  Grant any and all other relief deemed just and proper.

A jury trial is requested on all claims so triable.

Respectfully submitted,

WENDY MURPHY
*/s/ Wendy J. Murphy*

Women's and Children's
     Advocacy Project
New England Law | Boston
154 Stuart Street
Boston, MA 02116
617-422-7410
wmurphy@nesl.edu

April 3, 2025

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

EQUAL MEANS EQUAL, *et al.*

          Plaintiffs,

   v.

DONALD J. TRUMP, in his official
capacity as President of the United States, *et al.*

          Defendants.

Case No.: 1:25-cv-10806-WGY

## DEFENDANTS' MOTION TO DISMISS

      Defendants respectfully move to dismiss Plaintiffs' Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. Plaintiffs' Complaint should be dismissed because it fails to allege facts sufficient to demonstrate standing. Plaintiffs' Complaint also fails to state a claim for which relief can be granted as to any of their claims. Defendants incorporate their Memorandum in Support of their Motion to Dismiss, which describes in more detail why Plaintiffs lack standing and why Plaintiffs' Complaint fails to state a claim upon which relief can be granted.

DATE: June 17, 2025

BRETT A. SHUMATE
Assistant Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch

JEAN LIN
Special Litigation Counsel

*/s/ Andrew Rising*
ANDREW J. RISING (D.C. Bar # 1780432)
LIAM C. HOLLAND
Trial Attorneys, U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW, Rm. 12520
Washington, D.C. 20005
Phone: (202) 514-0265
E-mail: andrew.j.rising@usdoj.gov
*Counsel for Defendants*

**RULE 7.1(a)(2) CERTIFICATION**

I communicated with counsel for Plaintiffs regarding this motion to dismiss. Counsel indicated that Plaintiffs will oppose the motion.

/s/ *Andrew Rising*
ANDREW J. RISING
Trial Attorney
United States Department of Justice

**CERTIFICATE OF SERVICE**

I hereby certify that I have filed this Motion with the Court's ECF system, which sends notice to Plaintiffs' Counsel identified on the NEF.

/s/ *Andrew Rising*
ANDREW J. RISING
Trial Attorney
United States Department of Justice

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

EQUAL MEANS EQUAL, *et al.*,

        Plaintiffs,

    v.

DONALD J. TRUMP, in his official
capacity as President of the United States, *et al.*,

        Defendants.

Case No.: 1:25-cv-10806-WGY

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ALEXANDER K. HAAS
Director, Federal Programs Branch

JEAN LIN
Special Litigation Counsel

*/s/ Andrew Rising*
ANDREW J. RISING
LIAM C. HOLLAND
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW, Rm. 12520
Washington, D.C. 20005
Phone: (202) 514-0265
E-mail: andrew.j.rising@usdoj.gov

*Counsel for Defendants*

# **TABLE OF CONTENTS**

INTRODUCTION......................................................................................................1

BACKGROUND.......................................................................................................2

     I.      THE MILITARY SELECTIVE SERVICE ACT.................................................2

     II.    THE EQUAL RIGHTS AMENDMENT..........................................................3

          A.    Procedures for Amending the Constitution...........................................3

          B.    Proposal of the Equal Rights Amendment...........................................4

     III.   PROCEDURAL HISTORY ........................................................................7

LEGAL STANDARDS.............................................................................................7

ARGUMENT............................................................................................................8

     I.      THIS COURT LACKS SUBJECT MATTER JURISDICTION ...............................8

          A.    Fenore Lacks Standing.......................................................................9

               1.     Fenore fails to allege a present or future injury ......................9

               2.     Fenore fails to allege a stigmatic injury ................................10

          B.    Equal Means Equal Lacks Standing...................................................12

               1.     Equal Means Equal fails to demonstrate organizational standing .....12

               2.     Equal Means Equal fails to demonstrate associational standing........13

          C.    Plaintiffs' ERA Claim is Foreclosed by *Coleman v. Miller*...................14

               1.     *Coleman* confirms Congress's exclusive authority over ratification deadlines ...............................................................15

               2.     States' ratification rescissions are nonjusticiable under *Coleman*.........15

     II.    PLAINTIFFS FAIL TO STATE A CLAIM FOR RELIEF ON THE MERITS.....16

          A.    Plaintiffs' Purported ERA Claim Fails to State A Claim.................16

          B.    Plaintiffs' Equal Protection Claim is Foreclosed by *Rostker*............19

CONCLUSION......................................................................................................20

# TABLE OF AUTHORITIES

**CASES**

*Agostini v. Felton*,
  521 U.S. 203 (1997) ...................................................................................................20

*Alamo v. Clay*,
  137 F.3d 1366 (D.C. Cir. 1998) ...............................................................................11

*Allen v. Wright*,
  468 U.S. 737 (1984) ...................................................................................................11

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .....................................................................................................7

*Baker v. Carr*,
  369 U.S. 186 (1962) ............................................................................................. 8, 14

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .....................................................................................................7

*Blum v. Holder*,
  744 F.3d 790 (1st Cir. 2014) ......................................................................................9

*Castro v. Scanlan*,
  86 F.4th 947 (1st Cir. 2023) ................................................................................ 9, 10

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) .....................................................................................................9

*Coleman v. Miller*,
  307 U.S. 433 (1939) .........................................................................................*passim*

*Corrie v. Caterpillar, Inc.*,
  503 F.3d 974 (9th Cir. 2007) ...................................................................................16

*Dames & Moore v. Regan*,
  453 U.S. 654 (1981) ...................................................................................................18

*Diamond v. Charles*,
  476 U.S. 54 (1986) ............................................................................................. 11, 12

*Dillon v. Gloss*,
  256 U.S. 368 (1921) ......................................................................................... 4, 17, 18

*Doe v. Selective Serv. Sys.*,
No. 23-CV-02403-JST, 2024 WL 4859089 (N.D. Cal. Nov. 20, 2024) ...............................................19

*Draper v. Healey*,
827 F.3d 1 (1st Cir. 2016) ............................................................................................13

*Elgin v. U.S. Dep't of Treasury*,
641 F.3d 6 (1st Cir. 2011), *aff'd sub nom.*, 567 U.S. 1 (2012)........................................... 2, 19

*Equal Means Equal v. Dep't of Educ.*,
450 F. Supp. 3d 1 (D. Mass. 2020).............................................................................. 12, 13

*Equal Means Equal v. Ferriero*,
478 F. Supp. 3d 105 (D. Mass. 2020), *aff'd*, 3 F.4th 24 (1st Cir. 2021) ...................................6, 12, 13

*Equal Means Equal v. Ferriero*,
3 F.4th 24 (1st Cir. 2021)..........................................................................................6, 7, 8, 9

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) .............................................................................................. 8, 12

*Ferguson v. Idaho Dep't of Corr.*,
No. 4:20-CV-00003-DCN, 2020 WL 1016447 (D. Idaho Mar. 2, 2020) ...........................................16

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000) ....................................................................................................8

*García-Catalán v. United States*,
734 F.3d 100 (1st Cir. 2013)...........................................................................................8

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977) ...................................................................................................13

*Idaho v. Freeman*,
529 F. Supp. 1107 (D. Idaho 1981) ..................................................................................5

*Illinois v. Ferriero*,
60 F.4th 704 (D.C. Cir. 2023) .................................................................................*passim*

*Kerchner v. Obama*,
612 F.3d 204 (3d Cir. 2010) ..........................................................................................11

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
511 U.S. 375 (1994) ....................................................................................................7

*Lance v. Coffman*,
549 U.S. 437 (2007) ..................................................................................................11

*Lujan v. Defs. of Wildlife,*
504 U.S. 555 (1992)................................................................................................8, 9

*Lyman v. Baker,*
954 F.3d 351 (1st Cir. 2020)........................................................................................11

*Maldonado v. Fontanes,*
568 F.3d 263 (1st Cir. 2009)..........................................................................................8

*Massachusetts v. U.S. Dep't of Health & Hum. Servs.,*
682 F.3d 1 (1st Cir. 2012) ...........................................................................................19

*Nat'l Coal. for Men v. Selective Serv. Sys.,*
141 S. Ct. 1815 (2021) ......................................................................................... 19, 20

*Nat'l Coal. for Men v. Selective Serv. Sys.,*
969 F.3d 546 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 1815 (2021) ...................................... 19, 20

*Nat'l Coal. for Men v. Selective Serv. Sys.,*
No. CV-24-4016-AB, 2024 WL 5277137 (C.D. Cal. Nov. 20, 2024) ....................................19

*Nat'l Org. for Women, Inc. v. Idaho,*
459 U.S. 809 (1982) ............................................................................................. 5, 17

*Pocket Veto Case,*
279 U.S. 655 (1929).................................................................................................18

*Rodriguez de Quijas v. Shearson/Am. Express Inc.,*
490 U.S. 477 (1989)..................................................................................................20

*Rostker v. Goldberg,*
453 U.S. 57 (1981) ..............................................................................................*passim*

*Rucho v. Common Cause,*
139 S. Ct. 2484 (2019)...............................................................................................14

*Schwartz v. Brodsky,*
265 F. Supp. 2d 130 (D. Mass. 2003) ............................................................................10

*SEC v. Tambone,*
597 F.3d 436 (1st Cir. 2010).........................................................................................7

*Sierra Club v. Morton,*
405 U.S. 727 (1972)..................................................................................................12

*Sinochem Int'l Co. v. Malay. Int'l Shipping,*
549 U.S. 422 (2007)...................................................................................................7

*State Oil Co. v. Khan,*
  522 U.S. 3 (1997) .................................................................................................................2

*Summers v. Earth Island Inst.,*
  555 U.S. 488 (2009) ...................................................................................................... 9, 13

*Taylor v. El Centro Coll.,*
  No. 3:21-CV-0999-D, 2022 WL 102611 (N.D. Tex. Jan. 10, 2022) ....................................16

*Town of Norwood v. FERC,*
  202 F.3d 392 (1st Cir. 2000)..............................................................................................13

*United States v. AVX Corp.,*
  962 F.2d 108 (1st Cir. 1992)......................................................................................... 12, 14

*United States v. Sprague,*
  282 U.S. 716 (1931) ............................................................................................................3

*Valame v. Biden,*
  No. 23-CV-03018-NC, 2024 WL 251415 (N.D. Cal. Jan. 20, 2024) ........................ 6, 16, 19

*Valentín v. Hosp. Bella Vista,*
  254 F.3d 358 (1st Cir. 2001)................................................................................................7

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State,*
  454 U.S. 464 (1982) ..........................................................................................................11

*Virginia v. Ferriero,*
  525 F. Supp. 3d 36 (D.D.C. 2021), *aff'd sub nom.*, 60 F.4th 704 (D.C. Cir. 2023) .................... 6, 17, 18

*Warth v. Seldin,*
  422 U.S. 490  (1975) ...........................................................................................................9

*White v. Hart,*
  80 U.S. 646 (1871) ...................................................................................................... 15, 16

## CONSTITUTIONAL LAW

U.S. Const. amend. XVIII................................................................................................. 4, 18

U.S. Const. amend. XX..................................................................................................... 4, 18

U.S. Const. amend. XXI .................................................................................................... 4, 18

U.S. Const. amend. XXII................................................................................................... 4, 18

U.S. Const. art. III ................................................................................................................8

U.S. Const. art. V ........................................................................................................................3

**STATUTES**

1 U.S.C. § 112 ...........................................................................................................................14

50 U.S.C. § 3802 ......................................................................................................................2, 8

50 U.S.C. § 3809 ......................................................................................................................2, 8

50 U.S.C. § 3811 ...........................................................................................................................2

50 U.S.C. §§ 3801, *et seq.* ..........................................................................................................2

NDAA for Fiscal Year 2017,
   Pub. L. No. 114-328, 130 Stat. 2000 (2016) ...........................................................................3

**RULES**

Fed. R. Civ. P. 12 .................................................................................................................. 7, 10

**LEGISLATIVE MATERIALS**

H.R. 4350, 117th Cong. § 513 (2022).........................................................................................3

H.R. Rep. No. 95-1405 (1978) ..................................................................................................15

H.R.J. Res. 208, 92d Cong., 86 Stat. 1523 (1972) ........................................................ 4, 15, 18

H.R.J. Res. 554, 95th Cong., 92 Stat. 3795 (1978)............................................................. 4, 18

H.R.J. Res. 638, 95th Cong. (1978) .................................................................................... 5, 15

S. 2792, 117th Cong. § 511 (2022)..............................................................................................3

S. 2943, 114th Cong. § 591 (2016)..............................................................................................2

S. 4543, 117th Cong. § 521 (2023)..............................................................................................3

S.J. Res. 1, 89th Cong., 79 Stat. 1327 (1965) .................................................................... 4, 18

S.J. Res. 1, Gen. Assemb., Reg. Sess. (Va. 2020) ......................................................... 5, 16, 17

S.J. Res. 2, 54th Leg. (S.D. 1979) ..............................................................................................5

S.J. Res. 2, 79th Leg., Reg. Sess. (Nev. 2017)......................................................................5, 16

S.J. Res. 7, 92d Cong., 85 Stat. 825 (1971) .................................................................................. 4, 18

S.J. Res. 29, 87th Cong., 76 Stat. 1259 (1962) ............................................................................. 4, 18

S.J. Res. 39, 86th Cong., 74 Stat. 1057 (1960) ............................................................................. 4, 18

S.J. Res. Const. Amend. 0004, 100th Gen. Assemb. Reg. Sess. (Ill. 2018) ......................................... 5, 16

## OTHER AUTHORITIES

Bryan A. Garner *et al.*, THE LAW OF JUDICIAL PRECEDENT 29 (2016) .....................................................20

FY2023 NDAA: Selective Service and Draft Registration, Cong. Rsch. Serv. Insight, (Jan. 12, 2023),
    http://crsreports.congress.gov/product/pdf/IN/IN11973 ...................................................................3

House Armed Servs. Comm., Hearing on Recommendations of the National Commission on
    Military, National, and Public Service, 117th Cong., 1st Sess., YouTube (May 19, 2021),
    https://www.youtube.com/watch?v=N90tvUb6Fow&t=4229s ............................................................3

Inspired to Serve, Executive Summary, The Final Report of the National Commission on
    Military, National, and Public Service (March 2020),
    https://docs.house.gov/meetings/AS/AS00/20210519/112680/HHRG-117-AS00-Wstate-
    HeckJ-20210519-SD001.pdf ...............................................................................................................3

OLC, *Effect of 2020 OLC Opinion on Possible Congressional Action Regarding Ratification of the Equal
    Rights Amendment*, 46 Op. O.L.C., slip op. 3 (2022),
    https://www.justice.gov/d9/2022-11/2022-01-26-era.pdf ...................................................................5

OLC, *Ratification of the Equal Rights Amendment*, 44 Op. O.L.C., slip op. 15 (2020),
    https://go.usa.gov/xtJ3J.....................................................................................................................4, 5

Senate Comm. on Armed Servs., FY25 NDAA Executive Summary (June 2024),
    https://perma.cc/V3T2-N379.............................................................................................................3

Senate Comm. on Armed Servs., Hearing on Final Recommendations and Report of the National
    Commission on Military, National, and Public Service, 117th Cong., 1st Sess. (Mar. 11, 2021),
    https://perma.cc/8UXP-JXCC ...........................................................................................................3

## INTRODUCTION

The Constitution vests Congress and the Executive with broad discretion over military affairs, particularly with respect to the composition of the armed forces. Pursuant to that authority, in 1948 Congress enacted the Military Selective Service Act ("MSSA"), which requires men between the ages of 18 and 26 to register with the Selective Service System. Plaintiffs, Jacqueline Fenore and the nonprofit Equal Means Equal ("EME"), now argue that Congress's longstanding male registration requirement violates a proposed constitutional amendment, the Equal Rights Amendment (hereinafter "ERA"), and the Equal Protection component of the Fifth Amendment. Their claims implicate generalized policy grievances, not concrete and particularized injuries for purposes of Article III. Plaintiffs' principal legal theory also hinges on a premise no court has ever accepted: that the ERA was validly ratified and has become part of the U.S. Constitution. And the Supreme Court long ago foreclosed Plaintiffs' equal protection challenge in *Rostker v. Goldberg*, deferring to Congress' "broad constitutional power to raise and regulate armies and navies." 453 U.S. 57, 65 (1981). Plaintiffs' claims are thus foreclosed by controlling precedent in all respects and should be dismissed.

At the threshold, Plaintiffs' claims should be dismissed for lack of standing. Plaintiffs cannot demonstrate that they have suffered a legally cognizable injury that is fairly traceable to the MSSA. This is particularly true here because reaching the merits would force the judiciary to decide the constitutionality of an action taken by a co-equal branch of government and the standing inquiry is especially rigorous. The MSSA itself does not require Fenore or EME to take any action. To the contrary, their complaint is that the MSSA does *not* require women to register. But Plaintiffs do not connect Fenore's inability to register with any actual or imminent harm. And their theory of stigmatic harm fails to plausibly allege that the alleged stigmatization of nonregistration actually affects them in any way. Such claims fail to meet the burden of Article III.

Plaintiffs' claims also fail on the merits. It is undisputed that the ERA was not ratified by a sufficient number of states during the time period established by Congress, and the Supreme Court has long recognized such deadlines to be valid. For that reason, the Archivist of the United States has

not certified the ERA as an operative part of the Constitution, and every court to consider claims invoking the ERA has rejected them. The same result should obtain here.

Controlling precedent similarly forecloses Plaintiffs' equal protection claim, since the Supreme Court rejected an identical claim in *Rostker* and further declined the opportunity to overturn *Rostker* just four years ago. This Court is bound by this controlling precedent. Plaintiffs may disagree with *Rostker*'s holding and believe that it should be disregarded, but it is the Supreme "Court's prerogative alone to overrule one of its precedents," *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997). *See Elgin v. U.S. Dep't of Treasury*, 641 F.3d 6, 24 (1st Cir. 2011) (Stahl, J., concurring) ("[I]t would not be for this court to determine what, if any, impact these developments had on the continued vitality of *Rostker*, a task left solely to the Supreme Court."), *aff'd sub nom.*, 567 U.S. 1 (2012). This Court should therefore grant Defendants' motion and dismiss the Complaint in its entirety.

## BACKGROUND

### I.     THE MILITARY SELECTIVE SERVICE ACT

The MSSA, 50 U.S.C. §§ 3801, *et seq.*, requires male citizens and residents of the United States between the ages of 18 and 26, with certain exceptions, to register with the Selective Service System. 50 U.S.C. §§ 3802(a), 3809. Men who fail to register or otherwise comply with the MSSA and its implementing regulations may be subject to certain penalties and denied federal benefits. *Id.* §§ 3811(a), 3811(f). The MSSA does not require women to register. *See* 50 U.S.C. § 3802(a).

