**No. 26-1596**

**IN THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT**

EQUAL MEANS EQUAL; HEROICA FOUNDATION; JACQUELINE FENORE, individually and on behalf of others similarly situated,
Plaintiffs-Appellants,

v.

DONALD JOHN TRUMP, in the official capacity as President of the United States; CRAIG BROWN, in the official capacity as Acting Director of the Selective Service System; SELECTIVE SERVICE SYSTEM, an Independent Agency within the Executive Branch of the Federal Government,
Defendants-Appellees.

On Appeal from the United States District Court for the District of Massachusetts

# BRIEF FOR APPELLEES

BRETT A. SHUMATE
*Assistant Attorney General*

LEAH B. FOLEY
*United States Attorney*

THOMAS PULHAM
SEAN R. JANDA
*Attorneys, Appellate Staff*
*Civil Division, Room 7260*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3388*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....... 1

STATEMENT OF JURISDICTION ....... 2

STATEMENT OF THE ISSUES ....... 2

STATEMENT OF THE CASE ....... 3

A. The Military Selective Service Act ....... 3

B. The Equal Rights Amendment ....... 4

C. Factual and Procedural Background ....... 9

SUMMARY OF ARGUMENT ....... 11

STANDARD OF REVIEW ....... 12

ARGUMENT ....... 12

I. The District Court Correctly Dismissed Equal Means Equal's Claims for Lack of Standing ....... 12

II. The District Court Correctly Dismissed Plaintiffs' ERA Claim ....... 17

A. The ERA's Ratification Deadline Was Valid ....... 17

B. Plaintiffs' Contrary Arguments Are Unpersuasive ....... 22

III. The District Court Correctly Dismissed Plaintiffs' Fifth Amendment Claim as Foreclosed by Binding Precedent ....... 27

CONCLUSION ....... 31

CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Abdisamad v. City of Lewiston*,
960 F.3d 56 (1st Cir. 2020) ........ 12

*Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*,
576 U.S. 787 (2015) ........ 24

*Capen v. Campbell*,
134 F.4th 660 (1st Cir. 2025) ........ 14

*Coleman v. Miller*,
307 U.S. 433 (1939) ........ 11, 18, 19, 20, 23, 24

*Dames & Moore v. Regan*,
453 U.S. 654 (1981) ........ 22

*Dillon v. Gloss*,
256 U.S. 368 (1921) ........ 11, 17, 18, 20, 22, 23

*Draper v. Healey*,
827 F.3d 1 (1st Cir. 2016) ........ 13

*Elgin v. U.S. Dep't of the Treasury*,
641 F.3d 6 (1st Cir. 2011) ........ 30

*Equal Means Equal v. Department of Educ.*,
450 F. Supp. 3d 1 (D. Mass. 2020) ........ 16

*Friends of the Earth, Inc. v. Chevron Chem. Co.*,
129 F.3d 826 (5th Cir. 1997) ........ 16

*FW/PBS, Inc. v. City of Dallas*,
493 U.S. 215 (1990) ........ 12

*Housatonic River Initiative v. U.S. EPA*,
75 F.4th 248 (1st Cir. 2023) ........ 10

*Hunt v. Washington State Apple Advert. Comm'n*,
432 U.S. 333 (1977) ........ 16

*Idaho v. Freeman*,
529 F. Supp. 1107 (D. Idaho 1981) ........ 8, 19

*Illinois v. Ferriero*,
60 F.4th 704 (D.C. Cir. 2023) .................................................................. 1, 17, 25

*Jacobson v. Massachusetts*
197 U.S. 11 (1905) ....................................................................................... 25

*Mallory v. Norfolk S. Ry. Co.*,
600 U.S. 122 (2023) ..................................................................................... 28

*Mandel v. Bradley*,
432 U.S. 173 (1977) ..................................................................................... 19

*McCoy v. Massachusetts Inst. of Tech.*,
950 F.2d 13 (1st Cir. 1991) ..........................................................................24

*Mistretta v. United States*
488 U.S. 361 (1989) ..................................................................................... 23

*Monsalvo v. Bondi*,
604 U.S. 712 (2025) ..................................................................................... 26

*National Coal. for Men v. Selective Serv. Sys.*:
141 S. Ct. 1815 (2021) ................................................................................. 29
969 F.3d 546 (5th Cir. 2020), *cert. denied*,
141 S. Ct. 1815 (2021) ........................................................................ 1, 4, 29

*National Lab. Rels. Bd. v. Noel Canning*,
573 U.S. 513 (2014) ..................................................................................... 23

*National Org. for Women, Inc. v. Idaho*:
455 U.S. 918 (1982) ....................................................................................... 8
459 U.S. 809 (1982) .................................................................................. 8, 19

*Newman v. Wengler*,
790 F.3d 876 (9th Cir. 2015) ........................................................................ 29

*Ratification of the Equal Rights Amendment*,
44 Op. O.L.C. 1 (2020) .................................................................................. 5

*Rodriguez de Quijas v. Shearson/American Express, Inc.*,
490 U.S. 477 (1989) ..................................................................................... 28

*Rostker v. Goldberg*
453 U.S. 57 (1981) ...................................................................... 2, 3, 4, 12, 28

*Singleton v. Wulff*,
428 U.S. 106 (1976) .......... 27

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) .......... 13

*The Pocket Veto Case*,
279 U.S. 655 (1929) .......... 22

*Town of Norwood v. FERC*,
202 F.3d 392 (1st Cir. 2000) .......... 12, 16

*United States v. Diggins*,
36 F.4th 302 (1st Cir. 2022) .......... 11

*United States v. Sprague*,
282 U.S. 716 (1931) .......... 4

*Valame v. Trump*:
157 F.4th 1172 (9th Cir. 2025), *cert. denied*,
No. 25-1259, 2026 WL 1780172 (U.S. June 22, 2026) .......... 1, 4, 17
No. 25-1259, 2026 WL 1780172 (U.S. June 22, 2026) .......... 30

*Virginia v. Ferriero*,
525 F. Supp. 3d 36 (D.D.C. 2021) .......... 2, 21, 26

**U.S. Constitution:**

Art. V .......... 4, 18

Amend. XVIII, § 3 .......... 5

Amend. XX .......... 5

Amend. XXI, § 3 .......... 5

Amend. XXII, § 2 .......... 5

**Statutes:**

Military Selective Service Act:
50 U.S.C. § 3801 .......... 3
50 U.S.C. § 3802(a) .......... 3