In 1980, President Carter recommended to Congress that the MSSA be extended to include a requirement to register women. *See Rostker*, 453 U.S. at 60. Congress declined after "consider[ing] the question at great length" with "extensive testimony and evidence." *Id.* at 61, 72. The next year, the Supreme Court rejected an equal protection challenge to the MSSA's male-only draft registration requirement, giving due deference to Congress's considered judgment that women could not assume combat roles in the military. *Id.* at 78-79.

Congress again considered male-only registration in the context of the 2017 National Defense Authorization Act ("NDAA"). The Senate version of that bill would have required women to register, S. 2943, 114th Cong. § 591 (as passed by Senate, June 21, 2016), but the law as enacted instead created

a commission to study the military Selective Service process to determine, among other questions, whether the process was needed at all and, if so, whether to conduct it "regardless of sex." NDAA for Fiscal Year 2017, Pub. L. No. 114-328, §§ 551, 555, 130 Stat. 2000, 2130, 2135 (2016). In its final report, issued March 25, 2020, the Commission recommended that both men and women be required to register with the Selective Service. *See* Inspired to Serve, Executive Summary, The Final Report of the National Commission on Military, National, and Public Service (March 2020), *available at* https://docs.house.gov/meetings/AS/AS00/20210519/112680/HHRG-117-AS00-Wstate-HeckJ-20210519-SD001.pdf. Congress has held hearings on the Commission's report,[1] and has considered multiple proposals to amend or repeal the MSSA to include women in recent years,[2] but has yet to change the MSSA's registration requirements.

## II.    THE EQUAL RIGHTS AMENDMENT

### A.    Procedures for Amending the Constitution

Article V of the Constitution provides that Congress may propose new amendments "whenever two thirds of both Houses shall deem it necessary[.]" U.S. Const. art. V. Article V further provides that an amendment "shall be valid to all Intents and Purposes, as Part of this Constitution, when ratified by the Legislatures of three fourths of the several States, or by Conventions in three fourths thereof, as the one or the other Mode of Ratification may be proposed by the Congress." *Id.* The choice as to "the mode of ratification[] lies in the sole discretion of Congress[.]" *United States v. Sprague*, 282 U.S. 716, 730 (1931). In the exercise of that discretion, "Congress has specified the mode of ratification in the proposing clause included within every resolution proposing a constitutional

---

[1] *See* Senate Comm. on Armed Servs., Hearing on Final Recommendations and Report of the National Commission on Military, National, and Public Service, 117th Cong., 1st Sess. (Mar. 11, 2021), https://perma.cc/8UXP-JXCC; House Armed Servs. Comm., Hearing on Recommendations of the National Commission on Military, National, and Public Service, 117th Cong., 1st Sess., YouTube (May 19, 2021), https://www.youtube.com/watch?v=N90tvUb6Fow&t=4229s.

[2] *See, e.g.*, Senate Comm. on Armed Servs., FY25 NDAA Executive Summary (June 2024) at 3, available at https://perma.cc/V3T2-N379; FY2023 NDAA (S. 4543, 117th Cong. § 521); FY2023 NDAA: Selective Service and Draft Registration, Cong. Rsch. Serv. Insight, (Jan. 12, 2023), http://crsreports.congress.gov/product/pdf/IN/IN11973; FY2022 NDAA (H.R. 4350, 117th Cong. § 513 and S. 2792, 117th Cong. § 511).

amendment." *Ratification of the Equal Rights Amendment*, 44 Op. O.L.C., slip op. 15 (2020), https://go.usa.gov/xtJ3J ("2020 OLC Opinion"). Thus, for every Constitutional amendment ever adopted, Congress has dictated the mode of ratification (*i.e.,* by state legislatures or state conventions) in the proposing clause rather than in the text of the amendment itself. *See id.* at 14-15, 15 n.15 (collecting examples). As the Supreme Court has recognized, "[w]hether a definite period for ratification shall be fixed, so that all may know what it is and speculation on what is a reasonable time may be avoided, is, in our opinion, a matter of detail which Congress may determine as an incident of its power to designate the mode of ratification." *Dillon v. Gloss*, 256 U.S. 368, 376 (1921).

Congress has exercised its authority to impose a ratification deadline numerous times over the past hundred years. Although the early resolutions proposing amendments did not limit the time for ratification, *see*, *e.g.*, J. Res., 1st Cong., 1 Stat. 97 (1789), Congress included seven-year deadlines in the texts of what became the Eighteenth, Twentieth, Twenty-First, and Twenty-Second Amendments. *See* U.S. Const. amends. XVIII, § 3; XX, § 6; XXI, § 3; XXII, § 2. When proposing the Twenty-Third Amendment in 1960, Congress included the ratification deadline in the proposing clause rather than in the text of the proposed amendment. *See* S.J. Res. 39, 86th Cong., 74 Stat. 1057 (1960). Since then, Congress has placed a deadline for ratification in the proposing clause of every constitutional amendment it has approved. *See* S.J. Res. 29, 87th Cong., 76 Stat. 1259 (1962) (Twenty-Fourth Amendment); S.J. Res. 1, 89th Cong., 79 Stat. 1327 (1965) (Twenty-Fifth Amendment); S.J. Res. 7, 92d Cong., 85 Stat. 825 (1971) (Twenty-Sixth Amendment); H.R.J. Res. 208, 92d Cong., 86 Stat. 1523 (1972) (proposed ERA); H.R.J. Res. 554, 95th Cong., 92 Stat. 3795 (1978) (proposed D.C. Congressional Representation Amendment).

### B.  Proposal of the Equal Rights Amendment

On March 23, 1972, both Houses of Congress adopted (by two-thirds majority) a joint resolution to submit the ERA to the state legislatures. 86 Stat. 1523 (1972). As it had done with respect to several prior proposed constitutional amendments, Congress imposed a seven-year deadline for ratification. The proposing clause stated that the amendment would become "part of the Constitution when ratified by the legislatures of three-fourths of the several States within seven years

from the date of its submission by the Congress[.]" *Id.* Within nine months, twenty-two states ratified the ERA. *Illinois v. Ferriero*, 60 F.4th 704, 712 (D.C. Cir. 2023). By 1977, thirty-five states had ratified the ERA, three states short of the thirty-eight needed to meet the threshold three-fourths of the fifty states as required by Article V. *Id.* However, between 1973 and 1978, four states—Nebraska, Tennessee, Idaho, and Kentucky—voted to rescind their ratifications of the ERA. *Id.*

On October 20, 1978, Congress extended the deadline for ratification by an additional three years to June 30, 1982. *See* H.R.J. Res. 638, 95th Cong. (1978). A group of states and individuals challenged this extension, arguing that Article V prohibited Congress from extending a ratification deadline, *see Idaho v. Freeman*, 529 F. Supp. 1107, 1153-54 (D. Idaho 1981), but litigation was rendered moot by the expiration of the deadline. *Nat'l Org. for Women, Inc. v. Idaho*, 459 U.S. 809 (1982). In the meantime, in 1979, South Dakota passed a resolution stating that its prior ratification expired after the seven-year deadline, unless three-fourths of the states ratified by that time. *Id.* (citing S.J. Res. 2, 54th Leg. (S.D. 1979)).

Thirty-six years after the amended ratification deadline expired, in 2018, Nevada voted to purportedly ratify the ERA. *See* S.J. Res. 2, 79th Leg., Reg. Sess. (Nev. 2017). Shortly thereafter, Illinois and Virginia voted to purportedly ratify the proposed amendment. *See* S.J. Res. Const. Amend. 0004, 100th Gen. Assemb. Reg. Sess. (Ill. 2018); S.J. Res. 1, Gen. Assemb., Reg. Sess. (Va. 2020). After Virginia's vote, some states urged the Archivist of the United States to certify and publish the amendment as part of the Constitution. *See Ferriero*, 60 F.4th at 713. Other states sued the Archivist to block any such certification and publication. *See Alabama v. Ferriero*, No. 7:10-cv-2032 (N.D. Ala. Dec. 16, 2019). Facing these competing demands, the Archivist asked the U.S. Department of Justice's Office of Legal Counsel ("OLC") to determine the legal status of the ERA. OLC issued a formal opinion stating that the ERA "failed to secure the necessary ratifications within either of Congress's deadlines." 2020 OLC Opinion at 2.[3]

---

[3] OLC later clarified that "the 2020 OLC Opinion is not an obstacle either to Congress's ability to act with respect to ratification of the ERA or to judicial consideration of the pertinent questions." OLC, *Effect of 2020 OLC Opinion on Possible Congressional Action Regarding Ratification of the Equal Rights Footnote Cont'd.*

In 2020, Illinois, Nevada, and Virginia sued the Archivist of the United States seeking to compel the Archivist to certify and publish the ERA pursuant to Article V of the Constitution. *Virginia v. Ferriero*, 525 F. Supp. 3d 36 (D.D.C. 2021), *aff'd sub nom.*, 60 F.4th 704 (D.C. Cir. 2023). The district court dismissed the case for lack of jurisdiction. *Id.* The district court first held that the states lacked standing because they did not show that the Archivist's failure to certify and publish the ERA caused "a concrete injury that could be remedied by ordering him to act," *id.* at 45. The U.S. Court of Appeals for the D.C. Circuit affirmed dismissal of the suit. The D.C. Circuit also held that the plaintiff states were not entitled to mandamus relief because they had not established that the Archivist had a clear duty to certify and publish the ERA or that their right to relief was clear and indisputable, including because the states had not established that Congress lacked the authority to impose a time limit on ratification of the ERA or to place that time limit in the proposing clause of the ERA. *Ferriero*, 60 F.4th at 716-19. Individual and organizational plaintiffs, including EME, brought a similar lawsuit in this Court, which dismissed the case for lack of standing, a ruling the U.S. Court of Appeals for the First Circuit affirmed. *See Equal Means Equal v. Ferriero*, 478 F. Supp. 3d 105, 122 (D. Mass. 2020), *aff'd*, 3 F.4th 24 (1st Cir. 2021).

In 2023, a non-registered male sued the Selective Service System to challenge the constitutionality of the MSSA's male-only registration requirement on ERA and Equal Protection grounds identical to those raised by Plaintiffs here. *See Valame v. Biden*, No. 23-CV-03018-NC, 2024 WL 251415, at *1 (N.D. Cal. Jan. 20, 2024) (cited at Compl. ¶ 18, ECF No. 1). The district court dismissed the plaintiff's Equal Protection claim as foreclosed by *Roskter*, and dismissed his ERA claim on the grounds that plaintiffs "Cannot State a Claim Under a Non-Existent Amendment." *Id.* at *2 n.1, *3. Valame moved for an injunction halting enforcement of the MSSA pending appeal, which the Ninth Circuit denied. *See Valame v. Biden*, No. 24-369. His appeal of the district court's order dismissing his case is currently pending before the Ninth Circuit. *Id.*

---

*Amendment*, 46 Op. O.L.C., slip op. 3 (2022), https://www.justice.gov/d9/2022-11/2022-01-26-era.pdf ("2022 OLC Opinion").

## III.    PROCEDURAL HISTORY

Plaintiffs EME, a nonprofit organization, and Jacqueline Fenore, a female between age 18 and 25, filed their complaint on April 3, 2025.  Compl. ¶¶ 2-3.  They allege that by not requiring females to register for selective service, the MSSA violates both the Equal Protection component of the Fifth Amendment and the proposed Equal Rights Amendment, which they refer to as the "Twenty-Eighth Amendment to the United States Constitution."  Compl. ¶ 7.  As noted above, this is not EME's first attempt to litigate the validity of the ERA in this district.  *See supra* 6.  This Court dismissed EME's prior complaint invoking the ERA for lack of standing.  *See Equal Means Equal*, 3 F.4th 24.

## <u>LEGAL STANDARDS</u>

Plaintiffs' complaint should be dismissed for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).  When a defendant raises the issue of subject matter jurisdiction, the court must resolve the jurisdictional issue before proceeding to the merits of the plaintiff's claims.  *See Sinochem Int'l Co. v. Malay. Int'l Shipping*, 549 U.S. 422, 430-31 (2007).  In reviewing a motion to dismiss for lack of subject matter jurisdiction, a court is guided by the principle that "[f]ederal courts are courts of limited jurisdiction."  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  Thus, a court is presumed to lack jurisdiction in a particular case unless the contrary affirmatively appears, and the plaintiff bears the burden of establishing that such jurisdiction exists.  *Id.*  The court's review under Rule 12(b)(1) is not restricted to the pleadings; rather, the court may review extrinsic evidence to address any factual issues that affect jurisdiction.  *See Valentín v. Hosp. Bella Vista*, 254 F.3d 358, 363 (1st Cir. 2001) ("jurisdictional averments are entitled to no presumptive weight [and] the court must address the merits of the jurisdictional claim by resolving the factual disputes between the parties").

Defendants also move to dismiss for failure to state a claim. To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up); *SEC v. Tambone*, 597 F.3d 436, 442 (1st Cir. 2010).  "If the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal."  *Id.* at 442 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  A court must

separate the well-pleaded facts from conclusory legal allegations and accept as true only the factual allegations. *García-Catalán v. United States*, 734 F.3d 100, 103 (1st Cir. 2013). And "[w]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not show[n]—that the pleader is entitled to relief." *Maldonado v. Fontanes*, 568 F.3d 263, 268 (1st Cir. 2009) (cleaned up).

**ARGUMENT**

## I.  THIS COURT LACKS SUBJECT MATTER JURISDICTION

Article III of the Constitution limits federal-court jurisdiction to "actual cases and controversies." *Equal Means Equal*, 3 F.4th at 27 (citing U.S. Const. art. III, § 2, cl. 1). "An actual case or controversy only exists if the plaintiff has demonstrated 'such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends.'" *Id.* (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)). "[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). "By requiring the plaintiff to show an injury in fact, Article III standing screens out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). "The burden on the plaintiff at the pleading stage is plausibly to allege that each of the requirements to establish standing has been met." *Equal Means Equal*, 3 F.4th at 28.

Plaintiffs here—a female and a nonprofit organization—are totally unregulated by the statute the challenge. The MSSA requires males, but not females, between the ages of 18 and 26 to register. 50 U.S.C. §§ 3802(a), 3809. When (as here) a plaintiff challenges the government's alleged "unlawful regulation (or lack of regulation) of *someone else*," standing is "substantially more difficult to establish." *Lujan*, 504 U.S. at 562 (quotation marks omitted). Here too the Court's standing inquiry should be

J.A. 33

"especially rigorous" because "reaching the merits of the dispute would force [the court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Blum v. Holder*, 744 F.3d 790, 797 (1st Cir. 2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013)). This is so because, consistent with the bedrock principle of separation of powers, judging the constitutionality of executive or congressional action is "the gravest and most delicate duty that [courts are] called upon to perform." *Rostker*, 453 U.S. at 64.

Because Fenore cannot demonstrate that she has suffered a legally cognizable injury, she cannot meet the "injury in fact" requirement to establish standing. Nor can EME demonstrate that it has suffered the requisite injury to demonstrate standing to sue on its own behalf or on behalf of any of its unidentified members. *See Equal Means Equal*, 3 F.4th at 28-31. Even if Plaintiffs could establish Article III standing, their purported ERA claim would still be foreclosed by controlling precedent.

### A.      Fenore Lacks Standing

The first prong of the standing inquiry, "injury in fact," requires (1) an "invasion of a legally protected interest" that is (2) "concrete and particularized" and (3) "actual or imminent." *Lujan*, 504 U.S. at 560 (citations omitted). Demonstration of an injury in fact "is a hard floor of Article III jurisdiction." *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009). At their core, Plaintiffs' allegations raise general policy objections, not concrete and particularized injuries present, stigmatic, or future, and recourse for their policy objections lies with the political process, not in federal court.

1.      <u>Fenore fails to allege a present or future injury</u>

Fenore fails to carry her burden to show that she has suffered a concrete and particularized injury caused by Defendants' actions. In the Complaint, Plaintiffs do not offer a single "specific, concrete fact[]" to show that the MSSA—or Defendants' administration of the Act—has caused or will cause Fenore personal, particularized, and cognizable injury. *Warth v. Seldin*, 422 U.S. 490, 508 (1975). Instead, the Complaint alleges merely that "Plaintiffs and all women are harmed because Defendants intentionally exclude women from Selective Service." Compl. ¶ 16. But that conclusory allegation of generalized harm common to "all women" falls far short of the requirement to demonstrate the existence of a particularized harm to Fenore herself. *Id. See Castro v. Scanlan*, 86 F.4th

947, 955 (1st Cir. 2023) (the case or controversy requirement "prevents a plaintiff from invoking the Article III jurisdiction of a federal court by asserting what is merely a 'general interest common to all members of the public.'" (citation omitted)).

At bottom, the MSSA does not harm Fenore by requiring her to do anything, nor deprive her of any opportunities in life. Because she is not required to register, she cannot be subject to criminal penalties, a loss of eligibility for federal or state jobs and education benefits, or the denial of a security clearance for failing to register. And Plaintiffs alleges no such deprivation in their Complaint. Nor would selective service registration allow Fenore to receive any additional benefits that would not otherwise be available to her. As Plaintiffs concede, Fenore remains free to enlist in the military (now or in the event the draft is reinstated). Compl. ¶ 15. The Complaint does not allege that if Fenore did enlist, her exemption from the registration requirement would hinder her career opportunities in the military or otherwise place her at any comparative disadvantage. As such, she has not alleged any injury sufficient to establish Article III standing.

In *Schwartz v. Brodsky*, this Court came to the same conclusion. 265 F. Supp. 2d 130 (D. Mass. 2003). There, four men and one woman brought a challenge to the MSSA claiming, as Plaintiffs contend here, that the factual underpinnings of *Rostker* had been weakened. *See id.* at 132. This Court dismissed the claims of all plaintiffs for failure to state a claim under Rule 12(b)(6), and also found that the female plaintiff lacked standing because individuals "who have never been registered with the Selective Service System and are not under any compulsion to register in the near future" suffered neither "distinct and palpable harm nor imminent threat of concrete harm . . . sufficient to establish standing" from the male-only registration requirement. *Id.* at 131 n.1 (citation omitted). That conclusion remains correct here.

### 2.  Fenore fails to allege a stigmatic injury

Equally meritless is Plaintiffs' vague assertion that "Plaintiffs and all women have suffered stigmatic injury by the public perception that they are unworthy of registering for Selective Service." Compl. ¶ 17. Indeed, the plausibility of such a perception is undercut by the fact that "[w]omen today engage in combat in all military branches." *Id.* at ¶ 15. More importantly, stigmatic injury inflicted by

allegedly unconstitutional discrimination based on differential treatment requires that the differential treatment have some real, adverse consequence for the named plaintiff. *See Allen v. Wright*, 468 U.S. 737, 755-56 (1984) (emphasizing that when the injury asserted is a "stigmatic injury," the requirement of *personal* injury takes on heightened importance); *see, e.g., id.* at 737, 755 (plaintiffs lacked standing to challenge tax exemption granted to school when injury was exemption's allegedly stigmatizing effect); *Alamo v. Clay*, 137 F.3d 1366, 1370 (D.C. Cir. 1998) (assertions of stigma insufficient when plaintiffs fail to allege "any detrimental consequences" from the stigma). No such personal and concrete injuries are (or can be) alleged by Plaintiffs here. Fenore does not allege that the purported stigmatization she attributes to the MSSA has impacted her in any way. *See id.* Having failed to allege that the MSSA has any effect—measurable or otherwise—on her activities or opportunities in life, Fenore has failed to carry her burden to establish standing.