50 U.S.C. § 3806 .......... 3
50 U.S.C. § 3809(a)(1) .......... 3

1 U.S.C. § 106b .......... 9

28 U.S.C. § 1291 .......... 2

28 U.S.C. § 1331 .......... 2

28 U.S.C. § 1343 .......... 2

**Legislative Materials:**

101 Cong. Rec. 6628 (1955) .......... 6

117 Cong. Rec. 35814 (1971) .......... 21

H.R.J. Res. 208, 92d Cong. (1972) .......... 4, 6, 7, 17

H.R.J. Res. 554, 95th Cong., 92 Stat. 3795 (1978) .......... 6

H.R.J. Res. 638, 95th Cong., 92 Stat. 3799 (1978) .......... 7

J. Res., 1st Cong., 1 Stat. 97 (1789) .......... 5, 21

S.J. Res. 1, 89th Cong. 79 Stat. 1327 (1965) .......... 6

S.J. Res. 2, 79th Leg., Reg. Sess. (Nev. 2017) .......... 8

S.J. Res. 7, 92d Cong., 85 Stat. 825 (1971) .......... 6

S.J. Res. 29, 87th Cong., 76 Stat. 1259 (1962) .......... 6

S.J. Res. 39, 86th Cong., 74 Stat. 1057 (1960) .......... 6

S. Rep. No. 92-689 (1972) .......... 7, 17, 21

S.J. Res. Const. amend. 4, 100th Gen. Assemb., Reg. Sess. (Ill. 2018) .......... 8

H.R.J. Res. 1, 2020 Gen. Assemb., Reg. Sess. (Va. 2020) .......... 8

**Other Authorities:**

Ruth Bader Ginsburg, *Ratification of the Equal Rights Amendment: A Question of Time*, 57 Tex. L. Rev. 919 (1979) ........................................................... 21

Off. of Legal Couns., *Constitutionality of Extending the Time Period for Ratification of the Proposed Equal Rights Amendment* (Oct. 31, 1977), *reprinted in Equal Rights Amendment Extension: Hearings on H.R.J. Res. 638 Before the Subcomm. on Civ. & Const. Rts. of the H. Comm. on the Judiciary*, 95th Cong. 7 (1978) .................................................. 6-7, 7, 8, 17, 20, 21

# INTRODUCTION

Plaintiffs' complaint challenges the validity of the longstanding statutory requirement that men—but not women—register for the Selective Service System. Their principal legal theory hinges on the premise that the Equal Rights Amendment (ERA) has been validly ratified and is now part of the U.S. Constitution. And they additionally claim that the requirement violates the equal-protection principles that have been incorporated into the Fifth Amendment. Both of those theories are inconsistent with binding Supreme Court precedent and have been rejected by every court of appeals to consider them. *See Valame v. Trump*, 157 F.4th 1172 (9th Cir. 2025) (per curiam) (rejecting both ERA ratification argument and Fifth Amendment argument in context of Selective Service System), *cert. denied*, No. 25-1259, 2026 WL 1780172 (U.S. June 22, 2026); *Illinois v. Ferriero*, 60 F.4th 704 (D.C. Cir. 2023) (rejecting ERA ratification argument); *National Coal. for Men v. Selective Serv. Sys.*, 969 F.3d 546 (5th Cir. 2020) (per curiam) (rejecting Fifth Amendment argument in context of Selective Service System), *cert. denied*, 141 S. Ct. 1815 (2021). This Court should hold the same.

As to plaintiffs' ERA claim, it is undisputed that the requisite number of States failed to ratify the ERA before the deadline set by Congress expired. The Supreme Court has long held that Congress's explicit power to specify the mode of ratification for a proposed constitutional amendment includes the incidental power to set a deadline for ratification. Congress validly exercised that power with respect to the

ERA by placing a deadline for ratification in the ERA's proposing clause. Both precedent and Congress's historical practice support the conclusion that "Congress set deadlines for ratifying the ERA that expired long ago" and that the final ratifications alleged by plaintiffs "came too late to count." *Virginia v. Ferriero*, 525 F. Supp. 3d 36, 40 (D.D.C. 2021). This Court should therefore affirm the district court's rejection of plaintiffs' ERA claim.

As to plaintiffs' Fifth Amendment claim, the Supreme Court considered and rejected the same challenge to the Selective Service Act in *Rostker v. Goldberg*, 453 U.S. 57 (1981). The district court properly recognized that this directly on-point Supreme Court precedent remains binding unless and until the Court chooses to overrule it. Thus, the court's dismissal of plaintiffs' Fifth Amendment claim should also be affirmed.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. §§ 1331, 1343. J.A. 5. The district court dismissed plaintiffs' complaint on April 21, 2026. Add. 21. Plaintiffs filed a timely notice of appeal on May 19, 2026. *See* J.A. 1. This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

The issues presented are:

1. Whether plaintiff Equal Means Equal has established the requirements of associational standing to press claims on behalf of its members; and

2. Whether the Selective Service Act's male-only registration requirement is unconstitutional under the ERA or the Fifth Amendment.

## STATEMENT OF THE CASE

### A. The Military Selective Service Act

The Military Selective Service Act (MSSA) has long required male citizens between the ages of 18 and 26, with some exceptions, to register with a federal agency known as the Selective Service System. 50 U.S.C. §§ 3802(a), 3809(a)(1); *see also id.* § 3806 (exemptions and deferments). These registrations must be in accordance with the MSSA's implementing regulations, *see id.* § 3802(a), and their purpose "is to facilitate any eventual conscription" into the armed forces in the event of a military draft. *Rostker v. Goldberg*, 453 U.S. 57, 59 (1981); *see also* 50 U.S.C. § 3801. The MSSA does not require women to register. 50 U.S.C. § 3802(a).

In *Rostker*, the Supreme Court considered whether the MSSA's male-only registration requirement amounts to unconstitutional sex discrimination under the Fifth Amendment. 453 U.S. at 59. As the Court's opinion recounted, "Congress considered the question" whether to permit the registration of women "at great length" and heard "extensive testimony and evidence," including through multiple rounds of hearings, floor debate, and committee proceedings, before deciding to retain the male-only requirement. *Id.* at 61, 72. The Court found constitutional significance in the fact that Congress had not acted "unthinkingly" or "reflexively," *id.* at 72 (quotation omitted), as well as the fact that "the Constitution itself requires . . .

deference to congressional choice" when military affairs are involved, *id.* at 67. The Court ultimately concluded that "Congress acted well within its constitutional authority when it authorized the registration of men, and not women," under the MSSA. *Id.* at 83.