Absent a particularized, concrete injury, Plaintiffs' complaint is akin to a policy grievance, unsuitable for resolution in federal court. *See Lance v. Coffman*, 549 U.S. 437, 440 (2007) ("To have standing, we observed, a plaintiff must have more than 'a general interest common to all members of the public.'" (citation omitted)); *Lyman v. Baker*, 954 F.3d 351, 361 (1st Cir. 2020) ("[i]njuries that are too 'widely shared' or are 'comparable to the common concern for obedience to the law'" are not particularized (citation omitted)). Plaintiffs concede as much in their Complaint, admitting that their concern is so generalized that it applies to "all women," Compl. ¶¶ 16-17; *see also id* ¶ 22 ("Plaintiffs here seek to assert a meaningful voice for women at this critical time of judicial decision-making regarding women's status under the United States Constitution."). Such "abstract questions of wide public significance" are "most appropriately addressed in the representative branches," not in federal court. *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State*, 454 U.S. 464, 475 (1982) (citation omitted); *Kerchner v. Obama*, 612 F.3d 204, 208 (3d Cir. 2010) (same). Likewise, "assertion of a right to a particular kind of Government conduct, which the Government has violated by acting differently, cannot alone satisfy the requirements of Art. III without draining those requirements of meaning." *Valley Forge*, 454 U.S. at 483. Simply put, Article III "requires more than a desire to vindicate value interests." *Diamond v. Charles*, 476 U.S. 54, 66 (1986). Plaintiffs' "disagreement [with

the MSSA], however sharp and acrimonious . . . is insufficient by itself to meet Art. III's requirements." *Id.* At their core, Plaintiffs' allegations raise general policy objections, not particularized injuries present, stigmatic, or future, and recourse for their policy objections lies with the political process, not in federal court.

### B.     Equal Means Equal Lacks Standing

#### 1.     Equal Means Equal fails to demonstrate organizational standing

Similarly, EME lacks standing to sue, either on its own behalf or on behalf of its purported members.  An organization does not have standing to sue based on "a mere 'interest in a problem,' no matter how longstanding the interest and . . . how qualified the organization is in evaluating the problem." *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972).  "[O]rganizations may have standing to sue on their own behalf for injuries they have sustained." *All. for Hippocratic Med.*, 602 U.S. at 393-94 (citation omitted).  "In doing so, however, organizations must satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals." *Id.*; *see also Equal Means Equal v. Dep't of Educ.*, 450 F. Supp. 3d 1, 7 (D. Mass. 2020) (dismissing EME for lack of organizational or associational standing).  Under this test, it is no easier for an organization to establish standing than it is for an individual. *All. for Hippocratic Med.*, 602 U.S. at 393-94.

EME alleges no injury sufficient to establish organizational standing to sue on its own behalf. At most, it alleges that it "is an organization that represents women, and advocates for women's equality," Compl. ¶ 1, and that it "has been a national leader in the fight for women's equality for many years." *Id.* ¶ 3.  But "an organization may not establish standing simply based on the 'intensity of the litigant's interest' or because of strong opposition to the government's conduct, 'no matter how longstanding the interest and no matter how qualified the organization.'" *Id.* at 394 (citations omitted); *see also United States v. AVX Corp.*, 962 F.2d 108, 114 (1st Cir. 1992) ("[A] mere interest in an event— no matter how passionate or sincere the interest and no matter how charged with public import the event—will not substitute for an actual injury.").  Tellingly, EME invoked similar interests as a basis for standing in another lawsuit regarding the ERA less than five years ago.  This court correctly rejected its argument then, and should do so again here. *See Equal Means Equal v. Ferriero*, 478 F. Supp.

3d at 122 ("[i]f these allegations were sufficient to claim standing, an organizational plaintiff would have standing anytime a defendant's action interfered with their organizational goal of advocacy. This is precisely the principle the Supreme Court rejected in *Sierra Club*[.]").

2. Equal Means Equal fails to demonstrate associational standing

Nor has EME established associational standing to sue on behalf of its members. An "organization may have [associational] standing if at least one of its members has standing in his or her own right, the interests served by the suit are pertinent to the mission of the organization, and relief does not require the presence of the members in the suit." *Town of Norwood v. FERC*, 202 F.3d 392, 405–06 (1st Cir. 2000). "To satisfy this requirement, the association must, at the very least, 'identify a member who has suffered the requisite harm.'" *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016) (quoting *Summers*, 555 U.S. at 499).

At the outset, nowhere does the Complaint allege facts indicating that EME is an organization with members "possess[ing] all of the indicia of membership in an organization." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977). Indeed, courts in this district have previously rejected EME's claims of associational standing on similar grounds. *See Equal Means Equal v. Dep't of Educ.,* 450 F. Supp. 3d at 6 (EME "allege[d] they have supporters who 'voluntarily associate themselves with EME,' but that is not sufficient to [support] standing."). Thus, "Equal Means Equal's failure to allege facts in this regard is alone fatal to its associational standing theory." *Equal Means Equal v. Ferriero*, 478 F. Supp. 3d at 120.

Moreover, although EMS alleges that "[t]wo female members of EME whose ages are between 18 and 25 [unsuccessfully] attempted to register for Selective Service in March 2025," Compl. ¶ 12, those members lack standing in their own right for the same reasons that Fenore lacks standing. As explained above, an inability to register for the Selective Service does not amount to a present, future, or stigmatic injury for purposes of Article III. *See supra* 9-12; *Draper*, 827 F.3d at 3 (to secure associational standing, "the association must, at the very least, 'identify a member who has suffered the requisite harm.'" (quoting *Summers*, 555 U.S. at 499)). For all of the reasons stated, Plaintiffs have not demonstrated standing in this suit, and the Court should dismiss this suit for lack of jurisdiction.

*See AVX Corp.*, 962 F.2d at 113 (explaining that "[i]f a party lacks standing to bring a matter before the court, the court lacks jurisdiction to decide the merits of the underlying case").

### C.    Plaintiffs' ERA Claim is Foreclosed by *Coleman v. Miller*

Even if this Court were to find that Plaintiffs have adequately alleged standing under Article III, their ERA claim would still need to be dismissed under *Coleman v. Miller,* 307 U.S. 433 (1939). Plaintiffs' claim that the MSSA is unconstitutional because it violates the ERA derives from their assertion that the ERA is an operative part of the Constitution. Compl. ¶ 28. But the Complaint does not and cannot cite to any provision of the United States Statutes at Large—the official document that Congress directed must include "any amendments to the Constitution of the United States . . . ratified . . . pursuant to article V[,]" 1 U.S.C. § 112—including the provisions of the Equal Rights Amendment. Those "Statues at Large[,]" Congress directed, "shall be legal evidence of . . . ratified amendments to the Constitution of the United States therein contained, in all the courts of the United States[,]" including this one. *Id.*

Rather, Plaintiffs seemingly anticipate "proving" that the ERA is a part of the Constitution as part of their claim that Defendants are violating it. Compl., ¶¶ 28-29. But Plaintiffs themselves acknowledge that there is "disagreement about the ERA's validity because its ratification deadline expired before the last state ratified," *id.* at ¶ 29, and several states have taken action to rescind their prior ratifications before Virginia's ratification in 2020. Accordingly, Plaintiffs' purported ERA claim necessarily requires this Court to (1) find that a deadline established by a supermajority of Congress for the ratification of a constitutional amendment is invalid, and (2) find invalid the actions taken by five states to rescind their prior ratifications. In *Coleman v. Miller,* 307 U.S. at 447–56, however, the Supreme Court confirmed Congress's exclusive authority in this area, and held that the question of "what effect a prior rejection had on a subsequent ratification, w[as] committed to congressional resolution and involved criteria of decision that necessarily escaped the judicial grasp." *Baker*, 369 U.S. at 214. Because Plaintiffs' claim that the ERA is valid necessarily requires the Court to address issues within Congress's exclusive authority under *Coleman*, this case must be dismissed. *See Rucho v. Common Cause*, 139 S. Ct. 2484, 2494, 2508 (2019) (when a "claim is said to present a 'political question'

and to be nonjusticiable" the claim is "beyond the courts' jurisdiction" and the court must "dismiss [the case] for lack of jurisdiction.").

>    1.  *Coleman* confirms Congress's exclusive authority over ratification deadlines

To succeed on their ERA claim, Plaintiffs must demonstrate that the deadlines Congress imposed for states to ratify the ERA in 1972 and 1978 are invalid.  Compl. ¶ 29.  But under *Coleman,* "the question, what is a reasonable time [for ratification of a constitutional amendment], lies within the congressional province."  307 U.S. at 454.  Congress decided how much time to allot for ratification the ERA after considering "a great variety of relevant conditions, political, social and economic, which can hardly be said to be within the appropriate range of evidence receivable in a court of justice[.]" *Coleman*, 307 U.S. at 453; *see* H.R. Rep. No. 95-1405, at 11 (1978).  Were this Court to accept Plaintiffs' invitation to hold Congress's deadline invalid, it would give this Court a pivotal role in the Amendment process, which Article V places in the hands of Congress.  *See id.* at 453.  Indeed, to rule for the Plaintiffs, this Court would have to upend the last sixty years of constitutional amendments, during which time Congress has routinely set ratification deadlines in the same manner as the ERA.  *See supra* 4.  It is undisputed that Congress set a deadline for ratification of the ERA, *see* 86 Stat.  1523 (1972); H.R.J. Res. 638, 95th Cong. (1978).  This Court should defer to Congress's exclusive authority in this area.  *See Coleman*, 307 U.S. at 453-54.

>    2.  States' ratification rescissions are nonjusticiable under *Coleman*

In order to find that the ERA has been ratified by the required number of states, this Court must also find invalid the actions several states have taken over the years to rescind their prior ratifications.  If these rescissions were valid, only 33 states would have ratified the ERA (assuming, *arguendo*, that the post-deadline ratifications of Nevada, Illinois, and Virginia count), leaving the proposed amendment five states short of number needed for adoption.  *See supra* 5.  The Supreme Court has determined that this precise question is nonjusticiable.  As it explained, "in accordance with th[e] historic precedent" of the Fourteenth Amendment's ratification process, "the question of the efficacy of . . . attempted withdrawal [of a state's prior ratification], should be regarded as a political question pertaining to the political departments[.]" *Coleman*, 307 U.S. at 450; *see also White v. Hart*, 80

U.S. 646, 649 (1871) (A state's "den[ial] [of] the validity of her ratification of [a] constitutional amendment[]" presents a case that is "clearly one in which the judicial is bound to follow the action of the political department of the government, and is concluded by it").  Because under *Coleman*, this Court has no jurisdiction to decide the validity of the rescissions, the Court necessarily must dismiss Plaintiffs' ERA claim.  *Coleman*, 307 U.S. at 450; *see also Corrie v. Caterpillar, Inc.,* 503 F.3d 974, 980 (9th Cir. 2007) ("the presence of a political question deprives a court of subject matter jurisdiction").

## II.     PLAINTIFFS FAIL TO STATE A CLAIM FOR RELIEF ON THE MERITS

### A.     Plaintiffs' Purported ERA Claim Fails to State a Claim

Plaintiffs argue that the MSSA's male-only registration requirement is contrary to the ERA, which they claim was ratified as the 28th Amendment to the Constitution on January 27, 2020.  Compl. ¶ 28.  This claim fails because the ERA is not part of the Constitution; its ratification deadline expired without a sufficient number of states ratifying it, and Congress has taken no action to extend that deadline since.  Plaintiffs point to no authority compelling a different result.  Indeed, every court to have considered the question has held that the ERA has no effect.  *See, e.g.*, *Valame*, 2024 WL 251415, at *3 ("there is now no 28th Amendment and [plaintiff] cannot state a claim for relief under a constitutional amendment that does not exist"); *Taylor v. El Centro Coll.*, No. 3:21-CV-0999-D, 2022 WL 102611, at *8 (N.D. Tex. Jan. 10, 2022) ("[plaintiff]'s claim under the Equal Rights Amendment fails because there is no such amendment to the United States Constitution."); *Ferguson v. Idaho Dep't of Corr.*, No. 4:20-CV-00003-DCN, 2020 WL 1016447, at *1 n.1 (D. Idaho Mar. 2, 2020) (holding that the ERA is not part of the United States Constitution); *Ferriero*, 60 F.4th at 716-19 (Archivist did not have a duty to certify and publish the ERA because the deadline for ratification imposed by Congress was properly imposed in the proposing clause for the Amendment, and the deadline had lapsed).

Congress has twice set deadlines for ratification of the ERA:  first when it originally proposed the amendment to the states, and again in a subsequent joint resolution.  *See supra* 4-5.  But of the 38 ratification actions that Plaintiffs rely on to support their claim, Compl. ¶ 28, three were taken after both deadlines set by Congress had passed, *see* S.J. Res. 2, 79th Leg., Reg. Sess. (Nev. 2017); S.J. Res. Const. Amend. 0004, 100th Gen. Assemb. Reg. Sess. (Ill. 2018); S.J. Res. 1, Gen. Assemb., Reg. Sess.

(Va. 2020), and five others have rescinded. "To prevail, then, Plaintiffs must show: (1) that th[ose] three ratifications count; and (2) that the rescissions of five other states do not." *Ferriero*, 525 F. Supp. 3d at 55. They cannot do so. It is well established that Congress has the power to establish ratification deadlines, so the purported ratifications of Nevada, Illinois, and Virginia came too late to count. The ERA thus failed adoption regardless of whether the actions taken by five other states to rescind their prior ratifications were valid.

The Supreme Court long ago recognized "the power of Congress . . . to fix a definite period for the ratification" of proposed amendments, *Dillon*, 256 U.S. at 375-76; *see id.* at 376 (finding "no doubt" as to Congress's power to set such a time limit "as an incident of its power to designate the mode of ratification"); *see also Coleman*, 307 U.S. at 452; *Ferriero*, 60 F.4th at 716-19. And it is indisputable that Nevada, Illinois, and Virginia only purported to ratify the proposed amendment *after* the expiration of Congress' valid deadline.

That the deadline is valid is reflected in the litigation challenging Congress's extension of the ERA's deadline. While the case was pending in the Supreme Court, the extended deadline expired and the Solicitor General urged the Court to dismiss the case as moot because "the Amendment has failed of adoption no matter what the resolution of the legal issues presented." Mem. for the Adm'r of Gen. Servs. Suggesting Mootness at 3, *Nat'l Org. for Women, Inc. v. Idaho*, Nos. 81-1282 *et al.* (July 9, 1982). The Supreme Court agreed. *Nat'l Org. for Women*, 459 U.S. at 809. As the district court in *Virginia v. Ferriero* recognized, "[i]f the deadline was ineffective, a live controversy would have remained because additional states' ratifications could have still pushed the ERA past the three-fourths threshold." 525 F. Supp. 3d at 59.

In the face of *Dillon* and cases like it, Plaintiffs merely allege that some "believe the ERA is valid because the deadline is unconstitutional," citing statements by former-President Biden, Senator Gillibrand, the American Bar Association, and two law professors to that effect, as well as a failed House Joint Resolution to remove the ratification deadline. Compl. ¶ 29 n.1. But mere "belie[f] [that] the ERA is valid" cannot overcome controlling Supreme Court precedent to the contrary. *Id.* at ¶ 29. *See Dillon*, 256 U.S. at 376 (finding "no doubt" as to Congress's power to set a time limit "as an incident

of its power to designate the mode of ratification"); *Coleman*, 307 U.S. at 452; *Ferriero*, 60 F.4th at 716-19 (citing *Dillon* and *Coleman*).

Nor can Plaintiffs' theory be squared with Congress's actions, as Congress has proposed a time limit for every constitutional amendment over the last 100 years, and has placed deadlines for ratification in the proposing clause of amendments for the past sixty years, just as it did for the ERA. *See supra* 4; *The Pocket Veto Case*, 279 U.S. 655, 689 (1929) ("Long settled and established practice is a consideration of great weight in a proper interpretation of constitutional provisions of this character."); *see also Dames & Moore v. Regan*, 453 U.S. 654, 684 (1981) (relying on historical practice of less than 40 years). Accepting Plaintiffs' argument would thus deprive Congress of an authority that it has long exercised pursuant to Article V for every amendment proposed in modern history: the power to include ratification instructions, including a deadline for ratification, as conditions of the States' ratification of proposed amendments. *See* U.S. Const. amends. XVIII, § 3; XX, § 6; XXI, § 3; XXII, § 2; S.J. Res. 39, 86th Cong., 74 Stat. 1057 (1960) (Twenty-Third Amendment); S.J. Res. 29, 87th Cong., 76 Stat. 1259 (1962) (Twenty-Fourth Amendment); S.J. Res. 1, 89th Cong., 79 Stat. 1327 (1965) (Twenty-Fifth Amendment); S.J. Res. 7, 92d Cong., 85 Stat. 825 (1971) (Twenty-Sixth Amendment); H.R.J. Res. 208, 92d Cong., 86 Stat. 1523 (1972) (proposed ERA); H.R.J. Res. 554, 95th Cong., 92 Stat. 3795 (1978) (proposed D.C. Congressional Representation Amendment). Accordingly, because "Congress set deadlines for ratifying the ERA that expired long ago," the final three ratifications alleged by Plaintiffs "came too late to count" for purposes of ratification, so the ERA cannot serve as a vehicle for Plaintiffs' claim regardless of whether the attempted rescissions of five other states were valid. *Ferriero*, 525 F. Supp. 3d at 40.[4]

---

[4] Like the district court in *Ferriero*, this Court need not reach the issue of whether Nebraska, Tennessee, Idaho, Kentucky, and South Dakota validly rescinded their prior ratifications of the ERA in order to grant Defendants' motion to dismiss, because Congress's well-established power to set a deadline for ratification independently forecloses Plaintiff's claims. *See* 525 F. Supp. 3d at 46. But in order to find that the ERA is part of the Constitution as Plaintiffs claim, this Court would need to invalidate these States' rescissions, which presents a nonjusticiable political question. *See supra* 15-16.