More recently, two courts of appeals have confirmed that *Rostker*'s holding remains binding notwithstanding changes in the roles that women may perform in the military. *See Valame v. Trump*, 157 F.4th 1172 (9th Cir. 2025) (per curiam); *National Coal. for Men v. Selective Serv. Sys.*, 969 F.3d 546 (5th Cir. 2020) (per curiam).

**B. The Equal Rights Amendment**

1. Article V provides that Congress may propose new amendments to the Constitution "whenever two thirds of both Houses shall deem it necessary." U.S. Const. art. V. Congress has traditionally done so through a joint resolution that has two parts: a "proposing clause" that describes what Congress has done and the text of the amendment as it would appear in the Constitution. *See, e.g.*, H.R.J. Res. 208, 92d Cong. (1972). Article V further provides that an amendment "shall be valid to all Intents and Purposes, as Part of this Constitution, when ratified by the Legislatures of three fourths of the several States, or by Conventions in three fourths thereof, as the one or the other Mode of Ratification may be proposed by the Congress." U.S. Const. art. V.

The choice as to "the mode of ratification[] lies in the sole discretion of Congress." *United States v. Sprague*, 282 U.S. 716, 730 (1931). In the exercise of that

discretion, "Congress has specified the mode of ratification in the proposing clause included within every resolution proposing a constitutional amendment." *Ratification of the Equal Rights Amendment*, 44 Op. O.L.C. 1, 14-15 (2020) (*Ratification of the ERA*). Thus, for every constitutional amendment ever adopted, Congress dictated the mode of ratification (*i.e.*, by state legislatures or state conventions) in the proposing clause rather than in the text of the amendment itself. *See id.* at 14-15, 15 n.15 (collecting examples).

Congress has also used the proposing clause to convey other procedural instructions relating to ratification. This practice began with the First Congress, which proposed 12 constitutional amendments in a single joint resolution. *See* J. Res., 1st Cong., 1 Stat. 97, 97-98 (1789). The proposing clause authorized the state legislatures to ratify "all" 12 together or "any of " them individually. *Id.* The States ratified 10 of the 12 proposed amendments in 1791 as the Bill of Rights, and another in 1992 as the Twenty-Seventh Amendment.

Later, Congress began imposing deadlines for ratification. While the early resolutions proposing amendments did not limit the time for ratification, *see*, e.g., J. Res., 1 Stat. at 97, Congress included seven-year deadlines in the texts of what became the Eighteenth, Twentieth, Twenty-First, and Twenty-Second Amendments. *See* U.S. Const. amend. XVIII, § 3; *id.* amend. XX, § 6; *id.* amend. XXI, § 3; *id.* amend. XXII, § 2. When proposing the Twenty-Third Amendment in 1960, Congress included the ratification deadline in the proposing clause rather than in the text of the proposed

amendment. *See* S.J. Res. 39, 86th Cong., 74 Stat. 1057 (1960). "The general idea was that it was better not to make the 7-year provision a part of the proposed constitutional amendment itself " because this "would clutter up the Constitution." 101 Cong. Rec. 6628 (1955) (statement of Sen. Kefauver). Since then, Congress has placed a deadline for ratification in the proposing clause of every constitutional amendment it has approved. *See* S.J. Res. 29, 87th Cong., 76 Stat. 1259 (1962) (Twenty-Fourth Amendment); S.J. Res. 1, 89th Cong. 79 Stat. 1327 (1965) (Twenty-Fifth Amendment); S.J. Res. 7, 92d Cong., 85 Stat. 825 (1971) (Twenty-Sixth Amendment); H.R.J. Res. 208, 92d Cong., 86 Stat. 1523 (1972) (proposed ERA); H.R.J. Res. 554, 95th Cong., 92 Stat. 3795 (1978) (proposed D.C. Congressional Representation Amendment).[1]

"Congress moved from inclusion of the limit in the text of proposed amendments to including it within the proposing clauses," and occasionally varied the specific wording, "without ever indicating any intent to change the substance of their actions." Off. of Legal Couns., *Constitutionality of Extending the Time Period for Ratification of the Proposed Equal Rights Amendment* (Oct. 31, 1977) (*Constitutionality of ERA Extension*), *reprinted in Equal Rights Amendment Extension: Hearings on H.R.J. Res. 638 Before the Subcomm. on Civ. & Const. Rts. of the H. Comm. on the Judiciary*, 95th Cong. 7, 13

[1] The proposed D.C. Congressional Representation Amendment had a deadline in the text of the amendment as well. H.R.J. Res. 554, 92 Stat. at 3795.

(1978).[2] Indeed, the Senate Report on the ERA lumped the two practices together when it observed that a seven-year time limitation "ha[d] been included in every amendment added to the Constitution in the last 50 years." S. Rep. No. 92-689, at 20 (1972).

2. On March 23, 1972, both Houses of Congress adopted (by two-thirds majority) a joint resolution to submit the ERA to the state legislatures. H.R.J. Res. 208, 86 Stat. at 1523. As it had done several times before, Congress imposed a seven-year deadline for ratification. The proposing clause stated that the amendment would become "part of the Constitution when ratified by the legislatures of three-fourths of the several States within seven years from the date of its submission by the Congress." *Id.*

By the end of 1972, 22 States had ratified the ERA. *Ratification of the ERA* 7 & n.6. Over the next five years, only 13 more States followed suit, four States voted to rescind previous ratifications, and a fifth passed a resolution stating that its prior ratification would be rescinded if the ERA were not adopted within the seven-year period. *Id.* at 7 & n. 7, 8 & n.8. In 1978, with the deadline approaching and the ERA not yet ratified by three-quarters of States, both Houses passed a joint resolution extending the deadline three years. H.R.J. Res. 638, 95th Cong., 92 Stat. 3799 (1978).