### B.     Plaintiffs' Equal Protection Claim is Foreclosed by *Rostker*

Plaintiffs also raise an Equal Protection challenge to the MSSA, but they acknowledge that this claim is foreclosed by binding Supreme Court precedent. *See* Compl. ¶ 13. (conceding that "the Supreme Court has previously ruled that it is not unconstitutional under the Fifth Amendment to deny women the opportunity to register for Selective Service."). Plaintiffs' claim that the MSSA violates equal protection is indeed foreclosed by *Rostker*. Federal courts have consistently rejected such claims in the years since. *See, e.g., Nat'l Coal. for Men v. Selective Serv. Sys.*, 969 F.3d 546, 548 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 1815 (2021); *Valame*, 2024 WL 251415, at *2 n.1; *Nat'l Coal. for Men v. Selective Serv. Sys.*, No. CV-24-4016-AB, 2024 WL 5277137, at *4-5 (C.D. Cal. Nov. 20, 2024); *Doe v. Selective Serv. Sys.,* No. 23-CV-02403-JST, 2024 WL 4859089, at *4-5 (N.D. Cal. Nov. 20, 2024). *See also Elgin*, 641 F.3d at 24 (Stahl, J., concurring) ("[I]t would not be for this court to determine what, if any, impact these developments had on the continued vitality of *Rostker*, a task left solely to the Supreme Court."). Just four years ago, the Supreme Court declined an opportunity to "overrule *Roskter*" in deference to Congress's continued consideration of draft registration. *Nat'l Coal. For Men,* 141 S. Ct. at 1816. Accordingly, Plaintiffs' Equal Protection claim fails to state a claim upon which relief can be granted.

In an attempt to circumvent *Rostker*, Plaintiffs suggest that "*Rostker* is no longer good law because it was decided under a judicial review standard of intermediate scrutiny"—a level scrutiny that they contend "subjects females to unequal protection of the laws[.]" Compl. ¶ 14. But even if *Rostker* were applying intermediate scrutiny, which it was not, *see Rostker*, 453 U.S at 70, 81-83 (refusing to label the applicable level of scrutiny as heightened scrutiny and applying a standard closely resembling rational basis review), intermediate scrutiny remains the standard applicable to gender classification claims today. *See Massachusetts v. U.S. Dep't of Health & Hum. Servs.*, 682 F.3d 1, 9 (1st Cir. 2012) ("Gender-based classifications invoke intermediate scrutiny"). Plaintiffs' observation that "*Rostker* was decided at a time when women were forbidden to engage in combat" does not change the level of scrutiny. Compl. ¶ 15. Indeed, in *National Coalition for Men*, while Justice Sotomayor, joined by Justice Breyer and Justice Kavanaugh, similarly observed that "[t]he role of women in the military has

changed dramatically since [*Rostker*]," 141 S. Ct. at 1816, the Court denied certiorari all the same in light of Congress's continued consideration of the issue and  the "longstanding deference to Congress on matters of national defense and military affairs."  *Id.*

In any event, it is well established that lower courts are bound to follow Supreme Court precedent even when the underpinnings of a decision have been called into question by factual and legal changes, and must "leav[e] to [the Supreme] Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Express Inc.*, 490 U.S. 477, 484 (1989). *See also Agostini v. Felton*, 521 U.S. 203, 237 (1997) ("[W]e do not hold[] that other courts should conclude our more recent cases have, by implication, overruled an earlier precedent."); Bryan A. Garner *et al.*, THE LAW OF JUDICIAL PRECEDENT 29 (2016) ("Lower courts are bound even by old and crumbling high-court precedent—until the high court itself changes direction.").  The Fifth Circuit recognized as much in *National Coalition for Men*.  In reversing a district court order that had concluded *Rostker* was distinguishable in light of changes in military policy, the Fifth Circuit explained that the district court was not empowered to "ignore a decision from the Supreme Court unless directed to do so by the Court itself."  *Nat'l Coal. for Men*, 969 F.3d at 549 (citation omitted).  The Fifth Circuit further noted that *Rostker* also "deferr[ed] to Congress's determination that the administrative and operational burdens of [expanding the draft to include women] exceeded the utility," which Plaintiffs here fail to address in their Complaint.  *Id.* at 549 (citing *Rostker*, 453 U.S. at 81-82).  It is therefore appropriate to reject Plaintiffs' Fifth Amendment Equal Protection challenge under *Rostker* without need for further inquiry.

## CONCLUSION

For all of the foregoing reasons, Defendants respectfully request that the Court grant Defendants' motion and dismiss Plaintiffs' Complaint in its entirety.

Dated: June 17, 2025

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ALEXANDER K. HAAS
Director, Federal Programs Branch

JEAN LIN
Special Litigation Counsel

*/s/ Andrew Rising*
ANDREW J. RISING
LIAM C. HOLLAND
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW, Rm. 12520
Washington, D.C. 20005
Phone:   (202) 514-0265
E-mail:   andrew.j.rising@usdoj.gov

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that I have filed this Memorandum with the Court's ECF system, which sends

notice to Plaintiffs' Counsel identified on the NEF.

*/s/ Andrew Rising*
ANDREW J. RISING
Trial Attorney

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

EQUAL MEANS EQUAL;                      |
HEROICA FOUNDATION;                     |
JACQUELINE FENORE,                      |
individually and on behalf of           |
others similarly situated               |
                                        |
            **Plaintiffs,**             |
                                        |          **Civil Action No. 1:25-cv-10806**
DONALD J. TRUMP, in his official        |
capacity as President of the United     |
States; CRAIG BROWN, in his             |
official capacity as acting director of |
the SELECTIVE SERVICE                   |
SYSTEM; SELECTIVE SERVICE               |
SYSTEM                                  |
            **Defendants.**             |
                                        |
_____     |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

**WENDY MURPHY**
**Women's and Children's Advocacy**
**            Project**
**New England Law | Boston**
**154 Stuart Street**
**Boston, MA 02116**
**617-422-7410**
**MA BBO#550455**
**Wmurphy@nesl.edu**

J.A. 47

**TABLE OF CONTENTS**

INTRODUCTION ……………………………………………………..………..1

LEGAL STANDARD …………………………………………………….........1

FACTS ……………………..……………………………………….........1

ARGUMENT………….…..…………………………………………………….2

    I.      THE ERA IS THE TWENTY-EIGHTH AMENDMENT ...…………….....2

             a.   The Deadline is Per Se Invalid …………..…………………………3

             b.   The Deadline is Invalid Because it is in the Preamble……………..5

    II.     STATES CANNOT RESCIND RATIFICATIONS…………………….......8

    III.    BECAUSE THE ERA IS VALID, PLAINTIFFS ARE
           ENTITLED TO STRICT SCRUTINY REVIEW……………….…..…....10

    IV.    EVEN IF THE ERA IS NOT VALID, PLAINTIFFS ARE
           ENTITLED TO STRICT SCRUTINY REVIEW UNDER THE
           FIFTH AMENDMENT........................................................................12

    V.     THE MSSA IS UNCONSTITUTIONAL UNDER
           STRICT SCRUTINY ..........................................................................14

    VI.    PLAINTIFFS HAVE STANDING …………………………………..16

             a.   Discriminatory Exclusion ………….………………………………15

             b.   Stigma and Stereotype ………………..................................……16

             c.   Denial of Equal Opportunity to Participate in Civic Life ……….17

             d.   Equal Means Equal and Heroica Foundation Have Standing……19

   CONCLUSION ………………………………………………………....20

## **Table of Authorities**

<u>**Cases**</u>

*Ableman v. Booth*,
    62 U.S. 514 (1859)…………………………………………………………...12

*Ableman v. Booth*,
    11 Wis. 501 (1859)…………………………………………………………...12

*Arver v. U.S.*,
    245 U.S. 366 (1918)………………………………………………………….17

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)…………………………………………………………...1

*Brzonkala v. Virginia Polytechnic Institute and State University*,
    132 F.3d 949 (4th Cir. 1997) ……………………………………......………13

*Carter v. Jury Commissioner*,
    396 U.S. 320 (1970)……………………………………….……..15, 17

*Coleman v. Miller*,
    307 U.S. 433 (1939)…………………………………………………...2, 3

*Craig v. Boren*,
    429 U.S. 190 (1976)……………………………………………....……. 12, 13

*Dillon v. Gloss,*
    256 U.S. 368 (1921)……………………………………………...……..2, 3, 4

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)…………………………………………...…….6

*Elizabeth Cady Stanton Tr. V. Neronha*,
    No. 22-cv-00245-MSM (D.R.I.)…………………………………...……….5

*Edmonson v. Leesville*,
    500 U.S. 614 (1991)………………………………………………………….17

*ex. rel. Ashcroft v. Fulton*,
    642 S.W. 2d 617 (Mo. 1982)……………………………………….……….5

*Frontiero v. Richardson*,
    411 U.S. 677 (1973)…………………………………….…………11, 12, 16

*Garcia-Catalan v. U.S.,*
    734 F.3d 100 (1st Cir. 2013)………………………………………………..1

*Goldberg v. Rostker,*
    509 F. Supp. 586 (E.D. Pa. 1980)………………………………………16, 17

*Hawke v. Smith*,
    253 U.S. 221 (1920)……………………………………………………….9

*Hollingsworth v. Virginia,*
    3 U.S. (3 Dall.) 378 (1798)………………………………...………………9

*Idaho v. Freeman,*
    529 F. Supp. 1107 (D. Idaho 1982)………………………………………8, 20

*Illinois v. Ferriero,*
    60 F.4th 704 (D.C. Cir. 2023)……………………………………...……5

*In re Booth,*
    3 Wis. 1 (1854)…………………………………………………….……..12

*Jacobsen v. Massachusetts,*
    197 U.S. 11 (1905)………………………………………………...…….6

*Kerin v. Titeflex Corp.,*
    770 F.3d 978 (1st Cir 2014)…………………………….……………….1

*Kyle-Labell v. Selective Service,*
    364 F.Supp. 3d 394 (D.N.J. 2019)………………………….……14, 15, 16

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992)………………………………………………………1

*N.O.W., Inc. v. Idaho,*
    459 U.S. 809 (1982)…………………………………...…………….8

*Idaho v. Freeman*,
    625 F.2d 886 (9th Cir. 1980)…………………………………..………20

*Nat'l League of Cities v. Usery,*
    426 U.S. 833 (1976)………………………………………………..…..4

*Poy v. Boutselis,*
    352 F. 3d 479 (1st Cir. 2003)…………………………………...……6

*Reddy v. Foster*,
   845 F.3d 493 (1st Cir. 2017)…………………………….…15

*Reed v. Reed*,
   404 U.S. 71 (1971)………………………………….… …13, 16

*Rostker v. Goldberg*,
   453 U.S. 57 (1981)……………………………….………14, 15

*Schwartz v. Brodksy*,
   265 F.Supp.2d 130 (D. Mass. 2003)……………………..………………16

*U.S. v. SCRAP*,
   412 U.S. 669 (1973)…………………………………………...………15

*Strahan v. Coxe*,
   127 F.3d 155 (1st Cir. 1997)…………………….………………...5

*Strauder v. West Virginia*,
   100 U.S. 303 (1880)…………………………………..……………17

*Students for Fair Admissions v. President and Fellows of Harvard College*,
   980 F.3d 157 (1st Cir. 2020)…………………………….....…11, 12, 19

*Thurman v. City of Torrington*,
   595 F. Supp. 1521 (D. Conn. 1984)……………………………...………10

*U.S. ex rel. Hutcheson v. Blackstone Med., Inc.*,
   647 F.3d 377 (1st Cir. 2011)…………………………………...……………1

*U.S. v. DeRobertis*,
   538 F.Supp. 899 (N.D. Ill. 1982)……………………………….………….12

*U.S. v. Schwimmer,*
   279 U.S. 644 (1929)………………………………………...…………17

*U.S. v. Skrmetti*,
   605 U.S. ___ (2025)…………………………………...………………19

*U.S. v. Virginia*,
   518 U.S. 515 (1996)…………………………………………….……11, 12

*Valame v. Biden*,
   No. 5:2023cv03018 (N.D. Cal.)……………………………………….5, 19

*Valame v. Biden*,
 Docket No. 24-369 (9th Cir.)………………………….…......………19

*Virginia et al. v. Ferriero*,
  1:20-cv-00242 (D.C. Dist.)………………………..……………….5

*Warth v. Seldin*,
 422 U.S. 490 (1975)……………………………….…………………1

*Westminster School District v. Mendez*,
 161 F.2d 774 (9th Cir. 1947)…………………………………………..12

*White v. Crook*,
 251 F.Supp. 410 (M.D. Ala. 1966)…………………………..………15, 17

*Whren v. U.S.*,
 517 U.S. 806 (1996)…………………………….…………………..10

**<u>Constitutional Provisions</u>**

Amend. V, United States Constitution …………………………………...…….1

Amend. X, United States Constitution……………………………...…………….4

Amend. XIV, United States Constitution…………………………...………….9

Amend. XV, United States Constitution……………………………...…………..9

Amend. XVIII, United States Constitution …………………………...……..7

Amend. XIX, United States Constitution………………………...……………7, 9

Amend. XX, United States Constitution …………………………...…...……….6

Amend. XXI, United States Constitution ……………………….……………..7

Amend. XXII, United States Constitution …………………...………………7

Amend. XXIII, United States Constitution …………………………………7

Amend. XXIV, United States Constitution ……………………...……………...7

Amend. XXV, United States Constitution …………………………………...7

Amend. XXVI, United States Constitution …………….……….……………7

Amend. XXVII, United States Constitution……………………….….…….…….…4

Amend. XXVIII, United States Constitution……………………………..…..*passim*

Art. V, United States Constitution …………………………………………...... *passim*

**Statutes, Codes, and Resolutions**

50 U.S.C., § 3801 et seq, (Military Selective Service Act)………….….…………*passim*

92 Stat. 3795 (1978)…………………………………………………….…………8

S. Con. Res. 120, 102nd Congress (1991–92)……………………...……………4

H. Con. Res. 120, 102nd Congress (1991–92)………………………….…..4

H.J. Res. 25, January 31, 2023………………………………………..……2

Illinois S.J. Res. Const. Amend. 0004, 100th Gen. Assemb………………………..8

Nevada S.J. Res. 2, 79th Leg……………………………….…...………..8

**Rules**

F.R.C.P. 12(b)(1)……………………………………………………………...1

F.R.C.P. 12(b)(6)……………………………………………………………...1

**Other Authorities**

10 Cong. Rec. 6628 (1955)………………………………………………..7

75 Cong. Rec. 3856 (1932)……………………………………………..6

92 Stat. 3795 (1978)…………………………………...……………..7

*Archivist Letter to Congresswoman Maloney*, October 25, 2012, available at https://www.scribd.com/ document/557659874/Ferriero-Letter-of-Oct-25-2012-to-Rep-Maloney.......................................................................................8

Bernstein, R.B., *The Sleeper Wakes: The History and Legacy of the 27th Amendment*, 61 FORDHAM L.REV. 497 (1992)………………………….……..10

Condon, S., Scalia: *Constitution Doesn't Protect Women or Gays From Discrimination*, CBSNews.com, January 4, 2011………………………...13

Cong. Globe, 40th Cong., 2d Sess. 4266 (1868)…………………………………….……………9

*Congresswoman Maloney Letter to the Archivist,* August, 23, 2012, available at, *https://www.scribd.com/document/557671897/Rep-Maloney-Ltr-to-Ferriero-Aug-2012*.........................................................................................................................……………..8

*Debates on Woman Suffrage Referendum*, Mass. Archives, Legis. Records, Series 1915-03…………………………………………………………………...………17

Dellinger, W., *The Legitimacy of Constitutional Change: Rethinking the Amendment Process*, 97 HARV. L. REV. 386 (1983)…………………………………….………..6, 10

DeSimone, D., *Why 9/11 Inspired These Service Members to Join the Military*, USO.org, Sept. 7, 2021…………………………………………………….………………18

*Equal Rights Amendment Extension, Hearings on H.J. Res. 134 Before the Subcomm. On Civ. and Const. Rights of the H. Comm. On the Judiciary*, 95th Cong. 57 (1978)...5, 10

THE FEDERALIST NO. 21……………………………………………………………………..7

THE FEDERALIST NO. 39……………………………………………………………………..7

THE FEDERALIST NO. 43……………………………………………………………………..7

Fishell, L.A., *Note, Reversals in the Federal Constitutional Amendment Process: Efficacy of State Ratifications of the Equal Rights Amendment*, 49 IND. L.J. 147 (1973)……………………………………………………………………9

Gillibrand, K, press release, *ERA is the Law of the Land,* https://www.gillibrand.senate.gov/news/press/release/gillibrand-statement-on-president-biden-declaring-the-era-as-the-law-of-the-land/.…………………………………………………………………………2

Hatzenbuehler, M. L., et al., *State-Level Polices and Psychiatric Morbidity in Lesbian, Gay, and Bisexual Populations*. 99 AM. J. PUBLIC HEALTH (12) 2275 (2009)…………..13

Heckman, J., *Governmentwide hiring plan calls on agencies to recruit 'patriotic Americans' into federal workforce*, Federal News Network, May 29, 2025…………….18

Ho, J., *Finding Out What it Means to Me: The Politics of Respect and Dignity in Sexual Orientation Antidiscrimination*, 2017 UTAH L. REV. 463 (2017)…………………..………13

Jameson, J., A TREATISE ON CONSTITUTIONAL CONVENTIONS, 4th ed., Riverside Press (1887)…………………………………………………………..10

Joint Judiciary Committee Report on the Equal Rights Amendment, Report No. 92-359, 92d Congress, *Equal Rights For Men And Women*, July 14, 1971….………………….11

Kalfus, M., *Why Time Limits on the Ratification of Constitutional Amendments Violate Article V*, 66 U. CHI. L. REV. 437 (1999)………………………………………..…..4, 6

Kinnard, M., *Biden Says the Equal Rights Amendment is the Law of the Land*, Associated Press, APNews.com, January 17, 2025………………………………………2

Krieger N., *Discrimination and Health Inequities*, 44 INT'L J. OF HEALTH SERV. 643 (2014)……………………………………………………………………..………13

*Letter from State Attorneys General to U.S. Congress* (February 22, 2020)………...……6

Lincoln, A., *Gettysburg Address,* 1863………………………………………..………18

Natelson, R., *Amending the Constitution by Convention: A More Complete View of the Founders' Plan*, Independence Institute (2010)…………………………………..……9

National Archives, Milestone Documents, *14th Amendment to the U.S. Constitution: Civil Rights* (1868), https://www.archives.gov/milestone-documents/14th-amendment....9

NATIONAL ARCHIVES AND RECORDS ADMINISTRATION: EQUAL RIGHTS AMENDMENT, LIST OF STATE RATIFICATION ACTIONS, https://www.archives.gov/files/foia/pdf/era-list-of-state-ratification-actions-03-24-2020.pdf........................................................................8

National Public Radio, *Pentagon Says Women Can Now Serve in Front-Line Ground Combat Positions*, NPR.org. (Dec. 3, 2015)………………………………….………14

Neale, T., CONG. RESEARCH SERV. R42979, THE PROPOSED EQUAL RIGHTS AMENDMENT: CONTEMPORARY RATIFICATION ISSUES, 14 (2018)…………….……11

New York City Bar Association, *Statement Calling for the Publication and Certification of the Equal Rights Amendment*, December 24, 2024, https://www.nycbar.org/reports/publication-and-certification-of-the-equal-rights-amendment-biden/#_edn15…………...3

*Opinions of the Office of Legal Counsel of the Dep't of Justice*, Congressional Pay Amendment, 16 Op. O.L.C. 85 (May 13, 1992)……………………..…………….……4

Rankin, S., *With Virginia's Ratification, ERA Fight Advances*, ASSOCIATED PRESS, (Jan. 27, 2020)……………………………………………………………….…………2

*Ratification of the Equal Rights Amendment, Memorandum for the General Counsel National Archives and Records Administration*, slip op., Jan. 6, 2020………….4

Selective Service, *Register*, https://www.sss. gov/register/……………………..……..17

SENATE JUDICIARY COMMITTEE, *The Response to Rape: Detours on the Road to Equal Justice* (May 1993), https://www.ojp.gov/pdffiles1/Digitization/ 145360NCJRS.pdf …………………………………………….…………………..14

*Suffolk University/USA Today Issues Poll*, October 2018, https://www.suffolk.edu/-/media/suffolk/documents/academics/research-at-suffolk/suprc/polls/national/2018/ %2010_25_2018_marginals_pdftxt.pdf?la=en&hash=7303DAC9B701D7E65632FEDDF 60B260C8%20983B994 ………………………………………….…………………..3

Temple, S., ERA is the Law, Says ABA, *Democrats Abroad*, August 8, 2024, https://www.democratsabroad.org/sharitemple/era_is_the_law_says_aba…..…… 2

Tribe, L., Sullivan, K., *ERA is the Law of the Land*, The Contrarian, January 17, 2025, https://contrarian.substack.com/p/the-equal-rights-amendment-at-long...........................2

U.N. General Assembly, *In-Depth Study on All Forms of Violence against Women: Report of the Secretary General,* A/61/122/Add.1, July 6, 2006…………………..13

U.N. Women*, Investing in Gender Equality and Women's Empowerment* Oct. 31, 2010………………………………………………………………………….13

*Violence Against Women Act*, H.R. conf. rep. no. 103–711 (1994)……………..14

Wright, D., "*An Atrocious Way to Run A Constitution": The Destabilizing Effects of Constitutional Amendment Rescissions*, 59 DUQUESNE L. REV. 12 (2021)……………...10

## INTRODUCTION

This is a constitutional challenge to the Military Selective Service Act (MSSA), 50 U.S.C., § 3801 et seq., which requires "male citizens" aged 18 through 25 to register for the draft but forbids females to do the same. Plaintiffs assert claims under the Equal Rights Amendment (ERA) and the 5th Amendment. Defendants have filed a motion to dismiss under Rules 12(b)(1) and 12(b)(6). It should be denied.