---

[2] Some objections were made to a suggestion to add a deadline to the proposing clause of the Twentieth Amendment. *See Ratification of the ERA* 20-21, 21 n.18. But there do not appear to have been any similar expressions of concern with respect to the Twenty-Third or any subsequent Amendment. *Id.*

In response, several States and state legislators sued to prevent the ratification of the ERA under the extended deadline. *See Idaho v. Freeman*, 529 F. Supp. 1107 (D. Idaho 1981). The district court ruled in their favor, holding that the resolution extending the time for ratification was unconstitutional. *Id.* at 1150-54. The Supreme Court granted certiorari before judgment and stayed the district court's judgment. *National Org. for Women, Inc. v. Idaho*, 455 U.S. 918 (1982). But before the Court was able to decide the case, the extended deadline expired without any additional ratifications. At the suggestion of the Solicitor General, the Court vacated the district court's judgment and remanded the case with instructions to dismiss the complaints as moot. *National Org. for Women, Inc. v. Idaho*, 459 U.S. 809 (1982).

In 2017, 2018, and 2020, three additional States passed resolutions to ratify the ERA. *See* S.J. Res. 2, 79th Leg., Reg. Sess. (Nev. 2017); S.J. Res. Const. amend. 4, 100th Gen. Assemb., Reg. Sess. (Ill. 2018); H.R.J. Res. 1, 2020 Gen. Assemb., Reg. Sess. (Va. 2020). If those three actions counted as timely ratifications, and the States that voted to rescind their ratifications were not subtracted, then more than three-quarters of the States would have voted to ratify the ERA.

On January 6, 2020, the Office of Legal Counsel issued an opinion concluding that "the deadline in the proposing clause of the ERA Resolution was a valid and binding exercise of Congress's authority to set a deadline on ratification." *Ratification of the ERA* 25. And because "the deadline lapsed without ratifications from the requisite thirty-eight States," *id.*, the opinion concluded that the ERA has not been validly

adopted. Relying on that advice, the Archivist of the United States has not certified the adoption of the ERA or published it as part of the Constitution. *See* 1 U.S.C. § 106b.

**C. Factual and Procedural Background**

1. Plaintiffs are Jacqueline Fenore, Equal Means Equal, and Heroica Foundation. J.A. 4. As alleged in plaintiffs' complaint, Fenore is a female who "attempted to register for Selective Service" through the agency's website. J.A. 5-6. Her "registration was rejected solely because she is female." J.A. 6.

Equal Means Equal is "a project of Plaintiff Heroica Foundation," a nonprofit organization, that has a mission "to establish women's equality under the United States Constitution." J.A. 4. Plaintiffs have alleged that "[t]wo female members" of the organization "whose ages are between 18 and 25 attempted to register for Selective Service in March 2025, but their applications were rejected solely because they are female." J.A. 6.

In this suit, plaintiffs challenge the constitutionality of the male-only Selective Service registration requirement on two grounds. First, they claim that the requirement violates the ERA, which plaintiffs contend has been validly adopted. *See* J.A. 11-12. Second, they claim that the requirement violates the equal protection component of the Fifth Amendment. *See* J.A. 12-13.

2. The district court dismissed plaintiffs' complaint. The court explained its reasoning partly from the bench at the hearing on the government's motion to dismiss

and partly in a written opinion. First, at the hearing, the district court concluded, based on "controlling cases" of the Supreme Court, that the ERA had not been validly adopted. *See* Add. 38-39. The court thus dismissed plaintiffs' claim based on the ERA. Add. 39.

Second, in a written opinion, the district court concluded that Equal Means Equal failed to establish Article III standing. The court explained that, to establish associational standing, a plaintiff organization must demonstrate (among other things) "that at least one of its members has standing in her own right." Add. 10 (quotation omitted). And under this Court's precedents, "the organization claiming associational standing must 'identify' that member." *Id.* (quoting *Housatonic River Initiative v. U.S. EPA*, 75 F.4th 248, 265 (1st Cir. 2023)). Although plaintiffs alleged that two members of Equal Means Equal had been denied registration on the basis of their sex, plaintiffs "failed to name either member." Add. 9. The court thus dismissed without prejudice Equal Means Equal's claims for lack of standing. Add. 12.

Third, in the same opinion, the district court concluded that the Selective Service Act does not violate the Fifth Amendment under controlling precedent. The court explained that the Supreme Court had rejected that precise claim in *Rostker*. Add. 17. And although plaintiffs argued that "changed circumstances undercut the factual record on which the *Rostker* decision rests," Add. 18, the court concluded that it was "in no position to overrule binding Supreme Court precedent," Add. 19

(quoting *United States v. Diggins*, 36 F.4th 302, 311 (1st Cir. 2022)). The court thus dismissed Fenore's claim under the Fifth Amendment. *See* Add. 19-20.

## SUMMARY OF ARGUMENT

I. The district court properly held that Equal Means Equal has failed to establish the required elements of associational standing. One such requirement is that the association identify one or more members with standing in their own right. Here, Equal Means Equal has failed to properly identify—by name or other specific information—any member with standing. And indeed, Equal Means Equal has failed to establish that it even qualifies as a bona fine association or similar representative organization with members whom it may represent in court. Its claims were thus properly dismissed for lack of standing.

II. The district court properly dismissed plaintiffs' claim founded on the ERA. It is undisputed that the requisite number of States did not ratify the ERA before the expiration of the ratification deadline set by Congress. That ratification deadline was valid. The Supreme Court long ago recognized "the power of Congress . . . to fix a definite period for the ratification" of proposed amendments. *Dillon v. Gloss*, 256 U.S. 368, 375-76 (1921); *see also Coleman v. Miller*, 307 U.S. 433, 452 (1939) (similar). And in fixing the ERA's ratification period through the proposing resolution, Congress acted consistently with established practice. Because that deadline was valid, the ERA has not been properly adopted and plaintiffs may not advance a claim based on it.

III. The district court also correctly dismissed plaintiffs' Fifth Amendment claim as foreclosed by Supreme Court precedent. In *Rostker v. Goldberg*, 453 U.S. 57 (1981), the Supreme Court considered and rejected a challenge to the Selective Service Act's male-only registration requirement under the Fifth Amendment. The Supreme Court has not revisited or overruled that holding. And plaintiffs' assertion that relevant facts have changed since *Roster* provides no basis for deviating from the Supreme Court's directly on-point decision.

## STANDARD OF REVIEW

This Court "review[s] the grant of a motion to dismiss de novo." *Abdisamad v. City of Lewiston*, 960 F.3d 56, 59 (1st Cir. 2020) (quotation omitted).