## LEGAL STANDARDS

Under Rule 12(b)(1), the court must "accept as true all well-pleaded fact[s] . . . and indulge all reasonable inferences in the plaintiff[s'] favor." *Kerin v. Titeflex Corp.*, 770 F.3d 978, 981 (1st Cir. 2014). General allegations of injury suffice as it is presumed that they embrace "specific facts … necessary to support the claim." *Warth v. Seldin,* 422 U.S. 490, 508 (1975). At the motion to dismiss stage, plaintiffs need not set forth evidence that would be required at the summary judgment stage. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

Under Rule 12(b)(6) allegations need only be plausible to support a reasonable inference that the defendant is liable. *Garcia-Catalan v. U.S.*, 734 F.3d 100, 103 (1st Cir. 2013). The court must "accept as true all well-pleaded facts," analyze them in a light most hospitable to the plaintiff and draw all reasonable inferences for the plaintiff." *U.S. ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377, 383 (1st Cir. 2011). There need only be "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

## FACTS

On March 25, 2025, Plaintiff Jacqueline Fenore, a female between the ages of 18 and 25, attempted to register for Selective Service through its online portal. Her registration was rejected solely because she is female. Later that same month, two members of Plaintiff Equal Means Equal

(EME), females between the ages 18 and 25, also attempted to register for Selective Service. Their registrations were rejected solely because they are female. Com.pp.3-4.

<strong>ARGUMENT</strong>

**I.     THE ERA IS THE TWENTY-EIGHTH AMENDMENT**

When an amendment is proposed by two-thirds of Congress and "ratified by the legislatures of three fourths of the several states," it "shall be valid to all intents and purposes, as part of this Constitution…." U.S. CONST. art. V; *Dillon v. Gloss*, 256 U.S. 368, 376 (1921). The ERA was proposed in 1972 and ratified by the last necessary state on January 27, 2020. Rankin, S., *With Virginia's Ratification, ERA Fight Advances*, ASSOCIATED PRESS (Jan. 27, 2020). Therefore, the ERA is now the Twenty-Eighth Amendment to the U.S. Constitution.

Many scholars, the American Bar Association, government officials, and even President Biden agree that because the conditions of Article V have been satisfied, the ERA is valid. See e.g., H.J. Res. 25, January 31, 2023 (dozens of congresspeople submit "Joint Resolution" declaring the ERA valid); Kinnard, M., *Biden Says the Equal Rights Amendment is the Law of the Land*, Associated Press, APNews.com, January 17, 2025; Temple, S., *ERA is the Law*, *Says ABA*, Democrats Abroad, August 8, 2024. Senator Kirsten Gillibrand agrees, Gillibrand, K., Press Release, *Statement on President Biden Declaring the ERA the Law of the Land*, January 17, 2025, as do constitutional law professors Lawrence Tribe and Kathleen Sullivan, *The Equal Rights Amendment At Long Last*, The Contrarian, January 17, 2025.[1]

---

[1] Defendants argue that these government officials are merely expressing beliefs, and that beliefs cannot override binding Supreme Court precedent D.Mem.17-18, citing *Dillon v. Gloss*, 256 U.S. 368, 376 (1921) and *Coleman v. Miller*, 307 U.S. 433, 452 (1939). Fair enough, but as discussed at length herein, *Dillon* and *Coleman* are not binding precedent. *See* Arguments 1a and 1b. Moreover, statements of government officials and scholars should not be denigrated as mere beliefs since they participate directly in the development of laws and judges routinely rely on them to determine doctrinal contours. In a healthy democracy, such opinions should bear on how

### a. The Deadline is Per Se Invalid

Defendants correctly note that Congress burdened the States with a ratification deadline of seven years (later extended to ten), and that the ERA was ratified long after it expired, but the ERA is valid nonetheless because Article V nowhere authorizes Congress to impose deadlines.

In *Dillon v. Gloss*, 256 U.S. 368, 376 (1921) the Supreme Court said that Article V implies congressional authority to impose deadlines, but this should be disregarded as dictum because it was not necessary to the Court's adjudication of the issues.[2] Moreover, *Dillon* is not good law as it is premised on the notion that States must ratify amendments contemporaneously with congressional proposal to ensure national consensus.[3] *Id*. at 375. This arcane view has not

---

courts view the strength of legal arguments. For a list of influential groups that agree the ERA is now valid, see New York City Bar Association, *Statement Calling for the Publication and Certification of the Equal Rights Amendment*, December 24, 2024, notes 1, 3, 5.

[2] Language in *Dillon* allowing deadlines was described as a "holding" in *Coleman, id*., at 452, but dictum cannot be converted to a holding by declaration, and the "holding" language in *Coleman* was itself dictum because the issue of deadlines was not before the Court. *Coleman* involved whether the Kansas legislature could ratify an amendment with no deadline after first voting against it, and whether it could do so thirteen years after congressional proposal. Those questions have nothing to do with whether Congress may set deadlines. On the timeliness of ratifications, *Coleman* said (in a plurality ruling from a highly divided court) only that Congress has authority to determine the reasonableness of the passage of time between proposal and ratification *if an amendment has no deadline. Id*. at 452-54. That is obviously not the case here because the ERA has a deadline, albeit an invalid one. Defendants also argue that *Coleman* stands for the proposition that this case raises nonjusticiable political questions. Again, *Coleman* is inapt as it did not involve any of the Article V questions presented here. Indeed, as Defendants concede in Section II of their memorandum, several courts have adjudicated the Article V issues raised in this case, including the validity of the ERA and its deadline, D.Mem.16-17, and whether the States may rescind. D.Mem.5. None of these courts ruled that the issues were nonjusticiable political questions.

[3] Contemporaneity does not ensure national consensus. The 18th Amendment was ratified quickly but did not reflect consensus as it was repealed a few years later. And although it took 48 years to ratify the ERA, an arguably non-contemporaneous amount of time, national polling in 2018 demonstrated clear consensus in support of the ERA. *Suffolk University/USA Today Issues Poll*, October 2018 (75% were more likely to vote for a candidate that supports the ERA).

withstood the test of time, which was made obvious in 1992 when the Archivist published the 27th Amendment,[4] and Congress voted to validate it,[5] S. Con. Res. 120–102nd Congress (1991–92); H. Con. Res. 120–102nd Congress (1991–92), some *203 years* after its proposal. Government officials accepted the 27th Amendment as valid despite the lack of contemporaneity *and* a Supreme Court ruling decades earlier that said it was already too old, in 1921, to ratify. *Id.*, at 375. Either *Dillon* is no longer good law, or the 27th Amendment is not part of the Constitution.[6]

More importantly, the ERA's deadline is invalid because it disrupts the balance of power between Congress and the States. The framers wrote Article V the way they did because they were concerned that Congress would enact laws contrary to Article V and take power away from the States - hence, the people - and shift it to Congress. This "was of utmost concern to the framers." Kalfus, M., *Why Time Limits on the Ratification of Constitutional Amendments Violate Article V*, 66 U. CHI. L. REV. 437, 452–53 (1999). Indeed, the 10th Amendment was adopted to protect the States from having their powers diminished by Congress. *Nat'l League of Cities v. Usery*, 426 U.S. 833, 843 (1976) (10th Amendment "declares the constitutional policy that the Congress may not exercise power in a fashion that impairs the States' integrity or their ability to function effectively,

---

[4] Notably, the Archivist readily published the 27th Amendment on May 7, 1992, after the last state ratified it, *before* the Office of Legal Counsel ("OLC") advised him that, "the effective date of the amendment is the date on which it was ratified by the 38th State." *Opinions of the Office of Legal Counsel of the Dep't of Justice*, Congressional Pay Amendment, 16 Op. O.L.C. 85 (May 13, 1992). This stands in stark contrast to the OLC's letter *forbidding* publication of the ERA *despite* it being ratified by 38 states. *Ratification of the Equal Rights Amendment, Memorandum for the General Counsel National Archives and Records Administration*, slip op., Jan. 6, 2020.

[5] Congress has no authority to disregard Supreme Court precedent but that is what it did when it declared the 27th Amendment valid in 1992 despite *Dillon's* admonition in 1921 that it was already too old to ratify.

[6] That the 27th Amendment was validated despite the passage of 203 years is reason enough to invalidate the ERA's deadline because it is an official declaration that deadlines do not matter.

in a federal system"); *See Strahan v. Coxe*, 127 F.3d 155, 167 (1st Cir. 1997) ("… while Congress may regulate the conduct of individuals, it may not generally regulate the conduct of the States.")

Only one federal appellate court has addressed the deadline's validity, but it resolved the case on procedural grounds, saying only in dictum that the deadline is valid because of *Dillon*. *Illinois v. Ferriero*, 60 F.4th 704, 716-719 (D.C. Cir. 2023).[7] As dictum, *Ferriero* is not binding on this Court, nor is it persuasive authority because its dictum relies on *Dillon's* dictum.

**b.    The Deadline is Invalid Because it is in the Preamble**

Even if Congress may impose deadlines, the ERA's deadline is invalid because Congress placed it in the preamble rather than the text.[8] Article V authorizes Congress to do only two things, propose amendments and determine the mode of ratification, U.S. CONST. ART. V. Any authority to place deadlines in preambles must come from one of these provisions.

It cannot come from Congress' proposal power because the States only have authority to ratify "proposed" amendments and preambles are not part of amendments. *See, ex. rel. Ashcroft v. Fulton*, 642 S.W. 2d 617, 619-20 (Mo. 1982) (language in a preambulatory resolution proposing an amendment to the Missouri Constitution must be disregarded because it is not part of the amendment); *see also, Equal Rights Amendment Extension, Hearings on H.J. Res. 134 Before the*

---

[7] The District Court in *Ferriero* also ruled that the deadline was valid, but again, it was only dictum because the case was dismissed for lack of standing. *Virginia et al. v. Ferriero*, (same case) 1:20-cv-00242 (D.C. Dist.), Doc.117, March 5, 2021. Another District Court ruled that the ERA is not valid, primarily because the Archivist did not publish it, *Valame v. Biden*, No. 5:2023cv03018 (N.D. Cal.), thus "precluding its creation." Doc.61, pp.4-6. In support of this ruling, the *Valame* court cited *Elizabeth Cady Stanton Tr. V. Neronha*, No. 22-cv-00245-MSM (D.R.I.), another District Court that similarly found the ERA to be invalid because it has not yet been published in the Constitution. *Valame* at pp.4-5. Both courts misunderstand that publication is a ministerial act that has no bearing on an amendment's validity. *Dillon,* at 376.

[8] *Dillon* offers no guidance on this issue as the deadline there was in the text of the amendment.

*Subcomm. On Civ. and Const. Rights of the H. Comm. On the Judiciary*, 95th Cong. 57 (1978) (states "ratify[ ] the text of the Amendment and not the preliminary language of the resolution"). Congress itself raised concerns about adding substantive content to preambles when it was suggested that a deadline be added to the preamble of the 20th Amendment, with members saying it would be "of no avail" as it would not be "part of the proposed constitutional amendment." 75 Cong. Rec. 3856 (1932). Congress thus placed deadlines in the text of the next three amendments.

Nor can such power be derived from Congress' authority to determine the mode of ratification because selecting the mode entails choosing whether the States ratify by convention or legislative act and placing a deadline in a preamble has nothing to do with either. Indeed, Congress determining the mode is a *procedural* act that *facilitates* the States' Article V powers, while imposing a deadline ion the States is a substantive act that restricts them. *Poy v. Boutselis*, 352 F. 3d 479 (1st Cir. 2003) (limitation period is substantive when integral to the right in controversy). *See* Kalfus, *Time Limits*, *supra*, at 464; Dellinger, W., *The Legitimacy of Constitutional Change: Rethinking the Amendment Process*, 97 HARV. L. REV. 386, 408–09 (1983). In similar circumstances, courts have not enforced preambles because they "ha[ve] never been regarded as the source of any substantive power conferred. . .." *Jacobsen v. Massachusetts*, 197 U.S. 11, 22 (1905). *See District of Columbia v. Heller*, 554 U.S. 570, 578 (2008) (prefatory clause cannot limit or expand the scope of the operative clause").[9]

---

[9] In 2020, attorneys general from nearly half the States agreed that the language in the ERA's preamble is not binding on the States. *Letter from State Attorneys General to U.S. Congress* (February 22, 2020) ("[R]ather than including … [a deadline] in the ERA's text, Congress relegated a seven-year deadline to the joint resolution that proposed the ERA . . . No court has found that such an external limit is at all binding" on the States).

If this Court rules that Congress may impose extra-textual deadlines on the States, it will be condoning the idea that Congress has unilateral authority to amend the Constitution because it can impose short deadlines on amendments preferred by the States, to defeat them, and long deadlines or none at all on amendments they prefer, without ever affording the States an opportunity to approve or reject them.[10] This cannot be tolerated as the framers were clear that the States' amendatory powers should be *equal* to those of Congress. THE FEDERALIST NO. 43 (Alexander Hamilton) ("Article V equally enables the general and the States governments"); THE FEDERALIST NO. 39 (James Madison) (the balance struck in Article V makes the amendment process "neither wholly national nor wholly federal"); THE FEDERALIST NO. 21 (Alexander Hamilton) (strong national government could harm the autonomy of the States).

This Court should not imbue Congress with such authority because Congress' handling of deadlines has been arbitrary. No deadlines were in any amendments for the first 130 years. They appeared relatively recently with the 18th in 1917, and only a handful of times since, without consistency. The 19th did not have one at all, and when they were imposed, some were placed in the text (18th, 20th, 21st, 22nd) while others were placed in the preamble. (23rd, 24th, 25th, 26th). Not until 1960 did Congress place a deadline in a preamble, claiming this would "declutter" the text, 10 Cong. Rec. 6628 (1955).[11] Then in 1978, Congress placed a deadline in the text *and* the preamble of a proposed amendment. 92 Stat. 3795 (1978).

---

[10] Short deadlines can also cause states *to* ratify, as happened with the 18th Amendment. The point is not whether short or long deadlines cause certain results; it is that deadlines allow Congress to put pressure on the States in a way that undermines their constitutional powers under Article V.

[11] If placing a deadline in a preamble were truly about decluttering, why would Congress "clutter" the ERA's text with language about delaying the effective date of the ERA for two years after ratification? Delaying the enforcement date does not restrict States' Article V rights, yet the States were able to vote on it because it was in the text. Imposing a deadline on ratification *does* restrict the States' Article V rights, yet they were unable to vote on it because it was in the preamble.

Importantly, the Archivist issued a letter in 2012 stating that he was duty bound to record ERA ratifications and would publish the ERA as soon as 38 states ratified it, regardless of the deadline.[12] People then advocated for more ERA ratifications, and states voted to ratify, because they believed the deadline posed no barrier. Nevada ratified in 2017 (S.J. Res. 2, 79th Leg.), Illinois in 2018 (S.J. Res. Const. Amend. 0004, 100th Gen. Assemb.), and Virginia in 2020.[13]

If Congress may place deadlines in preambles, can they also say in a preamble, "two-thirds of the States must approve this preamble"? The obvious answer is no because this would subvert Article V. The same is true for deadlines. If Congress wants the power to use preambles to restrict States' Article V rights, it must first give itself the authority to do so by changing Article V.

## II.     STATES CANNOT RESCIND RATIFICATIONS

Several states purport to have rescinded their ERA ratifications, but those actions are legal nullities[14] because Article V does not permit rescissions and the Supreme Court has never recognized a purported rescission as valid.[15]

---

[12] The Archivist's letter was in response to a question from Congresswoman Carolyn Maloney about the legal status of the ERA. *Congresswoman Maloney Letter to the Archivist*, August 23, 2012. The Archivist replied, "Once NARA receives at least 38 state ratifications of a proposed constitutional amendment, NARA publishes the Amendment along with a certification of the ratifications and it becomes part of the Constitution." *Archivist Letter to Congresswoman Maloney*, October 25, 2012.

[13] The Archivist recorded these votes but later added, "ratification actions occurred after Congress's deadline expired." NATIONAL ARCHIVES AND RECORDS ADMINISTRATION: EQUAL RIGHTS AMENDMENT, LIST OF STATE RATIFICATION ACTIONS, (https://www.archives.gov/files/foia/pdf/era-list-of-state-ratification-actions-03-24-2020.pdf).

[14] In his 2012 letter explaining the legal status of the ERA, the Archivist said, "a later recission of a state's ratification is not accepted as valid." See, n.12.

[15] Rescissions were recognized as valid in *Idaho v. Freeman*, 529 F. Supp. 1107, 1150 (D. Idaho 1982), a case that was appealed to the Supreme Court but later vacated as moot. *N.O.W., Inc. v. Idaho*, 459 U.S. 809 (1982).