## ARGUMENT

### I. The District Court Correctly Dismissed Equal Means Equal's Claims for Lack of Standing

An "association or similar representative organization may have standing" to proceed on behalf of its members "if at least one of its members has standing in his or her own right, the interests served by the suit are pertinent to the mission of the organization, and relief does not require the presence of the members in the suit." *Town of Norwood v. FERC*, 202 F.3d 392, 405-06 (1st Cir. 2000). The "burden to show standing is upon" the association, *id.* at 405, which must "clearly" "allege facts demonstrating" that Article III's requirements are met, *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (quotation omitted). Equal Means Equal has failed to allege

the necessary facts to establish associational standing twice over: it has not identified any specific members who would have standing in their own right, nor has it demonstrated that it is a bona fide association or similar representative organization. Its claims should thus be dismissed.

1. The district court correctly held Equal Means Equal has failed to establish associational standing because it has not named any member who has been injured by the Selective Service Act's male-only registration requirement. As the Supreme Court has explained, to establish standing, an association must "name the individuals who were harmed by the challenged" conduct; "[t]his requirement of naming the affected members" has been loosened "only where *all* the members of the organization are affected by the challenged activity." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498-99 (2009).

Thus, this Court has rejected attempts by associations to establish standing without "nam[ing] an injured individual." *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016). This Court has applied that requirement even when the association asserts that "many of its members" have an interest in the case, *id.*, and even when the association challenges a statute that directly regulates the association's members, *see id.* And this Court has recently reiterated the requirement, making clear that, for an association to establish standing, its complaint must "name a[] specific [associational] member

whose interests" are implicated by the challenged conduct. *Capen v. Campbell*, 134 F.4th 660, 667 (1st Cir. 2025).[3]

Here, plaintiffs failed to meet this burden. The only factual allegation in the complaint relating to Equal Means Equal's standing is that "[t]wo female members" of the organization "whose ages are between 18 and 25 attempted to register for Selective Service in March 2025, but their applications were rejected solely because they are female." J.A. 6. But that allegation fails to identify the allegedly injured members. It thus does not permit the government to test the veracity of the allegation or to probe, for example, the individuals' relationship to Equal Means Equal or the context and circumstances of their alleged attempt to register. Nor does it allow the government and the courts to know on whose behalf Equal Means Equal is proceeding and which specific individuals will thus be properly bound by any judgment in the case. The district court thus correctly held this allegation insufficient to meet plaintiffs' burden.

---

[3] Although this Court did not dismiss the associational plaintiff in *Capen* (as the district court observed, *see* Add. 11), that result was a function of the preliminary-injunction context: in general, the court's "conclusion that the plaintiff lack[s] standing on appeal from the grant of a preliminary injunction d[oes] not, of course, bar the plaintiff from seeking in the District Court to amend its complaint" to cure any defect. *Capen*, 134 F.4th at 668 (alteration and quotation omitted). This appeal, by contrast, is from a final judgment dismissing plaintiffs' complaint. There are thus no ongoing proceedings in district court, and plaintiffs' failure to establish the requirements of associational standing in district court is therefore determinative at least as to this suit. (The dismissal of its claims without prejudice does not, of course, preclude Equal Means Equal from filing a new suit with additional allegations to establish its standing.)

In response, plaintiffs do not dispute that they have failed to specifically identify any particular member who has been injured by the challenged statute. Nor do plaintiffs have much to say about *Draper* and *Capen*, both of which were cited by the district court. *See* Add. 10-11. Instead, plaintiffs initially state that "this court has not consistently required the naming of members," Br. 29, but plaintiffs identify no case in which this Court has permitted an organization to proceed on behalf of members that it has failed to identify. Beyond that, plaintiffs focus on distinguishing *Summers* on the facts. They state that *Summers* involved allegations only of future, rather than past, injury, and that the "failure" there was "that no actual person, named or unnamed, had been injured." Br. 29.

But *Summers* clearly articulated the relevant identification requirement in categorical terms, without confining it to the context of future injury. And this Court has thus properly applied that requirement even where an "actual person, named or unnamed, had been injured." Br. 29. Both *Draper* and *Capen*, for example, involved challenges to state statutes that had already taken effect and were thus restricting individuals' conduct. Those individuals plainly were injured by the challenged statutes—and, indeed, in both cases, this Court held that other, non-associational plaintiffs did have standing—but the organizational plaintiffs were still required to name specific injured members to establish associational standing.

2. Even beyond its failure to specifically identify an injured member, Equal Means Equal has also failed to establish its ability to proceed as an "association or

similar representative organization" at all. *Town of Norwood*, 202 F.3d at 405. Although an organization need not be "a traditional voluntary membership organization" to press claims in a representational capacity, it must have genuine "members" who "possess all of the indicia of membership in an organization." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977). Thus, the organization should have, for example, "a clearly articulated and understandable membership structure" with members who "elect[] the governing body" and otherwise direct or control the organization. *Friends of the Earth, Inc. v. Chevron Chem. Co.*, 129 F.3d 826, 829 (5th Cir. 1997). In a "real sense," the organization must "represent[]" those members and "provide[] the means by which they express their collective views and protect their collective interests." *Hunt*, 432 U.S. at 345.

Here, Equal Means Equal has not carried its burden of establishing its status as a bona fide representational organization. The entirety of plaintiffs' allegations on this score consist of the statement that Equal Means Equal "is a project of Plaintiff Heroica Foundation, a national 501(c)(3) organization." J.A. 4. Plaintiffs do not explain, for example, how its alleged members may join Equal Means Equal, how the organization structures its membership, or how the members direct or control the organization. Plaintiffs have thus failed to carry their burden of demonstrating that Equal Means Equal may properly proceed in a representational capacity at all. *Cf. Equal Means Equal v. Department of Educ.*, 450 F. Supp. 3d 1, 6 (D. Mass. 2020) (concluding that Equal Means Equal had not established the requisite indicia of

membership but instead has only "supporters" who it does not "represent" in "either form or substance").

## II. The District Court Correctly Dismissed Plaintiffs' ERA Claim

Plaintiffs' principal contention is that the Selective Service Act's male-only registration requirement violates the ERA. As the district court correctly concluded, this claim fails because the ERA has never been validly adopted. As plaintiffs recognize, the congressionally established deadline for state ratifications lapsed long before three-quarters of States voted to ratify the ERA. And plaintiffs cannot show that "the deadline was somehow invalid." *Ratification of the ERA* 12. Both courts of appeals to address similar contentions have rejected them. *See Valame v. Trump*, 157 F.4th 1172, 1173 (9th Cir. 2025) (per curiam); *Illinois v. Ferriero*, 60 F.4th 704 (D.C. Cir. 2023). This Court should agree and affirm the district court's dismissal.