Other amendments have been validated despite purported rescissions. The 14th was adopted when three-fourths (28) of the States ratified it, even though New Jersey and Ohio had voted to rescind. 15 Stat. 706 (1868).[16] Cong. Globe, 40th Cong., 2d Sess. 4266, 4295-96 (1868); *see Coleman*, 307 U.S. at 448–49. Rescissions of the 15th and 19th were also not accepted as valid. Fishell, L.A., *Note, Reversals in the Federal Constitutional Amendment Process: Efficacy of State Ratifications of the Equal Rights Amendment*, 49 IND. L.J. 147, 150 (1973).

That Article V permits Congress to direct the States to ratify by convention rather than by legislative act proves that rescissions are not possible. The convention process is a unique, ad hoc event during which the States ratify through specially elected delegates who need not be members of the legislature. Their sole purpose is to decide whether to ratify an amendment. When the convention is done, it is adjourned. This process was included in Article V to allow for greater direct public participation, and to avoid the problem of entrenched political interests in state legislatures. Natelson, R., *Amending the Constitution by Convention: A More Complete View of the Founders' Plan*, Independence Institute, (2010) at 6. Because conventions expire, rescissions are not possible, thus, all rescissions are invalid because the framers would not have permitted two modes of ratification but allowed for rescissions under only one.

Rescissions are also invalid because amending the Constitution is not ordinary lawmaking, subject to shifting political winds. *Hollingsworth v. Virginia,* 3 U.S. (3 Dall.) 378, 381 (1798) (amendment process is "unconnected with the ordinary business of legislation"); *Hawke v. Smith*,

---

[16] The 14th Amendment was adopted on July 9, 1868, when the 28th state ratified it. National Archives, Milestone Documents, *14th Amendment to the U.S. Constitution: Civil Rights* (1868). The 28 States included New Jersey and Ohio, but they rescinded on March 24, 1868, and January 15, 1868, respectively. Either rescissions are not permitted, or the 14th Amendment was not ratified on July 9, 1868.

253 U.S. 221, 229 (1920) (ratification is not an act of legislation). Amending the Constitution is a solemn process, which is why scholars emphasize that ratification is one-way ratchet as this prevents chaos, preserves the integrity of Article V, and respects the balance of State and National powers. See Jameson, J., A TREATISE ON CONSTITUTIONAL CONVENTIONS, 629-33 (4th ed., Riverside Press 1887); Bernstein, R.B., *The Sleeper Wakes: The History and Legacy of the 27th Amendment*, 61 FORDHAM L.REV. 497, 548 (1992); Dellinger, *Constitutional Change*, *supra*, at 421-27 ("… once an amendment is ratified, the state is committed. Otherwise, think of the constitutional chaos …"); *Equal Rights Amendment Extension Hearings, supra*, (testimony of Prof. William Van Alstyne, noting that rescissions would be "profoundly ill-advised constitutional policy … No state ought to consider an amendment to the Constitution under the misimpression … that it may do it with some sort of celerity or spontaneity … That … is an atrocious way to run a Constitution. The policy that … [ratification] … when done … is done irrevocably, is terribly important … to the integrity of the role of Congress and the States.") *See* Wright, D., "*An Atrocious Way to Run A Constitution": The Destabilizing Effects of Constitutional Amendment Rescissions*, 59 DUQUESNE L. REV. 12, 17 (2021).[17]

### III.    BECAUSE THE ERA IS VALID, PLAINTIFFS ARE ENTITLED TO STRICT SCRUTINY REVIEW

Equal "protection" of the laws means ensuring that laws, policies, and programs of the government *are enforced equally*,[18] and *applied equally*,[19] on behalf of women. The ERA does this

---

[17] If the States may rescind ratifications, may Congress rescind proposals?

[18] *See Thurman v. City of Torrington*, 595 F. Supp. 1521, 1527 (D. Conn. 1984) ("affording [women] inadequate [police] protection . . . is subject to the Equal Protection Clause.")

[19] *Whren v. U.S.*, 517 U.S. 806, 813 (1996) (". . .constitutional basis for objecting to discriminatory application of laws is the Equal Protection Clause").

by requiring that courts apply a "strict scrutiny" standard of judicial review. *Frontiero v. Richardson*, 411 U.S. 677, 691-92 (1973) (Powell, J., concurring) (when the ERA is adopted, it will require courts to apply "the strictest test of judicial scrutiny");[20] Joint Judiciary Committee Report on the Equal Rights Amendment, Report No. 92-359, 92d Congress, *Equal Rights For Men And Women*, July 14, 1971, p.4 ( "[u]nder the text of the [ERA] . . . [j]ust as statutes classifying by race are subject to a very strict standard of equal protection scrutiny under the 14th Amendment, so too … classifying by sex would likewise be subject to a strict standard of scrutiny . . .").

Strict scrutiny is the only standard that affords women full equality because it requires classifications based on sex to serve a "compelling" government interest, be "narrowly tailored" to serve that interest, and use the "least restrictive means" to achieve the government's goal. *Students for Fair Admissions v. Harvard,* 600 U.S. 181, 206, 213-230 (2023) (strict scrutiny requires a compelling government interest, narrow tailoring, and proof that there are no "workable race-neutral alternatives…") Without the ERA women enjoy only intermediate scrutiny[21] which requires only an "important" interest and a "substantial relationship" between that interest and the government's goal. *U.S. v. Virginia*, 518 U.S. 515, 531-34 (1996). It utilizes no narrow tailoring or "least restrictive means" tests. These are crucial aspects of strict scrutiny because they prevent unnecessary discrimination. Under intermediate scrutiny, unnecessary discrimination is permitted.

---

[20] ERA ratification votes slowed after *Frontiero*. perhaps because the Court gave women strict scrutiny (albeit in a plurality), which is what the ERA would give women. This relieved the states of political pressure to ratify. Neale, T., CONG. RESEARCH SERV., R42979, THE PROPOSED EQUAL RIGHTS AMENDMENT: CONTEMPORARY RATIFICATION ISSUES, 14 (2018).

[21] Some courts refer to intermediate scrutiny as "heightened scrutiny," but this is a misnomer as it is a lesser standard than strict scrutiny, hence should be described as "lowered scrutiny."

IV.   **EVEN IF THE ERA IS NOT VALID, PLAINTIFFS ARE ENTITLED TO STRICT SCRUTINY REVIEW UNDER THE FIFTH AMENDMENT**

Even if the ERA is not valid, this Court should apply strict scrutiny under the 5th Amendment because intermediate scrutiny discriminates against women by treating them unequally. This cannot stand under any legitimate interpretation of a constitutional doctrine that guarantees people *Equal* Protection of the laws. *Students for Fair Admissions, Inc.*, *supra*, at 206 (the guarantee of Equal Protection "'cannot mean one thing when applied to one individual and something else when applied to [another].'" (citation omitted).[22]

In *Frontiero v. Richardson*, 411 U.S. 677 (1973) a plurality of the Supreme Court rightly adopted strict scrutiny for women under the 14th Amendment's Equal Protection Clause based on the nature of femaleness as a suspect class, women's long suffering based on their femaleness, and women's alignment with race as a category worth of strict scrutiny because sex, like race, is determined at birth and immutable. *Frontiero* at 691-92.[23]

---

[22] While the current judicial review standard for women under *U.S. v. Virginia*, 518 U.S. 515, 531-34 (1996) is intermediate scrutiny, it would not be unprecedented for this court to resist applying it on the grounds that it conflicts with women's fundamental rights. *See e.g., U.S. v. DeRobertis*, 538 F.Supp. 899, 909, n. 11 (N.D. Ill. 1982) (resisting Supreme Court precedent not requiring trial court interrogation of a defendant prior to jury waiver); *Westminster School District v. Mendez*, 161 F.2d 774, 779-80 (9th Cir. 1947) (en banc) (resisting precedent permitting racially segregated schools); *In re Booth,* 3 Wis. 1 (1854) (resisting precedent permitting slavery, which was then overturned by the Supreme Court in *Ableman v. Booth*, 62 U.S. 514 (1859), but the Wisconsin Supreme Court refused to honor the Supreme Court's writ, *Ableman v. Booth*, 11 Wis. 501 (1859)). Of course, this Court could avoid resisting precedent simply by validating the ERA because it requires strict scrutiny. *Frontiero v. Richardson*, 411 U.S. 677, 691-92 (1973).

[23] Soon after *Frontiero*, strict scrutiny was replaced with intermediate scrutiny. *Craig v. Boren*, 429 U.S. 190, 217 (1976) (Rehnquist, J. dissenting) ("only redeeming feature of the Court's opinion … is that it [ ] signals a retreat by those who joined the plurality opinion in *Frontiero* … from their view that sex is a 'suspect' classification for purposes of equal protection analysis").

Women have waited long enough for full equality, and they have suffered enough throughout this country's long and shameful history of subjugating women in the Constitution, first as non-persons with no Equal Protection rights at all when the 14th Amendment was adopted in 1868, and then when women were finally recognized as persons with *some* Equal Protection rights in *Reed v. Reed*, establishing those rights as unequal by giving women only rational basis review. 404 U.S. 71, 76-77 (1971). Rational basis was later elevated to intermediate scrutiny in *Craig v. Boren*, 429 U.S. 190, 217 (1976), but women remain unequal today because intermediate scrutiny is less protective than strict scrutiny.[24]

Unequal protection is state-sanctioned discrimination that causes women to suffer disproportionately high rates of violence,[25] and injures women in their dignity, autonomy, and humanity.[26] Discrimination also causes negative health consequences.[27] Researchers even found a correlation between higher rates of violence against persons who, because of state-sanctioned discrimination, are excluded from protection under hate crime laws.[28]

---

[24] As Justice Antonin Scalia candidly put it, the Constitution does not *require* discrimination against women, but neither does it prohibit it. Condon, S., Scalia: *Constitution Doesn't Protect Women or Gays From Discrimination*, CBSNews.com, January 4, 2011.

[25] U.N. General Assembly, *In-Depth Study on All Forms of Violence against Women: Report of the Secretary General,* A/61/122/Add.1 (6 July 2006) (inequality is the root cause of violence against women); U.N. Women*, Investing in Gender Equality and Women's Empowerment* (Oct. 31, 2010).

[26] Ho, J., *Finding Out What it Means to Me: The Politics of Respect and Dignity in Sexual Orientation Antidiscrimination*, 2017 UTAH L. REV. 463 (2017) (discussing philosophical and legal foundations of dignity, autonomy, and humanity in American law).

[27] Krieger N., *Discrimination and Health Inequities*, 44 INT'L J. OF HEALTH SERV. 643, 655, 687-88 (2014), (meta-analysis showing discrimination's negative health consequences).

[28] Hatzenbuehler, M. L., et al., *State-Level Polices and Psychiatric Morbidity in Lesbian, Gay, and Bisexual Populations*. 99 AM. J. PUBLIC HEALTH (12) 2275 (2009) (higher rates of psychiatric disorders among persons in states that did not extend protections against hate crimes and discrimination to them, compared to states that did).

Women are further harmed by inequality when they seek redress in the courts. *Brzonkala v. Virginia Polytechnic Institute and State University*, 132 F.3d 949, 971 (4th Cir. 1997) ("… gender bias permeates the court system and … women are most often its victims"). Congress enacted the Violence Against Women Act to confront this "bias and discrimination" against women. H.R. conf. rep. no. 103–711, at 385 (1994); *see generally,* SENATE JUDICIARY COMMITTEE, *The Response to Rape: Detours on the Road to Equal Justice* (May 1993).

Strict scrutiny will close the inequality gap and help prevent these intolerable harms.

## V.    THE MSSA IS UNCONSTITUTIONAL UNDER STRICT SCRUTINY

Under strict scrutiny the MSSA is unconstitutional unless Defendants can show that excluding women is justified by a compelling government interest, is narrowly tailored to serve that interest, and uses the least restrictive means to achieve the government's goal. Defendants cannot meet this burden because there is no compelling reason to exclude women from registering for Selective Service. Indeed, Defendants make no such claim. Hence, there is no need to analyze whether the government can also prove narrow tailoring and least restrictive means, because without a compelling interest these questions are irrelevant.

Defendants rely on *Rostker v. Goldberg*, 453 U.S. 57 (1981) to defend the constitutionality of the MSSA. In *Rostker*, the Supreme Court upheld the exclusion of women under intermediate scrutiny because, at the time, women were ineligible to serve in combat, thus were less ready for military service should a draft be called. *Id*. at 64-72. This is no longer true because women have been eligible to serve in combat since 2015. National Public Radio, *Pentagon Says Women Can Now Serve in Front-Line Ground Combat Positions*, NPR.org, (Dec. 3, 2015). Because the salient facts underlying *Rostker* have changed, it is not controlling. *Kyle-Labell v. Selective Service*, 364 F.Supp. 3d 394, 405-08 (D.N.J. 2019) (declining to follow *Rostker* because women can now fight

in combat, reasoning that, "When the facts of a Supreme Court decision 'do not line up closely' … it cannot be said that the decision 'directly controls' the new case", *quoting, Jefferson City v. Acker*, 210 F.3d 1317, 1320 (11th Cir. 2000)).[29]

## VI. PLAINTIFFS HAVE STANDING

Standing is established when a plaintiff shows (1) an 'injury-in-fact' that (2) is 'fairly . . . trace[able] to the challenged action of the defendant' and (3) is 'likely . . . [to] be redressed by a favorable decision' in court." *Lujan*, 504 U.S. at 560–61. Injury-in-fact is "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Reddy v. Foster*, 845 F.3d 493, 500 (1st Cir. 2017). "[A]n identifiable trifle is enough for standing to fight out a question of principle; the trifle is the basis for standing and the principle supplies the motivation." *U.S. v. SCRAP*, 412 U.S. 669, 689, n.14 (1973). The injury need only be "a perceptible harm that distinguishe[s the plaintiff] from other citizens …" *Id.* at 689. Specific facts proving injury are not required at the pleading stage. *Lujan*, *supra*, at 561. Defendants argue that Plaintiffs suffered no injury and have not demonstrated organizational or associational standing. D.Mem.9-15. Their arguments fail.

### a. Discriminatory Exclusion

When Ms. Fenore attempted to register for Selective Service, her application was rejected solely because of her sex. This injury, alone, established standing for a woman who filed the exact same case in New Jersey federal court. *Kyle-Labell, supra,* at 417 (female plaintiff had standing to mount an Equal Protection challenge to the MSSA solely because her Selective Service application was rejected based on her sex.)

---

[29] *Rostker* should also be distinguished because it applied intermediate scrutiny and Plaintiffs do not argue intermediate scrutiny or assent to the court applying it.

Discriminatory exclusion is a well-recognized injury. *White v. Crook*, 251 F.Supp. 401, 408-09 (M.D. Ala. 1966) (women had standing based solely on their exclusion from jury duty); *see*, *Carter v. Jury Commissioner*, 396 U.S. 320, 330 (1970) (Black people had standing based solely on their exclusion from jury service).

Defendants wrongly rely on *Schwartz v. Brodksy*, 265 F.Supp.2d 130 (D. Mass. 2003). In *Schwartz* a female and four males challenged the constitutionality of the MSSA, and the female was denied standing because she did not experience injury from exclusion, much less injury based on her sex. She never tried to register, and was not even age-eligible because she sued when was only 17, and the case was resolved before she turned 18. *Id*. at 131 & n.1.

The court's denial of standing to the female in *Schwartz* relied on language in *Goldberg v. Rostker*, 509 F.Supp. 586 (E.D. Pa. 1980) where standing was denied to persons who "… are not under any compulsion to register." *Id*., at 591. "Persons" obviously refers to males who could not register because there were no female plaintiffs. *Goldberg* was a class action filed by men for men. The class was defined as "all male persons who are registered or subject to registration." *Goldberg*, at 588-89 (citation omitted). The plaintiffs never asked to include women, but even if they had, women would have needed separate grounds for standing because the injury to males was defined as the act of registering, *id*. at 590-91, and females cannot suffer this injury. A female could have established injury in *Goldberg* by trying to register and being rejected, but that did not happen. As women did not seek standing in *Goldberg*, women were not denied standing in *Goldberg*. In turn, *Schwartz's* reliance on *Goldberg*, hence Defendants' reliance on *Schwartz,* are misplaced.

### b.  Stigma and Stereotype

Laws establishing people as inferior create injury by stigmatizing and stereotyping them. *Reed v. Reed*, *supra*, (Idaho law preferring men over women as estate administrators causes

stigmatic injury by declaring women less competent); *Frontiero*, *supra*, (employee benefits policy favoring women stigmatizes women by stereotyping them as incapable of being primary breadwinners);[30] *Strauder v. West Virginia,* 100 U.S. 303, 308 (1880) (excluding people from civic service based on race is a stigmatizing "brand upon" Black people, "fixed by law," that stereotypes them as unfit to serve.) Ms. Fenore clearly suffered these injuries because the MSSA is "replete … with … sex stereotypes…" that "stigmatize[] women" and impose on them "… a badge of inferiority…" *Goldberg,* 509 F.Supp. at 586, 594, 597, n.15.

### c.   Denial of Equal Opportunity to Participate in Civic Life

Ms. Fenore also suffered injury because the government has forbidden her to participate equally in civic life.[31] This has been recognized as injury in many cases, including *Carter* and

---

[30] Women have been stigmatized for a very long time *because* they do not serve their country equally. In 1915, Massachusetts State Senator Charles Browne said, "voting is a privilege earned through civic sacrifice, such as military service, which women do not undertake." *Debates on Woman Suffrage Referendum*, Mass. Archives, Legis. Records, Series 1915-03. More recently, social media is filled with criticisms of women because they do not serve their country equally. On July 4, 2025, a post on X said, "Frankly women don't even deserve the vote because they don't … perform military service like every male in this country. Why is it that in 2025, women don't have to sign up for the draft, but men do … and then women get to vote and decide the fate of those men? Crazy." A Reddit post in 2023 said, "I'm all for equality … but the one thing I've noticed from especially feminist types is that when the topic of being drafted into the military comes up, the drive for equality tends to disappear real quick."

[31] It matters not that the MSSA imposes a duty; the injury is inherent in the discriminatory classification. See *Carter v. Jury Commissioner*, 396 U.S. 320, 330 (1970) (whether jury service is deemed a "right, a privilege, or a duty, the State may no more extend it to some of its citizens and deny it to others on racial grounds than it may invidiously discriminate in the offering and withholding of the elective franchise"). In any event, Selective Service is both a duty and a privilege. *Arver v. U.S.*, 245 U.S. 366, 390 (1918) (Selective Service involves a citizen's performance of a "supreme and noble duty of contributing to the defense of the rights and honor of the nation …"); *U.S. v. Schwimmer,* 279 U.S. 644, 650 (1929) ("the very conception of a just government and its duty to the citizen includes the reciprocal obligation of the citizen to render military service in case of need …", *citing Arver*, *supra*, at 378). Indeed, the MSSA website states that "current law does not *permit* females to register," Selective Service, *Register*, https://www.sss.gov/register/ (emphasis added). "Permit" conveys the government's view that registering for Selective Service is both a requirement and a privilege.