### A. The ERA's Ratification Deadline Was Valid

1. When it submitted the ERA to the States, Congress included a seven-year ratification deadline in the proposing clause. H.R.J. Res. 208, 86 Stat. at 1523. As the Senate Judiciary Committee explained, such a "time limitation assures that ratification reflects the contemporaneous views of the people." S. Rep. No. 92-689, at 20; *see also Dillon v. Gloss*, 256 U.S. 368, 375 (1921) (similar). That deadline reflected a proper exercise of Congress's authority and, because the ERA was not ratified by a sufficient number of States before the deadline expired, it is not part of the Constitution.

Article V provides Congress with the express authority to select the "Mode of Ratification" for a proposed constitutional amendment. U.S. Const. art. V. The Supreme Court has long recognized that "the power of Congress . . . to fix a definite period for the ratification" of proposed amendments falls within the power to select the mode of ratification. *Dillon*, 256 U.S. at 375-76. Thus, in *Dillon*, a prisoner in custody for violating the National Prohibition Act argued that the Eighteenth Amendment was invalid on account of the seven-year ratification deadline imposed by Congress. *Id.* at 370-71. The Court rejected the argument, finding "no doubt" as to Congress's power to set such a limit "as an incident of its power to designate the mode of ratification." *Id.* at 376.

Eighteen years later, the Supreme Court confirmed that holding in *Coleman v. Miller*, 307 U.S. 433, 452 (1939). There, the Court considered the validity of Kansas's contested ratification of the Child Labor Amendment, which occurred more than 12 years after Congress had proposed the amendment. The challengers to the ratification contended that the proposed amendment "had lost its vitality through lapse of time and" thus "could not be ratified" 13 years later. *Id.* at 451. The Court rejected that argument. The Court explained that *Dillon* had "held that the Congress in proposing an amendment may fix a reasonable time for ratification." *Id.* But for the Child Labor Amendment, Congress had not provided a time limitation "either in the proposed amendment or in the resolution of submission." *Id.* at 452. And in the absence of Congress's exercising its "power to fix a reasonable time for ratification," the Court

determined that it would be improper for the Court to "take upon itself the responsibility of deciding what constitutes a reasonable time." *Id.* at 452-53. The Court thus held that Kansas's ratification was valid.

Those principles are further confirmed by the Supreme Court's decision that the controversy regarding ERA ratification became moot when the deadline (as extended by Congress) expired. *National Org. for Women, Inc. v. Idaho*, 459 U.S. 809, 809 (1982). In that case, the district court held that Idaho had validly rescinded its prior ratification of the ERA and that Congress lacked the power to extend the initial deadline set in the proposing clause. *Idaho v. Freeman*, 529 F. Supp. 1107, 1146-53 (D. Idaho 1981). The federal government and others then sought review in the Supreme Court, but the extended deadline expired while the case was pending in the Court.

The Acting Solicitor General urged the Court to dismiss the case as moot because "the Amendment has failed of adoption no matter what the resolution of the legal issues presented." Memorandum for the Administrator of General Services Suggesting Mootness at 3, *National Org. for Women*, 459 U.S. 809 (Nos. 81-1282 et al.). Citing that filing, the Court vacated the district court's judgment and remanded the case with instructions to dismiss the complaints as moot. *National Org. for Women*, 459 U.S. at 809. In doing so, the Supreme Court "necessarily decided," *Mandel v. Bradley*, 432 U.S. 173, 176 (1977) (per curiam), that the ERA failed of adoption because the ratification deadline had elapsed. Otherwise, the case would not have been moot, as additional States could have ratified the amendment.

2. Congress's decision to place the ERA's ratification deadline in the proposing clause, rather than the amendment's text, has no legal significance. The Supreme Court has never suggested that such a distinction matters. To the contrary, *Dillon* referred generally to a deadline in "the congressional resolution proposing the amendment." 256 U.S. at 370-71 (citation and quotation omitted). Similarly, *Coleman* specifically noted that in the proposed Child Labor Amendment, "[n]o limitation of time for ratification [was] provided . . . either in the proposed amendment or in the resolution of submission." 307 U.S. at 452. The Court's mention of both the amendment's text and the proposing clause again indicates its belief that a deadline contained in either one would have been effective.

Even putting aside those Supreme Court decisions, placing the deadline in the proposing clause is an "established practice" given how Congress proposed the Twenty-Third through Twenty-Sixth Amendments. *Ratification of the ERA* 3. By placing those deadlines in the amendments' proposing clauses, Congress sought to preserve the elegance of the Constitution's text by no longer "clutter[ing]" it "with extraneous sections imposing conditions on ratification that had no prospective effect." *Ratification of the ERA* 21. Members of Congress did not ascribe any substantive difference to the two types of deadlines. *See Constitutionality of ERA Extension*, *supra*, at 13 (noting that Congress moved the location "without ever indicating any intent to change the substance of their actions"); *see also Ratification of the ERA* 21-22, 21 n.18 (finding "no indication that Members of Congress (or any court)

seriously questioned the binding nature of a deadline stated in a resolution's proposing clause" in connection with the "Twenty-Third or any subsequent Amendment").

By placing the deadline in the ERA's proposing clause, Congress merely continued the practice it had begun with those previous amendments. By the time of the ERA, such language was accepted as part of "the traditional form of a joint resolution proposing a constitutional amendment for ratification by the States." S. Rep. No. 92-689, at 20. Even "principal congressional proponents of the ERA accepted addition of a seven year specification to the proposing clause" as "a 'customary' statute of limitations." Ruth Bader Ginsburg, *Ratification of the Equal Rights Amendment: A Question of Time*, 57 Tex. L. Rev. 919, 921 & n. 14 (1979) (citing 117 Cong. Rec. 35814-15 (1971) (remarks of Rep. Griffiths)).

More generally, Congress's use of the proposing clause in this way came within the context of an even longer-running practice of "placing ratification conditions in its proposing resolutions' prefatory language." *Virginia v. Ferriero*, 525 F. Supp. 3d 36, 57 (D.D.C. 2021). In the proposing clause of the first joint resolution submitting constitutional amendments to the States in 1789, Congress specified the mode of ratification and further invited the States to ratify the proposed amendments individually or as group. J. Res., 1 Stat. at 97. Congress has likewise "specified the mode of ratification in the proposing clause of every resolution proposing a constitutional amendment since then." *Ratification of the ERA* 19-20. That substantial

historical practice supports Congress's authority to exercise its power in this manner. *See The Pocket Veto Case*, 279 U.S. 655, 689 (1929) ("Long settled and established practice is a consideration of great weight in a proper interpretation of constitutional provisions of this character."); *see also Dames & Moore v. Regan*, 453 U.S. 654, 684 (1981) (relying on historical practice of less than 40 years).