*White*, *supra*, *see*, *Edmonson v. Leesville*, 500 U.S. 614, 619 (1991) (excluding a person from jury duty based on race denies them the "honor" of participating in the civic service of jury duty).

A new federal hiring program highlights how denying women the opportunity to participate equally in civic life exposes them to even more harm. Described as a "Merit Hiring Plan," federal agencies are now obligated to hire people who express patriotism. Heckman, J., *Governmentwide hiring plan calls on agencies to recruit 'patriotic Americans' into federal workforce*, Federal News Network, May 29, 2025. One of the ways applicants may express patriotism is to write an essay about how they registered for Selective Service. Because of the MSSA's exclusion of women, men can do this, but women cannot. This hiring initiative grew out of an Executive Order issued by President Trump on his first day in office. The Order directs agencies to "prevent the hiring of individuals who are unwilling to defend the Constitution …" This makes the MSSA even more harmful to women because, as this case shows, women want to *challenge* the Constitution precisely *because* it denies them an equal opportunity to *be patriotic*.[32]

Ms. Fenore wants to be called to service if and when a draft is needed. DeSimone, D., *Why 9/11 Inspired These Service Members to Join the Military*, USO.org, Sept. 7, 2021. Selective Service allows men to be conscripted, but not women. This injures Ms. Fenore in her very citizenship because she cannot participate equally in the defense of democracy, a form of government she *should* have an *equal* right – and duty - to serve because this country was created "of the people, by the people, [and] for the people…" Lincoln, A., *Gettysburg Address,* 1863.

---

[32] Ms. Fenore alleges that she has suffered stigmatic injury because the MSSA stereotypes her as less worthy than a man to serve her country. Com.p.5. More specificity is not required at the pleading stage. If this court is inclined to deny standing to Ms. Fenore on the grounds that she has not sufficiently alleged stigmatic harm, she will refile her claims accompanied by an affidavit alleging the myriad ways she has personally experienced stigma.

The Supreme Court recently emphasized that the primary issue in a sex discrimination case is not "what kind of law is being challenged," but rather, does the law treat women differently than men using an "overt gender criterion", *U.S. v. Skrmetti*, 605 U.S. ___ (2025), slip op. at 3. This is the key question because the Equal Protection guarantee ensures equality of "the laws;" not *some* laws - *all* laws, and for all people, not some. Put simply, discriminatory exclusions are injurious for standing purposes (though they may still pass constitutional muster) because they are per se harmful to individuals, entire classes of people, and American Democracy.[33]

### d.    Equal Means Equal and Heroica Foundation Have Standing

Associational standing[34] exists when at least one member of an organization has standing in their own right; the interests the group seeks to protect are germane to its purpose, and neither the claim nor the relief sought require the participation of individual members. *Students for Fair Admissions, supra, at* 182-83  (1st Cir. 2020), *Id*. at 182-83. Equal Means Equal and Heroica have

---

[33] In 2023, a male filed a case like this one, in which he asserted ERA and Fifth Amendment claims. *Valame v. Biden*, No. 5:2023-cv-03018 (N.D. Cal.). The government did not object to Valame's standing, though the issue was briefed after the judge ordered the parties to submit memoranda. *Id*., Doc.61, p.3 & n.2. The judge expressly declined to rule on standing and dismissed Valame's ERA claim on the merits. Because there was no determination that Valame had standing, the court's ruling should be disregarded as it had no jurisdiction to decide the merits. The court also declined to rule on Valame's 5th Amendment claim because he conceded it was "foreclosed by binding precedent." *Id*. at p.3, n.3. The case is now on appeal before the 9th Circuit. *Valame v. Biden*, Docket No. 24-369. The DOJ nowhere argues in its 9th Circuit brief that Valame lacks standing. *Id*., Doc. 28.1. Valame argued before the District Court that he had standing because he refused to register and suffered negative employment consequences. He also claimed stigmatic injury by having to "defend his country on an unequal basis," which made him "anxious about his role in society." *Id.* at p.2. Ms. Fenore's injuries are more serious. She was excluded *by the government*. In addition, she and all women suffer far greater stigmatic injuries. See argument VII b. It would be outrageous *and* discriminatory to grant standing to a man because he chose not to register to *avoid* serving his country, while simultaneously claiming stigma from having *to* serve his country, but then deny standing to a woman because she *tried to register* but was rejected, thus having no opportunity to disobey the law in order to give herself the same standing as a man.

[34] Equal Means Equal and Heroica Foundation assert no organizational standing claim.

been national leaders in the fight for women's equality for many years; two members had their Selective Service applications rejected solely because they are female, Com.p.2,[35] and their participation in this case is not required. This suffices to establish associational standing.[36]

**CONCLUSION**

Women have been bleeding to death on the front lines of battle since 2015, but they still cannot register for Selective Service. This discriminates against women *and* subjects them to lethal harm in the defense of American Democracy - without just compensation in the form of legal equality. Women deserve to participate equally in all aspects of military service – and to do so as fully equal persons under the United States Constitution.

Respectfully submitted,

For the Plaintiffs,

/s/ Wendy J. Murphy
WENDY J. MURPHY
Women's and Children's Advocacy Project
Center for Law and Social Responsibility
New England Law | Boston
154 Stuart Street
Boston, MA 02116
BBO#550455
Phone: (617) 422-7410
E-mail: wmurphy@nesl.edu

---

[35] It is worth noting that the National Organization for Women was granted full party standing after intervening in *Idaho v. Freeman* and was authorized to advocate for women as a class simply because the vitality of the ERA was at stake, 625 F.2d 886 (9th Cir. 1980).

[36] If this court rules that all plaintiffs lack standing, Equal Means Equal and Heroica Foundation anticipate that their members will file similar cases in other jurisdictions. Their goal is to give women a primary voice in any Supreme Court case that seeks to overturn *Rostker* and cause women to become eligible for the draft.

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon the attorneys of record for each party by the ECF filing system.

/s/Wendy J. Murphy

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| EQUAL MEANS EQUAL, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 1:25-cv-10806-WGY |
| | ) | (Leave to file granted 6/17/25) |
| DONALD J. TRUMP, in his official , capacity as President of the United States, *et al.*, | ) ) ) | |
| Defendants. | ) ) | |

## REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

Last month, in a similar challenge to the constitutionality of the Military Selective Services Act ("MSSA"), the Ninth Circuit affirmed the district court's dismissal of the case for failure to allege a cognizable legal theory. *Valame v. Trump*, No. 24-369, 2025 WL 1983954, at *1 (9th Cir. July 17, 2025). Specifically, the Ninth Circuit "reject[ed] as meritless [the plaintiff's] contention that the Equal Rights Amendment was ratified as the Twenty-Eighth Amendment to the Constitution." *Id.* The opinion was so uncontroversial that the Ninth Circuit handled the matter in a two-paragraph unpublished order. *Id.*

This Court should dismiss this case for the same reason. Plaintiffs' opposition makes clear that they disagree with multiple pronouncements of the Supreme Court on the very issues they seek to litigate. But this Court has no authority to ignore Supreme Court precedent, and certainly has no jurisdiction based on Plaintiffs' asserted generalized interest in "assert[ing] a meaningful voice for women at this critical time of judicial decision-making regarding women's status under the United States Constitution." Compl. ¶ 22, ECF No. 1. Such an interest does not come close to satisfying the requirements for Article III standing. As discussed below, Plaintiffs' opposition brief does not rebut Defendants' showing that this suit should be dismissed.

## ARGUMENT

### I.    Plaintiffs Lack Standing.

Plaintiffs have failed to establish standing.  They seemingly embrace the proposition that the mere existence of a law that "stigmatiz[es]" a plaintiff without more creates a cognizable Article III injury.  Pls.' Opp. to Defs.' Mot. to Dismiss 16-17, ECF No. 11 ("Ms. Fenore clearly suffered [stigmatizing] injuries because the MSSA is replete with sex stereotypes that stigmatize women." (citation modified))  But the Supreme Court has long held that a "stigmatizing injury" alone is insufficient to confer Article III standing.  *Allen v. Wright*, 468 U.S. 737, 755 (1984).  If "abstract stigmatic injury were cognizable, standing would extend nationwide to all members of the particular [sex] against which the Government was alleged to be discriminating[.]"  *Id.* at 755-56. *See Opiotennione v. Bozzuto Mgmt. Co.*, 130 F.4th 149, 154-156 (4th Cir. 2025) (membership in the disfavored age group by itself insufficient to establish injury in fact, which requires a "particularized injury" that is "personal, individual, distinct, and differentiated" (quoting *Public Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1292 (D.C. Cir. 2007) (Kavanaugh, J.)).

Elsewhere, Plaintiffs argue that Fenore has standing because she personally applied for Selective Service registration and "her application was rejected[.]"  ECF No. 11 at 15.  But Plaintiffs fail to explain how that rejection resulted in a concrete Article III injury to Fenore.  "Concreteness and particularization are independent and necessary prerequisites of the injury in fact requirement." *Town of Milton v. FAA*, 87 F.4th 91, 95 (1st Cir. 2023).  "To be concrete, 'the asserted harm [must have] a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts[.]'"  *Id.* (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 417 (2021)).  "'[T]raditional tangible harms, such as physical harms and monetary harms' are 'obvious[ly] concrete."  *Webb v. Injured Workers Pharmacy, LLC*, 72 F.4th 365, 372 (1st Cir. 2023) (quoting *TransUnion*, 594 U.S. at 425).  "Intangible harms can also be concrete, including when they 'are injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts,' such as 'reputational harms, disclosure of private information, and intrusion upon seclusion."  *Id.* (quoting *TransUnion*, 594

2

U.S. at 425).  The court must analyze whether Plaintiffs "have identified a close historical or common-law analogue for their asserted injury[.]'" *Id.* (quoting *TransUnion*, 594 U.S. at 424).

As relevant here, a claim of stigmatic injury must also comply with those prerequisites. "[S]tigmatic injury . . . is [only] judicially cognizable to the extent that" (1) the plaintiff is "personally subject to [the] discriminatory treatment" and (2) the subject of the discriminatory treatment involves "some concrete interest[.]" *Allen*, 468 U.S. at 757 n.22.  *See Opiotennione*, 130 F.4th at 156 (describing requirements).

Here, even if Fenore's denial satisfies the requirement that an Article III injury be particularized or personal, Plaintiffs fail to explain how it imposes concrete harm on Fenore given that she may voluntarily join the military.  Put differently, Fenore fails to show some concrete interest in being drafted pursuant to MSSA when she can join the military voluntarily subject to the same requirements as those who are drafted.  *See* ECF No. 11 at 15-16.  She invokes no binding authority to support the notion that this injury satisfies Article III's concreteness requirement.  Nor does Plaintiffs' opposition identity a close historical or common-law analogue cause of action under these circumstances.

In discriminatory treatment or exclusion cases where courts have found standing, the interest involved was concrete.  For example, in *Heckler v. Mathews*, 465 U.S. 728 (1984), the denial of a concrete benefit was never in dispute because the named plaintiff was being denied monetary benefits allegedly on a discriminatory basis.  *Id.* at 738; *see also Allen*, 468 U.S. at 757 n.22 (discussing the concrete injury in *Heckler v. Mathews*).  "[A] claim of unlawful exclusion from an existing benefits program can be fit for judicial resolution." *Dep't of Educ. v. Brown*, 600 U.S. 551, 564 n.1 (2023).  The closest Plaintiffs come to arguing that Fenone has a concrete interest is their suggestion that "Ms. Fenore wants to be called to service if and when a draft is needed." ECF No. 11 at 18.  But Fenore's denied registration in no way stops her from volunteering for military service in the very circumstance that a draft is needed.  *See Brown*, 600 U.S. at 564 ("It would be quite strange to think that a party experiences an Article III injury by *not* being affected by an unlawful action").

3

To the extent Fenore has experienced emotional distress because only men are permitted to register for the Selective Service, *see* ECF No. 11 at 15-16, "distress at or disagreement with the activities of others is not a basis under Article III for a plaintiff to bring a federal lawsuit challenging the legality of a government regulation allowing [or compelling] those activities." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 390 n.3 (2024).

Plaintiffs' reliance on *Kyle-LaBell v. Selective Serv. Sys.*, No. 15-5193 (ES) (JAD), 2018 WL 1535230 (D.N.J. Mar. 29, 2018), is unavailing. That case is wrongly decided because it failed to properly find an injury-in-fact, resting instead solely on the plaintiff's inability to register for the draft. 2018 WL 1535230, at *4. The court also relied on language in a Third Circuit opinion stating that "a discriminatory classification is itself a penalty and thus qualifies as an actual injury for standing purposes, where a citizen's right to equal treatment is as stake." 2018 WL 1535230, at *4 (quoting *Hassan v. City of N.Y.*, 804 F.3d 277, 289-90 (3d Cir. 2015)). But the *Hassan* court's expansive statement is directly at odds with Supreme Court precedent holding that "stigmatizing injury" alone is insufficient to convey Article III standing. *Allen*, 468 U.S. at 755. Unsurprisingly, the *Hassan* court relied on benefit denial cases, in which the concrete interests at stake were economic benefits (or the equal opportunity to bid on them). *See Hassan*, 804 F.3d at 289-90 (citing *Saenz v. Roe*, 526 U.S. 489, 505 (1999) and *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 657 (1993) ("*NFCAGCA*")).[1]

---

[1] In *Saenz*, where standing was not in dispute, the plaintiffs challenged a law placing them in a class with reduced monthly welfare benefits, as in *Mathews*. 526 U.S. at 494-96 & n.6. The Court's statement that the California law's "discriminatory classification is itself a penalty" because "the right to travel embraces the citizen's right to be treated equally in her new State of residence" was a statement about the validity, under the Fourteenth Amendment, of the state's discriminatory classification, not the Article III injury of the plaintiffs seeking relief. 526 U.S. at 504-05. In *NFCAGCA*, the defendants contested standing, arguing that it was speculative whether the plaintiffs would have been awarded a contract but for the challenged ordinance giving preferential treatment to minority-owned businesses. 508 U.S. at 664-68. The Court explained that "[t]he 'injury-in-fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Id.* at 666. In those cases, a plaintiff "need only demonstrate" an opportunity injury—"that it is able and ready to bid on contracts and that a

Plaintiffs' footnoted analogy to the harm alleged by a male plaintiff in *Valame v. Biden*, No. 23-cv-03018-NC, 2024 WL 251415 (N.D. Cal. Jan. 20, 2024), is even less apt.  ECF No. 11 at 19 n.33.  There, a plaintiff alleged that the Government had revoked his job offer after learning of his refusal to register for the Selective Service as required by law.  *Valame*, 2025 WL 1983954, at *1.  Fenore alleges no such denial of employment on the basis of her registration status, nor could she; Selective Service registration is not a prerequisite to federal employment for women.  In any event, the district court's dismissal of Valame's Equal Rights Amendment and Fifth Amendment claims was recently affirmed on the merits by the Ninth Circuit, as noted above.  *See id.*

Plaintiffs' opposition also provides no basis to conclude that the organizational Plaintiffs—Equal Means Equal ("EME") and the Heroica Foundation—have standing.  ECF No. 11. at 19-20.  First, Plaintiffs have waived any argument these Plaintiffs have organizational standing.  Memo. of P. & A. in Supp. of Defs.' Mot. to Dismiss, ECF No. 9 at 12-13; ECF No. 11 at 19 n.34.  Second, they entirely fail to contest Defendants' argument, ECF No. 9 at 13, that they have not demonstrated associational standing because the Complaint fails to plausibly allege that EME and Heroica Foundation have members possessing indicia of membership in an organization.  ECF No. 11 at 19-20.  Third, Plaintiffs entirely fail to contest Defendants' argument that they have failed to name at least one injured member of the association in the Complaint, as required by circuit precedent.  *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016).  "[T]he Supreme Court has 'dispensed with' the requirement 'of naming the affected members' only 'where *all* the members of the organization are affected by the challenged activity.'"  *Faculty, Alumni, and Students Opposed to Racial Preferences v. Harvard Law Review Ass'n*, No. 18-12105-LTS, 2019 WL 3754023, at *5 n.6 (D. Mass. Aug. 8, 2019) (quoting *Summers v. Earth*

---

discriminatory policy prevents it from doing so on an equal basis."  *Id.*  But the Court hardly wiped out the longstanding requirement that the plaintiff be able and ready to bid on something concrete.  Unlike the city contracts—or the equal opportunity to bid on them—at issue in *NFCAGCA*, this case involves no concrete interest because Fenore faces no concrete barrier to military enlistment.

*Island Institute*, 555 U.S. 488, 498-99 (2009)).  And Plaintiffs claim that only "two members" of EME[2]— not all—have "had their Selective Service applications rejected solely because they are female," ECF No. 11 at 20 (citing Compl. ¶ 1).

Rather than seek to redress an Article III injury, Plaintiffs' opposition makes clear that Plaintiffs seek to vindicate sincere and strong feelings that administration of the Selective Service System is unconstitutional.  *See, e.g.* ECF No. 11 at 20 n.36.  "But that kind of interest does not create standing."  *Carney v. Adams*, 592 U.S. 53, 60 (2020) (referring to a plaintiff who "may feel sincerely and strongly that [certain] laws should comply with the Federal Constitution").  *See also Sierra Club v. Morton*, 405 U.S. 727, 739 (1972) (interest in a problem insufficient).

**II.      *Coleman v. Miller* Precludes this Court's Consideration of Plaintiffs' Claims for Relief Premised on the ERA.**

As Defendants explained, the relief demanded in the Complaint is foreclosed by the Supreme Court's opinion in *Coleman v. Miller*, 307 U.S. 433 (1939), which prohibits the Judiciary from effectively determining the time period that a constitutional amendment remains open for ratification as well as the efficacy of state ratification redeterminations.  ECF No. 9 at 14-16.  In several footnotes, Plaintiffs seek to downplay or have this Court disregard *Coleman*.  ECF No. 11 at 2 n.1, 3 n.2.  But Plaintiffs provide little substantive justification to ignore the Supreme Court's pronouncements on the very issues necessarily involved in this case.

First, insofar as Plaintiffs are suggesting that Chief Justice Hughes's opinion in *Coleman* is not binding because it was "a plurality ruling[,]" ECF No. 11 at 3 n.2, they are mistaken.  Plaintiffs "overlook[] that Chief Justice Hughes' opinion, announced by Justice Stone, was styled 'Opinion of the Court.'"  *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 804 n.13 (2015) (quoting *Coleman*, 307 U.S. at 435).  And it was so styled for good reason.  Although Chief Justice Hughes' opinion—written for three justices—concludes only that time periods for ratification and the efficacy of state ratification redeterminations may not be decided by the judicial branch, *Coleman*, 307

---

[2] Plaintiffs' opposition refers to no allegations in the Complaint addressing the Heroica Foundation.