Indeed, as noted, *Dillon* expressly linked Congress's power to impose a ratification deadline with the power to specify a mode of ratification. 256 U.S. at 376. Congress has consistently specified the mode of ratification in the proposing clause, and there is no reason to believe that Congress could not validly exercise the incidental authority of setting a deadline in the same manner.

**B. Plaintiffs' Contrary Arguments Are Unpersuasive**

In response, plaintiffs advance a hodgepodge of arguments why the ERA's ratification deadline should be disregarded and the ERA treated as part of the Constitution. None provides any firm basis for rejecting Congress's deliberate choice to include a deadline in the ERA proposal.

1. At the outset, plaintiffs contend (Br. 5-6, 12) that Article V permits Congress only to propose an amendment's text and determine the "mode of ratification"—which plaintiffs say is limited to choosing between "ratification by convention or legislative act." Br. 12. But that argument disregards *Dillon* and *Coleman*, which this Court is not free to do. And it disregards Congress's well-established practice of exercising its Article V authority to regulate the ratification process beyond simply

selecting ratification by convention or legislative act. As explained, Congress has done so since the Founding—and has specifically used that authority to set ratification deadlines for more than a century. These "traditional ways of conducting government . . . give meaning to the Constitution." *Mistretta v. United States*, 488 U.S. 361, 401 (1989) (alteration in original) (quotation omitted). This is true "even when that practice began after the founding era" and "even when the nature or longevity of that practice is subject to dispute," which this is not. *National Lab. Rels. Bd. v. Noel Canning*, 573 U.S. 513, 525 (2014).

Plaintiffs next attempt (Br. 7-8) to minimize the reasoning of *Dillon* as dictum, because the amendment at issue there was ratified by a sufficient number of States before the deadline expired. But the Court in that case "held that the Congress in proposing an amendment may fix a reasonable time for ratification." *Coleman*, 307 U.S. at 452. The claim in *Dillon* was that the amendment was "invalid" because it improperly included a ratification deadline. 256 U.S. at 370. The Supreme Court rejected that claim—and upheld the validity of the amendment—on the single ground that Congress has authority under Article V "to fix a definite period for the ratification" as "an incident of its power to designate the mode of ratification." *Id.* at 376. The Court's statement about Congress's authority was thus essential to its reasoning, even if the Court could have validly rejected the claim on the alternative grounds that plaintiffs propose. And even if the statements in *Dillon* (and *Coleman*) were technically dicta, this Court is "bound by the Supreme Court's considered dicta

almost as firmly as by the Court's outright holdings." *McCoy v. Massachusetts Inst. of Tech.*, 950 F.2d 13, 19 (1st Cir. 1991).

Plaintiffs make no more headway when they argue that this Court should disregard *Coleman* as "a plurality ruling" that held "only that Congress has authority to determine the reasonableness of the passage of time between proposal and ratification *if an amendment has no deadline*." Br. 8 n.5. In so arguing, plaintiffs misstate the posture and holding of *Coleman*. The relevant opinion is the "opinion of the Court," 307 U.S. at 435, not a plurality opinion. *See Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 804 n.13 (2015) (confirming that *Coleman* has "precedential weight" and that "Chief Justice Hughes' opinion" was for the Court); *cf.* J.A. 83 (pointing out plaintiffs' same error in their filings in district court). And the holding is that the courts may not—"in the absence of a limitation by the Congress"—set a ratification deadline. 307 U.S. at 452. As the opinion's discussion of *Dillon* makes clear, the Court's analysis proceeds from the premise that Congress may validly impose a deadline in the proposing resolution.

And plaintiffs' attempt to suggest (Br. 9-10) that *Dillon* and *Coleman* are undermined by the recent adoption of the Twenty-Seventh Amendment is unavailing. The key point reflected in *Dillon* and *Coleman* together is that Congress may set a reasonable ratification deadline but that, in absence of congressional action, the Court cannot impose a deadline. Congress did not include any ratification deadline in proposing what became the Twenty-Seventh Amendment. The Twenty-Seventh

Amendment's validity thus turns on the lack of congressional action to establish a ratification deadline, and nothing about that amendment undermines the permissibility of the ERA's ratification deadline.

2. Plaintiffs fare no better when they contend that Congress's placement of the ratification deadline in the proposing resolution, rather than the ERA's text, renders it invalid. As an initial matter, plaintiffs are wrong to rely on *Jacobson v. Massachusetts*, 197 U.S. 11, 22 (1905), which states only that the Constitution's preamble "has never been regarded as the source of any substantive power conferred on the government of the United States." That the Constitution's preamble contains no substantive grants of authority has no relevance to the question whether the ERA's proposing resolution—which was in fact voted on by both Houses of Congress—may contain enforceable restrictions on the ratification process.

Indeed, plaintiffs undermine their own argument when they admit (as they must) that Congress has always specified the mode of ratification in the proposing resolution, rather than in the amendment's text. Br. 11-12. As explained, it is only natural that Congress would validly exercise its authority to set a ratification deadline—which is an incident of its authority to regulate the mode of ratification—in the same way. *See Illinois*, 60 F.4th at 719. And plaintiffs' attempt to draw a distinction between the mode and the deadline on the ground that the former is procedural while the latter is substantive is unavailing. For one, even on its own terms, it is unclear that plaintiffs are correct—many deadlines, such as those in litigation, are often treated as

procedural rather than substantive. *See Monsalvo v. Bondi*, 604 U.S. 712, 730 (2025). And regardless, whatever the merits of "the procedural/substantive distinction" that plaintiffs propose as a matter of "policy," Article V's "text does not draw any lines between procedural and substantive" regulations of the mode of ratification. *Id.*

Plaintiffs fare no better when they contend that permitting Congress to include a ratification deadline "disrupts the balance of power between Congress and the States." Br. 10; *see also* Br. 13. Article V balances the relevant federal and state powers by assigning to Congress the authority to set the mode of ratification, and the Supreme Court has long held that the authority to set a ratification deadline is a valid incident to Congress's express Article V power, as explained. Nor are plaintiffs correct to suggest (Br. 11-12) that ratifying States voted only on the amendment's text and not on the deadline. States vote to ratify proposed amendments under the conditions—including the mode of ratification and timing—established in the proposing clause, which are committed by Article V to Congress. Regardless, to the extent it is relevant, 30 of the 35 States "that ratified the ERA by 1977 voted on an instrument of ratification" that either quoted or referenced the deadline. *Virginia*, 525 F. Supp. 3d at 60.