U.S. at 450-54, the concurring opinion—authored by Justice Black and joined by Justices Frankfurter, Douglas, and Roberts—stated that Congress's exercise of power in this area is beyond judicial review:

> Since Congress has sole and complete control over the amending process, subject to no judicial review, the views of any court upon this process cannot be binding upon Congress . . . .

*Id.* at 459. Thus, seven justices found that determining time periods for ratification and the efficacy of state ratification redeterminations are outside the purview of the Judiciary. Accordingly, Chief Justice Hughes' opinion is the "holding of the Court" because it is the "position taken by those Members who concurred in the judgments on the narrowest grounds[,]" *Marks v. United States*, 430 U.S. 188, 193 (1977) (citation omitted), as a majority of the Supreme Court has recognized, *see, e.g.,* *Goldwater v. Carter*, 444 U.S. 996, 1002-05 (1979) (Rehnquist, J., concurring); *id.* at 1001 n.2 (Powell, J., concurring); *Baker v. Carr*, 369 U.S. 186, 214 (1962).

Second, Plaintiffs are wrong to assert that *Coleman* decided "only that Congress has authority to determine the reasonableness of the passage of time between proposal and ratification if an amendment has no deadline." ECF No. 11 at 3 n.2 (citation modified). Instead, *Coleman* also addressed limits on Article III power in this area. And on that critical issue, the Court was clear that "whenever Congress has not exercised th[e] power" "to fix a reasonable time for ratification" Article III courts lack the power to "take upon [themselves] the responsibility of deciding what constitutes a reasonable time and determine accordingly the validity of ratifications." 307 U.S. at 452-53.

True, Congress *did* exercise the power to fix a timeframe for ERA ratification when it promulgated the ERA's ratification deadline. *See* ECF No. 11 at 3 n.2. And Defendants agree that nothing in *Coleman* precludes a court from making a judicial pronouncement recognizing the validity of Congress's deadline. *See id.* (referencing how "several courts have adjudicated the . . . validity of the ERA and its deadline" and upheld it). But Plaintiffs ask this Court to disregard congressional deadlines and demand that the Court, instead, effectively decide that nearly fifty years—the time it took Virginia to ratify—"constitutes a reasonable time" for ERA ratification. *See Coleman*, 307 U.S. at 452-53. But *Coleman* clearly precludes the Judiciary from making that decision. *Id.* Thus, the Court

7

may dispose of Plaintiffs' ERA claims on this basis alone. *Id.* Even if this Court were to find that the congressional deadline had to be revised (which it does not, *see infra* at pp. 10-13), this Court would lack the power to itself decide how long the ERA remains open for ratification under *Coleman. Id.*

Third, Plaintiffs' opposition seemingly ignores *Coleman*'s holding regarding state ratification redeterminations. Plaintiffs devote an entire section of their brief to argument that states lack the power to rescind. ECF No. 11 at 8. Undoubtedly, this Court would have to determine that states may not rescind ERA ratifications to issue a judgment declaring that MSSA provisions are "unconstitutional under the ERA[.]" *See id.*; Compl. at 11-12, Prayer for Relief. But *Coleman* is clear that this Court may not determine the "efficacy" of state ratification redeterminations: "[T]he question of the efficacy of ratifications by state legislatures, in the light of . . . attempted withdrawal, should be regarded as a political question[.]" 307 U.S. at 450; *see also White v. Hart*, 80 U.S. 646, 649 (1871) (A State's "den[ial of] the validity of her ratification of [a] constitutional amendment[]" presents a case that is "clearly one in which the judicial is bound to follow the action of the political department of the government, and is concluded by it."). Because *Coleman* and *White v. Hart* preclude this Court from deciding the effectiveness of state ratification redeterminations—and thus that the ERA has become valid as part of the Constitution—the Court may dispose of Plaintiffs' ERA claims on this basis alone as well.

Fourth, Plaintiffs suggest that "language in *Coleman* was . . . dictum[.]" ECF No. 11 at 3 n.2. Even if that were so, this Court is "bound by the Supreme Court's 'considered dicta.'" *United Nurses & Allied Pros. v. NLRB*, 975 F.3d 34, 40 (1st Cir. 2020) (citation omitted). *See also Illinois v. Ferriero*, 60 F.4th 704, 718-19 (D.C. Cir. 2023) (similar). And Plaintiffs do not argue—nor could they—that *Coleman* is anything but "considered."

Moreover, *Coleman*'s holdings in these two areas are not dicta. "[P]ortions of [an] opinion necessary to [its] result" are not dicta. *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 67 (1996). And the Court's analysis of these two issues was undoubtedly necessary to its result. On the issue of ratification redeterminations, for example, the *Coleman* Court concluded that the validity of Kansas's ratification

8

of the Child Labor Amendment, after a prior rejection, was a political question by reviewing the ratification history of the Fourteenth Amendment. *Coleman*, 307 U.S. at 448–49. The Court found, for that amendment, that "the political departments of the Government dealt with the effect both of previous rejection and of attempted withdrawal." *Id.* at 449.[3] The Court held that "in accordance with this historic precedent the question of the efficacy of ratifications by state legislatures, in light of previous rejection or attempted withdrawal, should be regarded as a political question." *Id.* at 450. Because the result in *Coleman* was based on the reasoning that rescission after ratification or ratification after rejection present essentially the same issue, *see id.*, the Court's conclusion was not dicta. *See Seminole Tribe of Fla.*, 517 U.S. at 66–67.

The same is true on the issue of the Judiciary's power to determine what constitutes a reasonable time for ERA ratification. Again, the petitioners in *Coleman* contended that Kansas's ratification of the Child Labor Amendment was invalid because it occurred thirteen years after proposal by Congress—a period they contended was longer than permitted under Article V. 307 U.S. at 451-52. The Court concluded that "[w]henever Congress has not exercised that power" to fix a time for ratification, Article III courts may not "take upon [themselves] the responsibility of deciding what constitutes a reasonable time and determine accordingly the validity of ratifications." *Id.* at 452-53. It explained that doing so "would be an extravagant extension of judicial authority[.]" *Id.* at 454. Because these statements constitute the Court's rationale for its decision, they are not dicta. *Seminole Tribe of Fla.*, 517 U.S. at 66-67. That this case involves a plaintiff seeking judicial validation—of Virginia's ratification nearly fifty years after Congress proposed the ERA—rather than invalidation of a state's ratification does not undermine the binding effect of the *Coleman* Court's reasoning on this Court. *See* ECF No. 11 at 3 n.2; *Friends of the Earth, Inc. v. Chevron Chem. Co.*, 129 F.3d 826, 829 (5th Cir. 1997) ("Every case can be limited to its facts and distinguished from later ones." That alone provides "no cogent reason" for failing to follow binding authority.).

---

[3] The Court explained that "Ohio and New Jersey first ratified and then passed resolutions withdrawing their consent." *Coleman*, 307 U.S. at 448.

9

### III. Plaintiffs Fail to State a Claim for Relief.

Even if this Court were inclined to reach the merits of the claims in Plaintiffs' Complaint, dismissal would remain appropriate on the basis of dispositive issues of law. To credit Plaintiffs' ERA claim would require the Court to ignore Congress's ratification deadlines and binding Supreme Court precedent. And Plaintiffs' equal protection claim is foreclosed by *Rostker v. Goldberg*, 453 U.S. 57, 83 (1981), as multiple Courts of Appeal have recently confirmed.

#### A. The ERA's Ratification Deadlines Preclude Any Claim that MSSA Provisions Violate the ERA.

Plaintiffs' arguments that the ERA has been adopted despite the expiration of Congress's clear ratification deadlines are meritless.

Plaintiffs first try to undermine the Supreme Court's recognition in *Dillon v. Gloss* that Congress can set ratification deadlines incident to its authority to control the "mode of ratification" of a proposed constitutional amendment. ECF No. 11 at 3-5. They characterize *Dillon* as dictum. *Id.* at 3. "But as the [Supreme] Court itself has explained, 'while the language used in [*Dillon*] was not in the strict sense necessary to a decision, it is evident that [A]rticle [V] was carefully examined and that the Court's statements with respect to the power of Congress in proposing the mode of ratification were not idly or lightly made.'" *Illinois v. Ferriero*, 60 F.4th 704, 718 (D.C. Cir. 2023) (quoting *United States v. Sprague*, 282 U.S. 716, 732-33 (1931)). Indeed, in *Coleman*, the Court rejected the notion that *Dillion*'s pronouncements were dicta. 307 U.S. at 452 (citing *Dillon*, 256 U.S. at 374-76) ("We have *held* that the Congress in proposing an amendment may fix a reasonable time for ratification.").

Nor does the Twenty-Seventh Amendment's success diminish the force of *Dillon*'s import or of Congress's deadlines here, as Plaintiffs would have it. ECF No. 11 at 3-4 (arguing that *Dillon* is "not good law" in light of the Twenty-Seventh Amendment). Contrary to the express congressional ratification deadlines for the ERA, Congress simply declined to impose a ratification deadline for the Twenty-Seventh Amendment. 1 Stat 97 (1789). Congress's judgment that the Twenty-Seventh Amendment did not require a limited period for ratification does not detract from *Dillon*'s reasoning

10

that Congress is entitled to set one if it chooses.[4]  Congress has the authority to decide what is reasonable when proposing a constitutional amendment, *Dillon*, 256 U.S. at 375-76, and has done so here.

Any doubt about *Dillon*'s relevance, or the Supreme Court's determinations on the precise question presented by Plaintiffs here, is removed by the Supreme Court's later decision with respect to the ERA itself. At the Solicitor General's request, *see* Mem. for Adm'r of Gen. Servs. Suggesting Mootness at 3, *Nat'l Org. for Women, Inc. v. Idaho*, No. 81-1282 et al. (U.S. July 9, 1982), the Supreme Court previously dismissed as moot the Government's appeal of a district court's determination that Idaho's rescission of its ERA ratification was valid. *See Nat'l Org. for Women, Inc. v. Idaho*, 459 U.S. 809, 809 (1982). That holding was necessarily predicated on the deadline's expiration, which left no live dispute to resolve. *Id.*; *see also Ratification of the ERA*, 44 Op. OLC 1, 23 (Jan. 6, 2020). Had it been otherwise, the Government's appeal from the district court's declaratory judgment that Idaho's rescission nullified its prior ratification would have remained necessary for the Supreme Court to review in 1982.  Accordingly, even without *Dillon*, Plaintiffs' claims here fail.

Nor is the deadline itself "invalid because it [purportedly] disrupts the balance of power between Congress and the States."  ECF No. 11 at 4.  Article V "is a grant of authority by the people to Congress."  *Sprague*, 282 U.S. at 733.  And, again, "Article V confers upon Congress" power to address matters of detail that "flows from its power to designate the 'mode of ratification,' including the establishment of a reasonable time limit for ratification."  *Illinois*, 60 F.4th at 717 (quoting *Dillon*, 256 U.S. at 376).  The Tenth Amendment, *see* ECF No. 11 at 4, does not limit "the people's delegation by article 5 of certain functions to the Congress."  *Sprague*, 282 U.S. at 734.[5]

---

[4] Resolving any plausible doubt on Congress's view that the Twenty-Seventh Amendment was ratified within a reasonable period of time, the House and Senate passed separate versions of concurrent resolutions addressing the amendment's validity in 1992.  *See* H.R. Con. Res. 320, 102d Cong. (1992); S. Con. Res. 120, 102d Cong. (1992).

[5] Plaintiffs' views about the wisdom of Congress's historical use of regulating the mode of ratification, ECF No. 11 at 7 (arguing that "Congress' handling of deadlines has been arbitrary"), has no bearing on Congress's constitutional authority to regulate the mode by imposing a deadline.

11

Plaintiffs also wrongly contend that the location of the deadline renders it meaningless, in a further attempt to distinguish *Dillon*. ECF No. 11 at 5-8 & n.8. Their argument that Congress's discretion to place a deadline in a preamble cannot "be derived from Congress' authority to determine the mode of ratification," *id.* at 6, is directly contrary to the Supreme Court's conclusion that Congress's power to set deadlines is "an incident of its power to designate the mode of ratification." *Dillon*, 256 U.S. at 376; *Illinois*, 60 F.4th at 717 (rejecting the same argument).

And Plaintiffs' discussion of Article V fails to grapple with its text. *See* ECF No. 11 at 5-8. Plaintiffs suggest that Article V grants Congress only the power to "determine" one of two "mode[s] of ratification" when proposing amendments. *See id.* at 6. But Article V states that Constitutional amendments are valid "when ratified by the legislatures of three fourths of the several states, or by conventions in three fourths thereof, *as* the one or the other Mode of Ratification may be proposed by the Congress[.]" U.S. Const. art. V. (emphasis added). The language—"*as* the one or the other may be proposed by the Congress"—suggests expansive authority to regulate the chosen mode, not a procedural and technical straightjacket to decide one mode or the other and nothing more about incidental matters associated with the mode, as Plaintiffs would have it. *See Dillon*, 256 U.S. at 376. Indeed, at the Founding, the word "as" was defined as "[i]n the manner that[.]" *As*, Samuel Johnson, A Dictionary of the English Language (10th ed. 1792). The language plainly vests Congress with broad authority to regulate the manner of ratification by state legislatures or state conventions, as *Dillon* explains.

Plaintiffs are wrong to argue prefatory language to a proposed constitutional amendment has no operative effect. ECF No. 11 at 6. Rather, the prefatory clause has always set out Congress's preferred mode of ratification. *See Ratification of the ERA* at 14. And, as *Dillon* concluded, a ratification deadline is a regulation inexorably intertwined with the chosen mode. *Dillon*, 256 U.S. at 376. Indeed, "[t]he proposing clause for the Bill of Rights not only specified the mode of ratification but also contained a procedural instruction authorizing the state legislatures either to ratify 'all' twelve proposed articles or to ratify 'any of' them individually." *Ratification of the ERA* at 16 (citing 1 Stat. at 97). "This

12

proposing clause was debated by the House and the Senate and considered of a piece with the substantive proposed amendments." *Id.* (citing 4 *Documentary History of the First Federal Congress of the United States of America* 35–45 (Charlene Bangs Bickford & Helen E. Veit eds., 1986)). Plaintiffs' "argument that the proposing clause is akin to the inoperative prefatory clause in a bill is unpersuasive, not just because proposed constitutional amendments are not 'ordinary cases or legislation' . . . but also because if that were the case, then the specification of the mode of ratification in every amendment in our nation's history would also be inoperative." *Illinois*, 60 F.4th at 719.

Indeed, "'[l]ong settled and established practice' may have 'great weight in a proper interpretation of constitutional provisions.'" *Chiafalo v. Washington*, 591 U.S. 578, 592 (2020) (quoting *The Pocket Veto Case*, 279 U.S. 655, 689 (1929)). And here Congress has included ratification deadlines in proposed constitutional amendments for more than 100 years, *see* U.S. Const. amend. XVIII, § 3, and has included the deadline in the proposing clause since 1960, *see* 74 Stat. 1057 (1960) (23rd Amendment), largely to avoid "clutter[ing] up the Constitution with vestigial ratification deadlines, *see* 101 Cong. Rec. 6628 (1955) (Sen. Kefauver). The fact that Congress included language about the effective date of the ERA in its proposed text rather than the proposing clause, ECF No. 11 at 7 n.11, is of no import.

Furthermore, there is no basis for Plaintiffs' argument that Congress's decision to place a ratification deadline in the proposing clause rather than the proposed text renders it invalid because "imposing a deadline []on the States is a substantive act that restricts them." ECF No. 11 at 6. Whether in the text or in the proposing clause, States receive ample notice of the deadline by which they may ratify a proposed amendment. *See* Lawrence H. Tribe, Comment, *A Constitution We Are Amending: In Defense of a Restrained Judicial Role*, 97 Harv. L. Rev. 433, 445 (1983) (Acknowledgment of Congress's authority under Article V "demands judicial deference to procedural provisions that Congress writes into the resolutions by which it proposes amendments for ratification no less than to procedural provisions that Congress inserts into the texts of the proposed amendments themselves.").

13

**B.  Plaintiffs' Equal Protection Claim is Foreclosed by *Rostker*.**

Plaintiffs evidently disagree with the Supreme Court's opinion in *Rostker v. Goldberg*, 453 U.S. 57 (1981), which rejected an equal protection-based challenge to the MSSA.  ECF No. 11 at 14-15. But this Court cannot overturn Supreme Court precedent.  *See, e.g., Lawyers United Inc. v. United States*, No. 1:19-CV-3222-RCL, 2020 WL 3498693, at *5 (D.D.C. June 29, 2020) ("Quite simply, the Court must follow controlling precedent until that precedent is directly overturned.").

Plaintiffs are wrong to argue that this Court can disregard *Rostker* because "facts underlying *Rostker*" purportedly have "changed[.]"  ECF No. 11 at 14.  In *Elgin v. U.S. Dep't of Treasury*, 641 F.3d 6 (1st Cir. 2011), Judge Stahl rejected this exact argument.[6]  The *Elgin* plaintiffs argued "that *Rostker* is no longer good law . . . due to dramatic changes in the roles of women in the military."  641 F.3d at 22 (Stahl, J., concurring).  As Judge Stahl explained, "changes in the military" do not undermine "principles of stare decisis" that "mandate the finding that *Rostker* is controlling and that plaintiffs' claim[s] are meritless."  *Id.*; *see also id.* at 24 ("[I]t would not be for this court to determine what, if any, impact these [factual] developments had on the continued vitality of *Rostker*, a task left solely to the Supreme Court."); *Valame*, 2025 WL 1983954, at *1 (similar); *Nat'l Coal. for Men v. Selective Serv. Sys.*, 969 F.3d 546, 549-50 (5th Cir. 2020) ("[T]he factual underpinning of the controlling Supreme Court decision has changed, but that does not grant a court of appeals license to disregard or overrule that precedent."), *cert. denied*, 141 S. Ct. 1815, 1816 (2021) (Sotomayor, J., respecting the denial) (denying certiorari despite observing that "[t]he role of women in the military has changed dramatically since [*Rostker*]").

## CONCLUSION

For the foregoing reasons, the Court should dismiss this action.

Dated: August 18, 2025                              Respectfully submitted,

---

[6] The majority concluded that the court lacked subject matter jurisdiction and did not address the equal protection issue.  *Elgin*, 641 F.3d at 13.  The Supreme Court granted certiorari and affirmed the majority's opinion that district court jurisdiction was precluded by the Civil Service Reform Act. *Elgin v. Dep't of Treasury*, 567 U.S. 1, 23 (2012).

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ALEXANDER K. HAAS
Director, Federal Programs Branch

JEAN LIN
Special Litigation Counsel

*/s/ Liam C. Holland*
LIAM C. HOLLAND B.B.O. #704799
ANDREW J. RISING
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
Tel.: (202) 514-4964
Fax: (202) 616-8470
Email: Liam.C.Holland@usdoj.gov

*Counsel for Defendants*

15