Finally, plaintiffs assert that perhaps "some members of Congress were troubled by the ERA's deadline" and "may have insisted that it be placed" in the proposing resolution "to facilitate its defeat in future litigation." Br. 14. But plaintiffs offer no support for that assertion. To the contrary, as explained, by the time the

ERA was proposed, ratification deadlines were common to include in the proposing resolution, and even the ERA's proponents accepted the inclusion of the deadline as appropriate. And regardless, plaintiffs nowhere explain how their speculation about the private motivations of "some members of Congress" could bear on the question whether the deadline reflects a proper exercise of Congress's authority.

* * *

Plaintiffs additionally contend that States may not properly rescind their ratifications, Br. 17-19, and that the ERA would mandate strict-scrutiny review of plaintiffs' claims regarding the constitutionality of the Selective Service Act, Br. 19-21. Because the ERA was not validly adopted before the deadline, neither of these questions is properly presented for resolution by this Court. Should this Court reverse the district court's judgment, that court should have the first opportunity to address any remaining threshold and merits arguments regarding the ERA's status. *See Singleton v. Wulff*, 428 U.S. 106, 120 (1976) (noting the "general rule" that "a federal appellate court does not consider an issue not passed upon below"); *see also* Dkt. No. 9, at 15-16 (arguing that the efficacy of attempted rescissions is non-justiciable).

## III. The District Court Correctly Dismissed Plaintiffs' Fifth Amendment Claim as Foreclosed by Binding Precedent

As the district court correctly held, plaintiffs' claim that the Selective Service Act's male-only registration requirement violates the Fifth Amendment is foreclosed

by binding Supreme Court precedent. Plaintiffs provide no basis to disregard that holding, which squarely forecloses their claim.

Plaintiffs claim that the male-only registration requirement is unlawful sex discrimination under the Fifth Amendment. The Supreme Court has already rejected that precise claim in *Rostker v. Goldberg*, 453 U.S. 57 (1981). In *Rostker*, the Supreme Court explained that the question presented was whether the Selective Service Act "violates the Fifth Amendment" by requiring the registration of men and not women. *Id.* at 59. The Court specifically held "that Congress acted well within its constitutional authority when it authorized the registration of men, and not women," and reversed the contrary judgment of the district court. *Id.* at 83.

Unless and until the Supreme Court overrules *Rostker*, this Court remains bound by that holding. *See, e.g.*, *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023) ("If a precedent of this Court has direct application in a case . . . a lower court should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." (quotation omitted)); *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.").

In response, plaintiffs suggest that "*Rostker* may be disregarded because the underlying facts have changed"—and, in particular, because women may now serve in

combat roles in the military, which they could not do at the time of *Rostker*. Br. 28. But federal courts of appeals cannot "engage in anticipatory overruling of Supreme Court precedent" even if "factual developments may appear to have significantly undermined the rationale for an earlier holding." *Newman v. Wengler*, 790 F.3d 876, 880 (9th Cir. 2015) (per curiam) (alteration and quotation omitted).

Indeed, the Fifth and Ninth Circuits have both recognized as much in recent litigation involving similar claims about the Selective Service Act. The Fifth Circuit thus held that, although certain facts had changed since *Rostker*, the plaintiffs' sex-based equal protection claims were nevertheless foreclosed because federal courts could not "ignore a decision from the Supreme Court unless directed to do so by the Court itself." *National Coal. for Men v. Selective Serv. Sys.*, 969 F.3d 546, 549 (5th Cir. 2020) (per curiam) (quotation omitted). The Supreme Court denied certiorari shortly thereafter. *National Coal. for Men v. Selective Serv. Sys.*, 141 S. Ct. 1815 (2021). In a statement concurring in the denial of certiorari, Justice Sotomayor, joined by Justices Breyer and Kavanaugh, acknowledged that "[t]he role of women in the military has changed dramatically since" *Rostker* but explained that denial was still appropriate in light of Congress's continued consideration of the report of the National Commission on Military, National, and Public Service regarding the future of the Selective Service System. *Id.* at 1816 (Sotomayor, J., respecting the denial of certiorari). But even given those factual developments, no Justice suggested that the Fifth Circuit erred in following *Rostker*'s holding.

More recently, in *Valame*, the Ninth Circuit agreed that "Fifth Amendment claims challenging the [Selective Service Act's] male-only registration requirement" remain "foreclosed by binding Supreme Court precedent." 157 F.4th at 1173. The Supreme Court recently denied certiorari, with no noted dissents or separate opinions. *See Valame v. Trump*, No. 25-1259, 2026 WL 1780172 (U.S. June 22, 2026).

It is therefore appropriate to reject plaintiffs' sex-based equal protection challenge under *Rostker* without further inquiry. *See Elgin v. U.S. Dep't of the Treasury*, 641 F.3d 6, 24 (1st Cir. 2011) (Stahl, J., concurring) ("[I]t would not be for this court to determine what, if any, impact these [factual] developments had on the continued vitality of *Rostker*, a task left solely to the Supreme Court.").

Separately, plaintiffs contend at length (Br. 21-27) that the Supreme Court's precedents holding that sex-based classifications must be reviewed through the lens of intermediate scrutiny under the Fifth Amendment are themselves "unconstitutional." Br. 21; *see* Br. 21-27. Plaintiffs thus "urge this Court to write an opinion (or even a well-placed footnote) criticizing intermediate scrutiny as unconstitutional - recognizing it as women's *Plessy* - and urging the Supreme Court to reignite" strict scrutiny for sex-based classifications. Br. 27. As plaintiffs appear to recognize, however, their contention is foreclosed by "binding precedent." Br. 26. It thus provides no basis for reversing the district court's dismissal of plaintiffs' Fifth Amendment claim.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

LEAH B. FOLEY
*United States Attorney*

THOMAS PULHAM

*s/ Sean R. Janda*
SEAN R. JANDA
*Attorneys, Appellate Staff*
*Civil Division, Room 7260*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3388*
*sean.r.janda@usdoj.gov*

September 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 7642 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Sean R. Janda*
Sean R. Janda